THE LAW FIRM OF RAVI BATRA, P.C.
142 Lexington Avenue
New York, NY 10016
Michael W. Kennedy, Esquire
Ravi Batra, Esquire (*pro hac vice*)
(212) 545-1993
(212) 545-0967 (fax)

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

---

IN TOUCH CONCEPTS, INC., d/b/a ZCOM,

         *Plaintiff,*

     -against-

(1) CELLCO PARTNERSHIP d/b/a
VERIZON WIRELESS, (2) TOM
VERGHESE, (3) RYAN BROOMES,
(4) JORGE VELEZ, (5) ANTHONY
FIOCCO, (6) BRUNO PAVLICEK, (7) AJAY
BHUMITRA; (8) SHELLY BHUMITRA, (9)
POONAM SAWNHEY; and, (10)
JOHN/JANE DOE CELLCO PARTNERSHIP
d/b/a VERIZON WIRELESS PERSONNEL
## 1-10, so named as their identities have yet to
be established,

        *Defendants*

---

CASE No. 12 Civ. 00542 (PGS) (TJB)

**<u>ORAL ARGUMENT IS
REQUESTED</u>**

MOTION DAY: 9/4/2012

# PLAINTIFF'S BRIEF IN OPPOSITION
# TO ALL DEFENDANTS'
# MOTIONS TO DISMISS

*On the brief*:

      Ravi Batra, Esquire (*pro hac vice*)
      Todd B. Sherman, Esquire (*of the bars of the
      State of New York and Southern and Eastern
      Districts of New York*)

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

PRELIMINARY STATEMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

COUNTER STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

ARGUMENT IN OPPOSITION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

POINT I:      UNDER SETTLED LEGAL PRINCIPLES,
              ZCOM'S FIRST AMENDED COMPLAINT
              STATES CAUSES OF ACTION  . . . . . . . . . . . . . . . . . . . . . . .  26

POINT II:     VZW FAILED TO ACT IN GOOD FAITH OR FAIRLY . . . . . . .  30

              ● PUBLIC POLICY AND FAIRNESS
                DICTATES THAT THE IMPLIED
                COVENANT OF GOOD FAITH AND
                FAIR DEALING CANNOT BE WAIVED . . . . . . . . . . . .  32

POINT III:    THE VZW DEFENDANTS' TORTIOUSLY
              INTERFERED WITH ZCOM'S CONTRACTS
              WITH ITS "SUB AGENTS" . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

POINT IV:     ZCOM HAS ADEQUATELY PLED FRAUD AND
              MISREPRESENTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

POINT V:      THE DEFENDANTS TORTIOUSLY INTERFERED
              WITH ZCOM'S PROSPECTIVE BUSINESS
              RELATIONSHIPS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

POINT VI:     VZW BREACHED ITS CONTRACT WITH ZCOM  . . . . . . . . . .  43

              ● VZW BREACHED THE CONTRACT BY
                FAILING TO PROVIDE NOTICE OF ITS
                INTENT TO SUE AND TO PROVIDE ZCOM
                WITH AN OPPORTUNITY TO NEGOTIATE  . . . . . . . . .  43

- ZCOM'S COUCHING OF ITS "FOR CAUSE" TERMINATION OF ZCOM AS "WITHOUT CAUSE" WAS IN BAD FAITH - AS IT WAS DEVISED TO EVADE JUDICIAL REVIEW OF THEIR MISCONDUCT ........................ 44

- VZW'S FAILURE TO ACT IN GOOD FAITH AND FAIRLY WAS A BREACH OF CONTRACT ..... 45

POINT VII:    THE "ECONOMIC LOSS DOCTRINE" IS INAPPLICABLE TO THIS CASE ........................ 46

POINT VIII:   ALL OF THE DEFENDANTS SPREAD VICIOUS LIES ABOUT ZCOM, RENDERING THEM LIABLE FOR INJURIOUS FALSEHOOD .......................... 47

POINT IX:     VZW HAS BEEN UNJUSTLY ENRICHED VIA ITS MALICIOUS ACTS TOWARDS ZCOM .................. 50

POINT X:      IN THIS ACTION, THE COURT HAS JURISDICTION OVER ALL OF THE PARTIES .......................... 50

POINT XI:     VERGHESE'S MOTION TO STRIKE MUST BE DENIED ......................................... 54

CONCLUSION ................................................... 56

# TABLE OF AUTHORITIES

**Federal Cases**

*904 Tower Apartment LLC v. Mark Hotel LLC,*
— F.Supp.2d. —,  2012 WL 1075854 (S.D.N.Y. Mar. 29, 2012) . . . . . . . . . . . 38

*Allied Corp. v. Frola*, 701 F. Supp. 1084 (D.N.J. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 1-2

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009) . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Averbach v. Rival Mfg. Co.*, 809 F.2d 1016 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . 1, 42

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-27

*Blockbuster, Inc. v. Galeno*, 472 F.3d 53 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 51

*Coll. Of Dental Surgeons Of Puerto Rico v. Connecticut Gen. Life Ins. Co.,*
585 F.3d 33 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*D'Agostino v. Appliances Buy Phone, Inc.*, 2011 WL 4345674
(D.N.J. September 15, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*D'Annunzio v. Ayken, Inc.*, 2012 WL 2906248 (E.D.N.Y. July 17, 2012) . . . . . . . . . . . 49

*E.E.O.C. v. Univ. of Pennsylvania*, 850 F.2d 969 (3d Cir. 1988),
*aff'd*, 493 U.S. 182 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Eisai Co., Ltd. v. Teva Pharmaceuticals USA, Inc.,*
629 F. Supp. 2d 416 (D.N.J. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546 (2005) . . . . . . . . . . . . . . 53

*Farina v. Nokia Inc.*, 625 F.3d 97, 114 (3d Cir. 2010)
*cert. denied*, — U.S. —, 132 S. Ct. 365 (2011) . . . . . . . . . . . . . . . . . . . . . . . 53-54

*Fishoff v. Coty Inc.*, 634 F.3d 647(2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Fowler v UPMC Shadyside*, 578 F3d 203 (3d Cir 2009) . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Gaia House Mezz, LLC v. State St. Bank & Trust Co.*, — F.Supp.2d —,
    2012 WL 1530385 (S.D.N.Y. April 30, 2012) . . . . . . . . . . . . . . . . . . . . . . . . 30-31

*Garlanger v. Verbeke*, 223 F. Supp.2d 596 (D.N.J. 2002) . . . . . . . . . . . . . . . . . . . . 55

*Granovsky v. Pfizer, Inc.*, 631 F. Supp. 2d 554 (D.N.J. 2009) . . . . . . . . . . . . . . . . 52-53

*Harrison Research Laboratories, Inc. v. HCRAmerica, LLC*,
    2010 WL 5343197 (D.N.J. Dec. 20, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Holk v. Snapple Beverage Corp.*, 575 F.3d 329 (3d Cir. 2009) . . . . . . . . . . . . . . . . . . 6

*Honeywell Int'l Inc. v. Int'l Union, United Auto., Aerospace & Agr.*
    *Implement Workers of Am.*, 2011 WL 6293032
    (D.N.J. December 16, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Hotel St. George Associates v. Morgenstern*, 819 F. Supp. 310
    (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Johnson v. Anhorn*, 334 F.Supp.2d 802 (E.D.Pa.2004) . . . . . . . . . . . . . . . . . . . . . . . 55

*Kalika v. Stern*, 911 F. Supp. 594 (E.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Kaye v. Grossman*, 202 F.3d 611(2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Keating v. Pittston City*, 446 F. App'x 492 (3d Cir. 2011) . . . . . . . . . . . . . . . . . . . . 1-2

*King Pharmaceuticals, Inc. v. Corepharma, LLC*, 2010 WL 1850200
    (D.N.J. May 7, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Mareno v. Jet Aviation of Am., Inc.*, 970 F.2d 1126 (2d Cir. 1992) . . . . . . . . . . . . . . . 3

*Mazzola v. Roomster Corp.*, — F.Supp.2d. —, 2012 WL 1019124
    (S.D.N.Y. Mar. 26, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Medlin v. Boeing Vertol Co.*, 620 F.2d 957 (3d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . 54

*Mkt. St. Assocs. v. Frey*, 941 F.2d 588 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . 33-34

*Nami v. Fauver*, 82 F3d 63 (3d Cir 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520 (2d Cir.2004) . . . . . . . . . . . 30

*Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Prisco v. State of New York*, 1996 WL 596546 (S.D.N.Y. Oct. 16, 1996) . . . . . . . . . . 41

*Pullman Co. v. Jenkins*, 305 U.S. 534 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Revell v. Port Auth. of New York, New Jersey,* 598 F.3d 128 (3d Cir.2010) . . . . . . . . . 26

*Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Seawright v. Greenberg*, 233 F. App'x 145 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . 53

*Shah v. Hyatt Corp.*, 425 F. App'x 121(3d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Simington v. Lease Fin. Group, LLC,*  2012 WL 651130
          (S.D.N.Y. Feb. 28, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Sparig v. Danenberg*, 2012 WL 2564231 (E.D.N.Y. June 29, 2012) . . . . . . . . . . . . . . 42

*State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94
          (E.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Stern v. Cosby*, 645 F.Supp.2d 258 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Stiefvater Real Estate, Inc. v. Hinsdale*, 812 F.2d 805 (2d Cir. 1987) . . . . . . . . . . . . . . 3

*Tonka Corp. v. Rose Art Indus., Inc.*, 836 F. Supp. 200 (D.N.J. 1993) . . . . . . . . . . . . . 55

*Trace Services, Inc. v. Am. Meter Co.*, 141 F.R.D. 47 (W.D. Pa. 1992) . . . . . . . . . . . . . 3

*Ventimiglia v. Tishman Speyer Archstone-Smith Westbury, L.P.,*
          588 F. Supp. 2d 329 (E.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010),
          *cert. denied*, — U.S. —, 132 S. Ct. 98 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Westmoreland Hosp. Ass'n v. Blue Cross of W. Pennsylvania,*
          605 F.2d 119 (3d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

**New York State Cases**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
  98 N.Y.2d 144, 773 N.E.2d 496 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*ARB Upstate Communications LLC v. R.J. Reuter, L.L.C.*,
  93 A.D.3d 929, 940 N.Y.S.2d 679 (3d Dept. 2012) . . . . . . . . . . . . . . . . . . . . . . 38

*Banco Popular N. Am. v. Lieberman*, 75 A.D.3d 460, 905 N.Y.S.2d 82
  (1ˢᵗ Dept. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Burrowes v. Combs* 25 A.D.3d 370, 808 N.Y.S.2d 50 (1ˢᵗ Dept. 2006) . . . . . . . . . . . . . 36

*Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 488 N.E.2d 828 (1985) . . . . . . . . . . 41

*City of Syracuse v. R.A.C. Holding, Inc.*, 258 A.D.2d 905,
  685 N.Y.S.2d 381 (4ᵗʰ Dept 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 663 N.E.2d 289 (1995) . . . . . . . . . . . 30-31

*Dialcom, LLC v. AT & T Corp.*, 20 Misc. 3d 1111(A), 867 N.Y.S.2d 16
  (Sup. Ct. Kings Cty. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*El Entm't U.S. LP v. Real Talk Entm't, Inc.*, 85 A.D.3d 561,
  925 N.Y.S.2d 472 (1ˢᵗ Dept. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.*, — A.D.3d —, — N.Y.S.2d —,
  2012 WL 3024000 (2d Dept. July 25, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Forman v. Guardian Life Ins. Co. of Am.*, 76 A.D.3d 886,
  908 N.Y.S.2d 27 (1ˢᵗ Dept. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Frankini v. Landmark Const. of Yonkers, Inc.*, 91 A.D.3d 593,
  937 N.Y.S.2d 80 (2d Dept. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Galvin Bros., Inc. v. Town of Babylon*, 91 A.D.3d 715,
  936 N.Y.S.2d 563 (2d Dept. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Glazier v. Harris*, 95 A.D.3d 538, 944 N.Y.S.2d 75 (1ˢᵗ Dept. 2012) . . . . . . . . . . . . . . . 49

*Graubard Mollen Dannett & Horowitz v. Moskovitz*,
    86 N.Y.2d 112, 653 N.E.2d 1179 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Jered Contracting Corp. v. New York City Transit Auth.*,
    22 N.Y.2d 187, 239 N.E.2d 197 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-39

*JP Morgan Chase v. J.H. Elec. of New York, Inc.*,
    69 A.D.3d 802, 893 N.Y.S.2d 237 (1st Dept. 2010) . . . . . . . . . . . . . . . . . . . . . . 44

*Kevin Spence & Sons, Inc. v. Boar's Head Provisions Co., Inc.*,
    5 A.D.3d 352, 774 N.Y.S.2d 56 (2nd Dept. 2004) . . . . . . . . . . . . . . . . . . . . . . . 42

*Kosowsky v. Willard Mountain, Inc.*, 90 A.D.3d 1127,
    934 N.Y.S.2d 545 (3d Dept. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413,
    668 N.E.2d 1370 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Lampert v. Edelman*, 24 A.D.2d 562, 261 N.Y.S.2d 450 (1st Dept.1965) . . . . . . . . . . . . 47

*Lansco Corp. v. Strike Holdings LLC*, 90 A.D.3d 427,
    933 N.Y.S.2d 666 (1st Dept. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Liberman v. Gelstein*, 80 N.Y.2d 429, 605 N.E.2d 344 (1992) . . . . . . . . . . . . . . . . . . . . 49

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*,
    41 A.D.3d 269, 838 N.Y.S.2d 536 (1st Dept. 2007) . . . . . . . . . . . . . . . . . . . . . . 31

*Marine Midland Bank v. John E. Russo Produce Co., Inc.*,
    50 N.Y.2d 31, 405 N.E.2d 205(1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Matter of Kaszirer*, 298 A.D.2d 109, 747 N.Y.S.2d 502 (1st Dept. 2002) . . . . . . . . . . . 32

*McGhee v. Odell*, 96 A.D.3d 449, 946 N.Y.S.2d 134 (1st Dept. 2012) . . . . . . . . . . . 44-45

*Merzon v. Lefkowitz*, 289 A.D.2d 142, 735 N.Y.S.2d 106 (2001) . . . . . . . . . . . . . . . . . . 32

*Orix Credit Alliance, Inc. v. E. End Dev. Corp.*, 260 A.D.2d 454,
    688 N.Y.S.2d 191(2d Dept. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Outback/Empire I, Ltd. P'ship v. Kamitis, Inc.*, 35 A.D.3d 563,
    825 N.Y.S.2d 747(2d Dept. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*People v. Greenberg*, 95 A.D.3d 474, 946 N.Y.S.2d 1 (1st Dept. 2012) . . . . . . . . . . . . . 41

*Pludeman v. N. Leasing Sys., Inc.*, 10 N.Y.3d 486, 890 N.E.2d 184 (2008) . . . . . . . . . . 39

*P.T. & L. Contracting Corp. v. Trataros Const., Inc.*,
    29 A.D.3d 763, 764, 816 N.Y.S.2d 508 (2d Dept. 2006)  . . . . . . . . . . . . . . . . . . . 45

*Richbell Info. Services, Inc. v. Jupiter Partners, L.P.*,
    309 A.D.2d 288, 765 N.Y.S.2d 575 (1st Dept. 2003)  . . . . . . . . . . . . . . . . . . . 31-32

*Scott v. Fields*, 92 A.D.3d 666, 938 N.Y.S.2d 575 (2d Dept. 2012) . . . . . . . . . . . . . . . . 38

*Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 720 N.E.2d 892 (1999) . . . . . . . . . . . . . 37

*Sound Refrigeration & Air Conditioning, Inc. v. All City Testing & Balancing Corp.*,
    84 A.D.3d 1349, 924 N.Y.S.2d 172 (2d Dept. 2011)  . . . . . . . . . . . . . . . . . . . . . . 46

*Ullmannglass v. Oneida, Ltd.*, 86 A.D.3d 827, 927 N.Y.S.2d 702
    (3d Dept. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*US Express Leasing, Inc. v. Elite Tech. (NY), Inc.*, 87 A.D.3d 494,
    928 N.Y.S.2d 696 (1st Dept. 2011)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Washington Avenue Assoc. Inc. v. Euclid Equip. Inc.*,
    229 A.D.2d 486, 645 N.Y.S.2d 511 (2d Dept. 1996)  . . . . . . . . . . . . . . . . . . . . . . 36

*White Plains Coat & Apron Co., Inc. v. Cintas Corp.*,
    8 N.Y.3d 422, 867 N.E.2d 381 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36-37

*Williams v. Williams*, 23 N.Y.2d 592, 246 N.E.2d 333 (1969) . . . . . . . . . . . . . . . . . . . . 49

**Connecticut Cases**

*Rhode Island Hosp. Trust v. Martin Trust*, 6 Conn. L. Rptr. 75
    (Conn. Super. Ct. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*T.D. Bank, N.A. v. Nutmeg Investments, LLC*, 50 Conn. L. Rptr. 714
(Conn. Super. Ct. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Town of New Hartford v. Connecticut Res. Recovery Auth.*,
42 Conn. L. Rptr. 101 (Conn. Super. Ct. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 33

## Federal Statutes

Fed. R. Civ. P. 9(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 43, 52

Fed. R. Civ. P. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4

Fed. R. Civ. P. 15(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

28 U.S.C. § 1332(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

28 U.S.C. § 1332(d)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

28 U.S.C § 1332(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

28 U.S.C. § 1404(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

28 U.S.C. § 1447(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

28 U.S.C.§ 1453 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

28 U.S.C. § 1711(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

## New York State Statutes

C.P.L.R. Art. 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

N.Y. U.C.C. § 1-102(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**Other Sources**

Josh Kosman, *Verizon pre-paid tangle, New York Post*, September 28, 2011,
   http://www.nypost.com/p/news/business/verizon_pre_paid_tangle_
   0colc0vovmONO2g0mkY7mK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48-49

Sandra K. Miller, *What Fiduciary Duties Should Apply to the LLC
   Manager after More than a Decade of Experimentation?*,
   32 J. Corp. L. 565 (2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34

## PRELIMINARY STATEMENT

Plaintiff In Touch Concepts d/b/a Zcom ["Zcom"] respectfully submits this brief in opposition to the motions to dismiss made by each defendant: Cellco Partnership d/b/a Verizon Wireless ["VZW"], Jorge Velez ["Velez"], Ryan Broomes ["Broomes"], Bruno Pavlicek ["Pavlicek"], Anthony Fiocco ["Fiocco], Tom Verghese ["Verghese'] (collectively the "VZW defendants")[1], Shelly Bhumitra ["Shelly"], Poonam Sawnhey ["Poonam"] and Ajay Bhumitra ["Ajay"]. Notwithstanding that the defendants are keenly aware that they have individually and collectively harmed Zcom, such that Zcom's business was destroyed and several hundred people lost their jobs as a result, the defendants brazenly seek relief from this Court claiming that the fact rich amended complaint does not provide enough detail. We respectfully disagree, particularly considering that a complaint cannot be considered "deficient in failing to allege the self-evident. . ." *Averbach v. Rival Mfg. Co.*, 809 F.2d 1016, 1020 (3d Cir. 1987).

However, if the Honorable Court determines that more factual detail is needed, we respectfully submit that the factual details that the defendants urge are "missing" can be provided. Accordingly, should the Court find any deficiency with Zcom's amended complaint, leave to further amend pursuant to Fed. R. Civ. P. 15(a)(2), so as to insert the factual details that the defendants urge are lacking is respectfully sought. *See e.g. Keating*

---

[1] The VZW defendants are all jointly represented, except for Verghese who was terminated by VZW and is represented by separate counsel. Upon information and belief, VZW is indemnifying Verghese and providing for his defense.

*v. Pittston City*, 446 F. App'x 492, 495 (3d Cir. 2011); *Allied Corp. v. Frola*, 701 F. Supp. 1084, 1093 (D.N.J. 1988).

At the outset it ought be noted that references by the jointly represented VZW defendants, along with Shelly and Poonam, to a threatened motion by VZW pursuant to Fed. R. Civ. P. 11, are unbecoming and perhaps frivolous in and of themselves - and further evidence the bad faith and litigation misconduct that these defendants are willing to embrace.   The purpose of the "safe harbor" is to avoid painting a prejudicial picture of an adversary, while also not needlessly burdening the Court.  So much for the "safe harbor" and proper procedure for these defendants.  Critically, however, the defendants paint a wholly unbalanced picture, that is factually false.

To be clear, Zcom's amended complaint was NOT the result of VZW's threats to move for Rule 11 sanctions.  To the contrary, Zcom had <u>previously</u> discussed amendment of its complaint with counsel for all defendants at a telephone conference before Magistrate Judge Bongiovanni on February 23, 2012, and a schedule was set for proffering proposed amendments in an effort to seek consent to file pursuant to Fed. R. Civ. P. 15(a)(2), memorialized in a Consent Order of February 28, 2012 (Docket # 32), amended by Consent Order of March 27, 2012 (Docket # 35), and again by application granted on May 1, 2012 (Docket # 36).   VZW did not threaten a Rule 11 motion until March 26, 2012, when they were already well aware that Zcom was amending.

Additionally, while in the best of faith Zcom accepted some, but not all of VZW's requests, this was not our of "<u>fear</u>."  Indeed, Zcom rejected VZW's demands and filed its amended complaint despite same.  So much for "fear."  To the contrary, it was in the interests of streamlining the litigation in the spirit of judicial efficiency.  Notably, all defendants ultimately consented to Zcom's interposition of its first amended complaint.

Moreover, it is respectfully submitted that VZW's threatened motion was itself "dead on arrival."   Firstly, there was nothing frivolous about the complaint as filed in State Court.  Furthermore, and rather critically, "Rule 11 has no retrospective application to a complaint filed in state court even if the action subsequently is removed to federal court." *Mareno v. Jet Aviation of Am., Inc.*, 970 F.2d 1126, 1128 (2d Cir. 1992).  *See also Kalika v. Stern*, 911 F. Supp. 594, 605 (E.D.N.Y. 1995).

Here, Zcom filed the complaint initiating this action in New York State Supreme Court.  It was the jointly represented VZW defendants who removed the action to federal court (Docket #1), and ultimately had the matter transferred from the Southern District of New York ["SDNY"] to the District of New Jersey ["DNJ"].  The prohibition on sanctioning a plaintiff pursuant to Rule 11 "is especially true where defendants have removed the case from state court to federal court." *Hotel St. George Associates v. Morgenstern*, 819 F. Supp. 310, 321 (S.D.N.Y. 1993), *citing, Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir.1986), *Stiefvater Real Estate, Inc. v. Hinsdale*, 812 F.2d 805, 809 (2d Cir. 1987). *See also Trace Services, Inc. v. Am. Meter Co.*, 141 F.R.D. 47, 49 (W.D. Pa. 1992). Accordingly, VZW's proposed Rule 11 motion was itself frivolous.

## COUNTER STATEMENT OF FACTS

Zcom maintained a long standing agency relationship with wireless communications behemoth VZW, spanning back to approximately 1990, wherein Zcom was authorized to sell VZW branded products and services  (Amend. Comp. ¶¶ 34, 236).  Zcom was so successful in the proper performance of its obligations under the agreement that VZW expanded Zcom's authority to allow Zcom to enlist other entities, vetted and approved by VZW, to market and sell VZW products and services under the Zcom brand name (Amend. Comp. ¶¶ 35).  As Zcom had the agreement with VZW, they were colloquially referred to as the "Master Agent," while the entities working under Zcom's authority were known as "sub agents" (Amend. Comp. ¶ 228). Ultimately, Zcom had approximately 150 store locations around the United States, most of which were sub agents.  Moreover, Zcom was the largest VZW Master Agent in the New York metropolitan area, comprising approximately 25% of VZW's agent based activations (Amend. Comp. ¶ 34).   During Zcom's tenure as a Master Agent, the vast majority of wireless network access sales and activations were for subscription based, "postpaid" VZW plans (Amend. Comp. ¶¶ 8, 238-241).

The Master Agreement between VZW and Zcom (Amend. Comp. Ex. 4), is not the product of negotiation in its drafting.  Rather, the only negotiation between VZW and Zcom was in obtaining VZW's consent to market and sell their products and services, rates of compensation, and obtaining authority to enlist sub agents who were approved by VZW, at "approved by VZW" locations.  The "structural" terms and conditions of the Master

4

Agreement were, however, on a "take it or leave it" basis.  The Master Agreement was drafted by, or on behalf of VZW, and Zcom had no input into its construction.  For example: VZW illegally imposed clauses eliminating the implied covenant of good faith and fair dealing (*Id.* at §10.2) coupled with a "no cause" termination (*Id.* at § 8.9) - a deadly combination it turns out when misused by VZW in practice.

Through directly controlled corporate entities, Shelly, owner of "Reachout Wireless, Inc." and Poonam, owner of "American Candy, Inc." were granted Zcom sub agencies, with VZW's consent, as a favor by Zcom's now President, Vikas Dhall ["Vikas"], to Shelly's brother Ajay, a self-proclaimed "godfather" of the cellular activation industry, and owner of a network of *AT&T Wireless* and *Sprint Nextel* activation agencies (Amend. Comp. ¶ 8).  Zcom  and Vikas did not know that when they permitted Shelly, Poonam and their companies to become "sub agents" to Zcom, they had always planned to act as Ajay's "Trojan Horse" inside of the Zcom "family," seeking to destroy Zcom from within so that Ajay could either take over Zcom's business, aided by defendant Verghese, a VZW District Manager with "jurisdiction" over Zcom, whom Ajay, Shelly and Poonam bribed and corrupted to their intended benefit - or, with Zcom's failure, a significant competitor of Ajay's would be eliminated (Amend. Comp. ¶¶ 8-9, 107, 117, 122, 354-362, 648-683).

Such bribes included Shelly ostensibly paying for Verghese to attend a trade show in Europe, along with Vikas.  Critically, as part of his scheme, and to divert attention from himself, Shelly suggested that Vikas use Shelly's travel agent, on the guise that upgrades could be arranged.  In turn, that travel agent used Vikas' credit card number to book Vikas'

airfare, and - without permission or authority - that of Verghese.   Shelly was thus able to

use this deceit to his own advantage by informing Verghese that he had arranged for his

travel,[2] and then misleadingly reporting to VZW that Zcom and Vikas  had improperly paid

for Verghese's travel - in breach of VZW's ethics policies, to benefit Ajay (Amend. Comp.

¶¶ 378, 735).

Ajay, Shelly and Poonam 's bribes to defendant Verghese were an incentive to have

VZW "freeze" Zcom's then ongoing year-to-year new store growth (Amend. Comp. ¶¶ 8-9,

107, 117, 122, 354-362, 478, 648-683).  Pursuant to VZW policy, Verghese - in his

capacity as a VZW District Manager - had to approve any new store within the Zcom

"family" prior to the application moving up the "ladder" at VZW.  Accordingly, as a result

of the bribes provided to Verghese by Shelly, Poonam and Ajay, Verghese became an

corrupted impenetrable dam that unjustly curtailed ITC's growth, while minimizing

competition for Ajay's ranging network (*Id.*).[3]

In or about 2008 - 2009, after the business relationship between Zcom and

VZW was again renewed for another 5-year term (Amend. Comp. ¶ 5; Ex. 4), VZW began to

heavily promote the marketing and sale of "prepaid" wireless service activations (Amend.

Comp. ¶ 9).   This enabled VZW to spike their numbers of activations, which is a significant

_____

[2]Indeed, close friends Shelly and Verghese even arrived at J.F.K. airport together (*see e.g.*
Amend. Comp. ¶¶ 57, 378, 735)

[3]Notably, while Zcom's growth was thwarted by VZW, by way of the corrupted Verghese,
Ajay's competing network continued to grow - such that Shelly was operating Sprint Nextel activation
agencies under Ajay's umbrella, in competition with Zcom and VZW, and in violation of Zcom's
contract with Shelly and Reachout Wireless.

measure of the success of wireless providers in the national cellular carrier industry, made up of VZW, *AT&T Wireless, Sprint Nextel* and *T-Mobile USA* (Amend. Comp. ¶ 9).  In an effort to increase the "spiked" activation figures, VZW embarked on a scheme which, in substance, required the activating agents to market prepaid service for "emergency use" - thus, the "selling point" was that the service was available to the customer "just in case" (Amend. Comp. ¶¶ 9, 27, 265, 288-290, 293, 308, 311, 517-519, 589-593).    VZW's scheme required the activating agent to outlay the cost for the prepaid service  "out of pocket," with a <u>false</u> promise of compensation from VZW that would more than make up for the agent's costs (Amend. Comp. ¶¶ 5, 9, 19-29, 52-53, 60-62, 70-72, 78-80, 86, 95, 118, 121, 132, 139, 146, 156, 165, 167, 170, 174-176, 182-189, 188-190, 198-199, 204-205, 210-211, 216-217, 219, 251-340, 348, 361, 363-368, 372, 376, 459-462, 496-522, 529-551, 573-610, 616-643, 654-656, 833-835).

Based upon the compensation guidelines for Zcom, as unilaterally set by VZW, the marketing and sale of prepaid services was generally a loss for Zcom (Amend. Comp. ¶¶ 9, 388, 463-468).   When a prepaid account was legitimately activated by a Zcom sub agent, Zcom only retained a meager portion of the commission for itself, with the bulk going to the sub agent (*Id.*).  Moreover, such activations did <u>not</u> provide for the payment of residuals over time to Zcom or its sub agents.  Furthermore, notwithstanding that it was VZW mandating that Zcom and its network of sub agents continuously intensify their prepaid activations, VZW did not count such activations towards the "minimum performance" requirements that VZW unilaterally established for Zcom (*Id.*).  Thus, while VZW was

directing Zcom to aggressively focus on the marketing and sale of VZW branded prepaid products and services - for VZW's own gain, and the gain of its personnel, it simultaneously deprived Zcom of any performance credit or residual income (*Id.*).   The pre-paid scheme was therefore a "bitter pill" for Zcom, while great for VZW - and its enhanced stock price and profits, lifted up by higher "spiked" activation figures.

VZW's scheme was multifaceted, involving misleading Zcom, its sub agents, and its end user customers on multiple fronts.   As designed and implemented by VZW, the scheme involved the activation of cellular telephones ostensibly for use with prepaid VZW branded wireless services.   However, in accordance with VZW's scheme, these phones were either: (i) already owned by customers who had intended to discard them upon upgrading to newer equipment; (ii) already discarded by customers who had upgraded to newer equipment;[4] or, (iii) provided by VZW, pre-loaded with an amount of "air time" "minutes" - with a short "shelf-life"[5] before expiration, as unilaterally determined by VZW (Amend. Comp. ¶¶ 5, 9, 19-29, 52-53, 60-62, 70-72, 78-80, 86, 95, 118, 121, 132, 139, 146, 156, 165, 167, 170, 174-176, 182-189, 188-190, 198-199, 204-205, 210-211, 216-217, 219, 251-340, 348, 361, 363-368, 372, 376, 459-462, 496-522, 529-551, 573-610,

---

[4]Phones that customers intended to discard, or did discard upon an upgrade, were referred to by VZW as "Customer Provided Equipment" or "CPE."

[5]Short "shelf-life" means that VZW got paid for "air time" minutes, which were very high priced, and as they did not "roll over," VZW got paid for their non-use.   Profit galore for VZW.

616-643, 654-656, 833-835).[6]

VZW, by way of its personnel in direct contact with Zcom and its sub agents, including defendants Verghese, Velez and Broomes, demanded that Zcom and its sub agents aggressively sell prepaid plans by telling the customers that: (i) they could have an "emergency" phone for pennies a day; (ii) they would "credit" the customer's putative "activation fee" of $25.00; (iii) an existing phone would be activated as a "pre-pay" account where the customer does not have to sign any contract; and, (iv) they were running a promotion wherein the agent would "give" the customer $45.00 worth of "air time" to use. By VZW's own design, these end user customers - who were dealing with Zcom and its own branded sub agents - not directly with VZW - were not informed that the prepaid air time minutes were at the most expensive rates charged, most commonly twenty-five cents per minute.  Moreover, these customers were also not informed that the prepaid "air time" minutes that were supposedly being "given" to them would expire in 30 days (Amend. Comp. ¶¶ 256, 264-267, 296, 313-318, 332, 519, 527-551, 578).

VZW represented to Zcom, and its sub agents directly, that they would be compensated via a $40.00 commission on each prepaid activation, along with a $20,00 incentive, colloquially known as a "spiff," for each prepaid activation.  VZW further directed Zcom, and its sub agents directly, that they were to activate the prepaid accounts

---

[6]The heavy promotion of prepaid products and services along with CPE activation began in or about November 2009, although there was promotion of same which predated that.  Such promotion continued until in or about April - May 2010 when VZW began pushing VZW branded cellular phones "bundled" with prepaid air time minutes.

by crediting them with $15.00 and that after the first thirty days the accounts were to be

replenished by the Zcom activating agent with $30.00 on behalf of the customer (hence,

$45.00 for VZW from Zcom directly or via its sub agent).  VZW additionally assured Zcom

and its sub agents that the one-time replenishment was all that was required in order to

ensure that the prepaid phone remained active for at least 180 days, thus avoiding "charge

backs" of commissions.  That it was VZW who was the force behind the aggressive forced

marketing and sale of VZW branded prepaid products and services with CPE, is

conclusively evidenced by e-mails that VZW designated as "confidential," emphasizing the

push - along with potential penalties to Zcom and its sub agents for failure to comply

(Amend Comp. ¶¶ 268-276, 334-336, 340, 387, 462, 529-537; Exs. 15-20).[7]  VZW's

ability to punish was rooted in VZW's contract-enshrined violation of New York's public

policy which requires every contract to have the implied covenant of good faith and fair

dealing.

　　　With wholesale fraudulent intent, VZW did not inform Zcom, or its sub agents that

the prepaid activations mandated by VZW were devised with a "self-destruct" mechanism

designed to minimize the actual expenses incurred by VZW, while fraudulently enhancing

their own bottom-line (Amend. Comp. ¶¶ 277-280).

---------------------------------

　　　[7]A May 19, 2009 e-mail from John Coyle, then a District Manager for VZW - who lost his job
with VZW ostensibly because of his involvement with the prepaid scheme - to Zcom,  indicated that
VZW sought to implement a plan to financially hurt stores that were allegedly underperforming (Amend.
Comp. Ex. 17).

Furthermore, neither Zcom, nor its sub agents, were informed by VZW that "test calls" had to be made from the prepaid phone at the time of activation to prevent premature deactivation by VZW.   The scheme was such that if the prepaid phone was not used for "test calls" at the time of activation, or otherwise used by the end user customer within 150 days, the account would deactivate within 150 days, 30 days shy of the minimum activation period for commissions to be retained by Zcom, or its sub agents.   Thus, the customer and activating agent were led to believe that they had a phone available for a future emergency - when in fact, then unbeknownst to Zcom after 150 days the phone would be deactivated (Amend. Comp. ¶¶ 9, 277, 286, 291-293, 311, 516, 627).

Moreover, Zcom and its sub agents were falsely led to believe that the $40.00 commissions would be paid on all prepaid activations pursuant to VZW's "program;" however, a crux of the fraud was VZW's intention not to really compensate its activating agents.  Thus, while some commissions were paid out by VZW, a large percentage of nearly 40% were later "charged back" because of VZW's "self-destruct"  (Amend. Comp. ¶¶ 9, 268-301, 307, 309-311, 321, 331, 363-365, 464, 512-520, 550-552, 577, 583-610).

The VZW prepaid activation scheme was thus designed to permit VZW and its personnel the benefits of newly activated accounts, while depriving Zcom, and its family of sub agents of their commissions on said activations.  This worked to VZW's advantage because on the day that a new prepaid number was activated VZW could claim a new activation in its head to head competition with its competitors, and in its advertising in pursuit of new customers (*Id.*).

11

Notwithstanding the unilateral "self destruct," VZW was always paid for each prepaid account. Within a day after the initial activation of a prepaid phone, VZW would receive payment from Zcom of approximately $13.20 for each prepaid activation (the "Master Agent" discounted rate for $15.00 worth of prepaid "air time"). Thereafter, within 45 days of the initial activation, VZW would receive another payment from Zcom of approximately $26.40 (the "Master Agent" discounted rate for $30.00 worth of prepaid "air time"). Accordingly, within 45 days, VZW would receive $39.60 from Zcom for each prepaid account activated. All of these funds, whether for an account activated by Zcom - or a sub agent - were paid to VZW by Zcom, as all financial transactions between VZW and the Zcom "family" went directly through Zcom (*Id.*).

In furtherance of its scheme, VZW imposed strict minimum prepaid activation requirements on Zcom and its sub agents - and threatened sanctions when such were not met (Amend Comp. ¶¶ 268-276, 334-336, 340, 387, 462, 529-537; Exs. 15-20). At the same time, VZW employees informed Zcom and its sub agents, *inter alia*, that participation in the prepaid program was "do or die" for VZW personnel, master agents, and "sub agents" (Amend. Comp. ¶¶ 5, 9, 19-29, 52-53, 60-62, 70-72, 78-80, 86, 95, 118, 121, 132, 139, 146, 156, 165, 167, 170, 174-176, 182-189, 188-190, 198-199, 204-205, 210-211, 216-217, 219, 251-340, 348, 361, 363-368, 372, 376, 387, 459-462, 496-522, 529-551, 573-610, 616-643, 654-656, 833-835). VZW's insistence, including the "do or die" mantra, is irrefutably evidenced by a December 4, 2009 recorded conversation between defendant Jorge Velez, then an VZW account manager, and Zcom sub agent Sandeep

12

"Sunny" Girhotra ("Sunny"). During that conversation, the entirety of which is transcribed within the amended complaint (Amend. Comp. ¶ 462), Velez, on behalf of VZW, makes clear that participation in VZW 's push of prepaid activation, albeit "shady" was required, that without such activations people would lose their jobs and that participation was "do or die. (*Id.*). Moreover, Velez further reported that his "general" was Verghese and that Verghese, and "bosses' bosses," which would have to include Patrick Devlin, VZW's President of its New York Metro region, were demanding more prepaid account activations (*Id.*).

VZW's heavy push of the prepaid activation program, along with the greed of Shelly and his Reachout Wireless, along with Poonam and her American Candy,[8] resulted in Shelly and Poonam activating an inordinately large number of prepaid accounts, including vast amounts in fictitious customer names, including Berkshire Hathaway head Warren Buffett, Hollywood stars Julia Roberts and Robin Williams, co-founder of Apple Computer, the late Steve Jobs and Russian leader Vladimir Putin (Amend. Comp. ¶¶ 9, 306, 325, 348, 252, 511, 521, 528, 577, 654-655, 732; Ex. 11). These fraudulent activations initially caused Shelly and Poonam's corporate entities to be compensated for activations they did not really perform and were in direct breach of their contracts with Zcom. Moreover, these fraudulent activations were further "payment" to Verghese, whose performance within

---

[8]As sub agents, Shelly and Poonam, and their companies, like their principal, Zcom, were unaware of VZW's secret self-destruct feature.

13

VZW appeared better because of the significant activation growth at the behest of the Shelly and Poonam, acting with and for Ajay (*Id.*).

Zcom internally detected what appeared to be fictitious prepaid account activations and expeditiously reported same to VZW, who were, ironically, the root cause of the problem - as VZW, by way of its management personnel, including defendants Verghese, Velez and Broomes, as well as John Coyle, were directly coercing Zcom sub agents to make such fictitious activations.   Moreover, in a further effort to prevent future fraud, and root out any preexisting fraud, in or about November 2009 Zcom implemented a comprehensive anti-prepaid fraud program with a protocol for identifying and preventing such fraud, and imposing repercussions for participating in same (Amend. Comp. ¶¶ 327, 337-338, 523, 527; Ex. 13).  Of course, Zcom could not police VZW, the fraud-source and fraud-pusher.   To further cover up their own fraud and deceit, VZW outwardly commended Zcom for its fraud detection and prevention, while instructing Zcom to continue to deter prepaid activation fraud; however, at the same time VZW personnel were surreptitiously in direct contact with Zcom's sub agents <u>coercing</u> them to commit the very prepaid activation fraud that Zcom was trying to thwart (*Id.*)!

In partial response to the inordinate growth in prepaid activations - ultimately traceable to Shelly, Poonam and their companies, VZW sent internal corporate security personnel, defendants Pavlicek and Fiocco to Zcom.  During interviews at Zcom's corporate offices in Nassau County, New York, Pavlicek and Fiocco were informed that Zcom was being victimized by the misconduct of VZW and its employees, including

Verghese Velez and Broomes who were all actively involved in the fraudulent prepaid "do or die" push.  Furthermore, Pavlicek and Fiocco were provided with evidence substantiating Zcom's complaints, and disproving even the notion that Zcom was involved in wrongdoing. Unfortunately for Zcom, VZW arbitrarily and in bad faith ignored the facts and instead fabricated their own in an effort to cover up its own misconduct (Amend. Comp. ¶¶ 8-9, 25-28, 52-54, 64, 70, 78, 85-88, 95-97, 123, 372-390, 403, 429-437, 554-560, 569, 613, 646, 684, 712, 717-726; Exs. 5-6, 9-13).

Thereafter, Shelly and Poonam, acting with and for Ajay, fed false information to VZW to further hurt Zcom.[9]  VZW, after a sham investigation which was really devised to whitewash VZW's orchestration and implementation of the prepaid scheme, while sending a message to its agents to "get with the program or be terminated," ultimately wrongfully, in bad faith and unfairly, arbitrarily and capriciously passed blame onto Zcom for the misconduct of Shelly, Poonam, Ajay, VZW's own internal policies and procedures regarding prepaid activations, and VZW's own personnel, including Verghese, Velez and Broomes (*Id.*).

---

[9]In a further effort to harm Zcom, Shelly bribed Raymond Patterson, then a Zcom employee, who has since been terminated, in order to have Patterson take proprietary trade secret materials belonging to Zcom and disclose them to Shelly - which Patterson did via e-mail.  Furthermore, a self described "Anonymous Benefactor" - whose identity remains unknown to Zcom and Vikas - advised Zcom and Vikas of the theft, and provided documentary proof of same, including e-mail transmissions of the stolen data  (Amend. Comp. Ex. 10 at 000019-000023)- and e-mails which confirmed communications between Shelly and Pavlicek (Amend. Comp. Ex. 10 at 000006-000010, 000045-000047).

In the worst of faith, by letter dated July 26, 2011, VZW sought to terminate its

agency relationship with Zcom effective January 31, 2012 ("Termination Letter") (Amend.

Comp. Ex. 5) because:

      a.     Zcom would not cooperate in a scheme instituted and orchestrated

by VZW and its personnel which involved mass activations of prepaid cellular phone

services, under false pretenses, to artificially inflate the quantity of new account

activations that VZW, could claim; and,

      b.     after VZW's heavily increased prepaid activations came into

question, Zcom actively resisted being VZW's scapegoat, such that VZW fabricated false

claims of "misconduct" by Zcom in an effort to steer attention and blame away from

VZW's own wrongdoing.

By the termination letter VZW falsely alleged that the termination was generically made,

"without cause" and " for 'no cause';" however, VZW added that they had "grounds for a

'with cause' termination." In "support" of their "grounds" for "cause," VZW referred to the

very prepaid scheme that they implemented and forced upon Zcom and its sub agents, under

threats of business loss and financial ruin. Furthermore, VZW "invented" bad acts that they

sought to fraudulently attribute to Zcom, <u>falsely claiming</u> not only that Zcom had initiated

VZW's own "prepaid" activation scam, with financial benefit to VZW from such scam, but

also <u>falsely asserting</u> that Zcom:

a.      intentionally paid for Verghese's European trip - when VZW knew full well that it was Shelly who had arranged same, and Verghese drove up to J.F.K. airport with Shelly;

b.      issued a $20,000.00 to $30,000.00 mortgage to VZW manager John Coyle, when no such mortgage or loan had ever been made, nothing of the type was ever publically recorded, and the records of all bank accounts associated with Zcom, and Vikas confirmed that no such transaction ever occurred as there simply no monies paid/given to Coyle, ever;

c.      improperly gifted $1,000.00 - by check - to then VZW account manager Chris Malenda, notwithstanding that the monies were a *wedding gift* for 4 invited guests to Malenda's wedding (2 of whom actually went and 2 who *R.S.V.P.'d* and whose plate settings were paid for but did not show up), and the wedding cost approximately $230.00 per person, in "hard" and "soft" costs, such that the only "gift" would have been $20.00 per *R.S.V.P.* person given, as the remainder went to cover the costs of the event consumed by the guests attending;

d.      fraudulently sought to obtain commissions for distribution of VZW branded pre-paid cellular phones which were to be given away to customers as part of an VZW incentive promotion, notwithstanding that Zcom provided documentary proof that it had, in fact, provided all of these cellular instruments to New York based non-profit

17

organization(s) for use, as needed, by, *inter alia*, autistic kids who were residents of a non-profit facility (Amend. Comp. Ex. 12).

(Amend. Comp. ¶¶ 6-7, 9, 13, 29, 55, 378, 404-414, 557-560, 804-813).

In the best of faith Zcom continuously and repeatedly sought to have VZW reconsider its termination of Zcom, an they steadfastly refused, wholly failing to even meet to negotiate. While Zcom offered proof to VZW of the falsity of the allegations that VZW relied upon in terminating Zcom, as VZW fabricated evidence to begin with it is hardly surprising that they were not interested in the truth, much less evidence that would disprove their falsehoods:

      a.     on July 27, 2011, Vikas sent an e-mail to VZW's Pino Salonna asking "can we talk?;"

      b.     on August 18, 2011, after receiving the Termination Letter, Vikas formally wrote to VZW in a good faith effort to have them reconsider (Amend. Comp. Ex. 5 at 000004);

      c.     VZW responded by letter of August 24, 2011 refusing and declining any negotiation, albeit, accepting the implied covenants of good faith and fair dealing despite VZW's bad faith drafted non-enforceable exclusions from same at Section 10.2 of their contract with Zcom (Amend. Comp. Ex. 4 at § 10.2; Ex. 5 at 000005 - 000006);

       d.      By e-mail dated August 30, 2011, Zcom proposed three options for the future of Zcom: (i) restructuring Zcom's corporate governance with outside independent directors; (ii) merging Zcom with another VZW approved Master Agent; and/or, (iii) selling Zcom's stores to a VZW Master Agent (Amend. Comp. Ex. 5 at 000007-000009);

       e.      By e-mail of September 16, 2011, VZW made clear that VZW was not interested in the truth, documentary evidence or the first two options that Zcom proposed; and that Zcom's third option was the only option they would consider (Amend. Comp. Ex. 5 at 000010) as VZW did not want Zcom or Vikas any longer as a VZW agent!  VZW wished to sweep VZW's own corrupt "pre-paid" fraud scam under the rug and defalcate Zcom's business enterprise and contractual rights, in bad faith and unfairly. (Amend. Comp. ¶¶ 220, 438-457, 559, 688).

     <u>Zcom's "Chamberlain" efforts with VZW</u>: Once VZW made clear that they had drawn a line in the sand, Zcom sought to obtain VZW's assistance with an exit strategy that would protect itself and its sub agents, while still being beneficial to VZW.  In turn, VZW directed Zcom to sell its operations.  Accordingly, Zcom found ready, willing, and able buyers, all of whom were already in business with VZW and were pre-approved as Master Agents to operate VZW branded retail stores with sub agents working under them. Critically, all of Zcom's locations, including each of its sub agents' stores, had been vetted and approved by VZW as well an easy marriage.  Notwithstanding Zcom's efforts to comply with VZW's demands, in a persistence of their bad faith and unfair dealing, for months they

thwarted every prospective sale - unilaterally imposing conditions subsequent - and steadfastly refusing to permit Zcom's sub agents to continue in operation with a new Master Agent.   Only on the cusp of the termination becoming effective on January 31, 2012 did VZW consent to the sale of a minuscule fraction of the Zcom "family."  (Amend. Comp. ¶¶ 438-457).

The Amended Complaint contains documentary evidence, in the form of e-mail traffic, which confirms Zcom's good faith attempts to sell to three different pre-approved VZW Master Agent purchasers, and VZW's tortious bad faith interference with same (Amend Comp. Ex. 7).[10]

a.      Zcom's attempts to sell to "prospective buyer # 1" and VZW's defendants' tortious interference with same, is evidenced by e-mails (Amend. Comp. Ex. 7 at 000001 - 000014).  Critically, evidencing VZW's malice, on or about October 8, 2011, "prospective buyer # 1" informed Zcom that VZW was showing Zcom's locations and facilities to other agents for what appeared to be a take over of the entirety of Zcom without paying any consideration to Zcom, thus, this was VZW's planned and malicious defalcation of Zcom's 150 store distribution network..  Zcom followed this up with an e-

_____

[10]The identities of who the first two prospective purchasers were was not disclosed in the amended complaint in the spirit of compliance with non-disclosure agreements.  Nevertheless, VZW is well aware of who these entities are, and via the e-mail traffic appended as Exhibit 7 to the complaint, the times and dates of occurrences are also reported.  Thus, the complaint is highly particularized - and the prospective buyers are well identified.  The third buyer, United Telecom, is identified, as at least some of the proposed sales were approved by VZW on the "eve" of VZW's wrongful termination of Zcom becoming effective.

mail of that date (Amend. Comp. Ex. 7 at 000003).  After "prospective buyer # 1" then

asked VZW for preliminary approval to take over as Master Agent for Zcom's locations

(Amend. Comp. Ex. 7 at 000004), on October 12, 2011, VZW asserted a need to

"independently evaluate" each location - which had already been vetted and approved by

VZW  and in long standing operation.  VZW further arbitrarily announced a refusal to

permit any buyer of Zcom to buy any sub agent locations - eviscerating Zcom's Fair Market

Value (Amend. Comp. Ex. 7 at 000005).  On October 14, 2011, Zcom e-mailed VZW

regarding VZW's attempts to "dismember" and "steal" Zcom - evidenced by VZW's

retention of a real estate firm to "show" Zcom's 65 Long Island New York based locations

(Amend. Comp. Ex. 7 at 000007 - 000009).  On November 10, 2011, VZW reiterated its

arbitrary "need" to re-approve any locations prior to any sale even being considered by

VZW - thus thwarting any chance of a productive transaction with "prospective buyer 1"

(Amend. Comp. Ex. 7 at 000014);

       b.    Zcom's attempts to sell to "prospective buyer # 2" and VZW's

defendants' tortuous interference with same, is also evidenced by e-mails (Amend. Comp.

Ex. 7 at 000015 - 000032).  After a series of prior e-mail communications between

prospective buyer # 2 and Zcom, the prospective purchaser indicated delay by VZW in

responding to a proposal for a sale of locations (Amend. Comp. Ex. 7 at 000021 - 000027).

Thereafter, on November 29, 2011, the prospective buyer wrote indicating that VZW would

only consider a finalized deal (Amend. Comp. Ex. 7 at 000028).  Thus, VZW demanded that

the parties agree to all terms before they would even indicate if the deal was even possible -

as VZW demanded to approve each part of the transaction.   Thereafter, further evidencing

VZW's malicious plan to "steal" Zcom and redistribute it, on December 13, 2011,

"prospective buyer # 2" e-mailed Zcom and indicated that it would be acquiring Zcom

stores regardless of a deal - clearly indicating VZW's "back room" direct dealing with

"prospective buyer # 2" - yet the buyer, with greater good faith than VZW, still sought to

meet with Zcom and reach an agreement (Amend. Comp. Ex. 7 at 000029-000032).

Nevertheless, as "prospective buyer # 2" was aware that it could obtain Zcom's stores

directly through VZW, any deal involving Zcom was successfully thwarted by VZW

(VZW's arbitrary and bad faith refusal to consent to any transfer killed such deal, and

Zcom's stores shortly after January 31, 2012 were all available to VZW to re-appoint

directly as many new "master agents" - thus stealing Zcom's sub agents;

        c.     Zcom's Efforts to Sell to Prospective Buyer # 3, United Telecom

["UT"], were severely hampered by VZW, as also evidenced by e-mails (Amend Comp. Ex.

7 at 000033 - 000050).  UT engaged in e-mail correspondence with VZW, on or about

December 15, 2011, indicating that a deal was near finalized and advising that they only

sought to purchase sub agent locations"that have a proven track record over the years."

(Amend Comp. Ex. 7 at 000033-000035).  Moreover, UT further indicated a willingness to

make sub agents a part of UT in the event that VZW would not permit the entities to

function as sub agents (*Id.*).   In the worst of faith, VZW replied on December 22, 2011

mendaciously urging that notwithstanding efforts to comply with VZW's own demands, UT,

Zcom and VZW were "going around in circles," while falsely claiming that UT and Zcom

had not provided requested information - which had <u>already</u> been provided (Amend Comp.

Ex. 7 at 000036 - 000037).   Thereafter, notwithstanding that UT was crystal clear in its

representation that it would take over Zcom sub agents outright and even make them

corporate owned UT stores, while Zcom was equally clear as to its authority to sell the sub

agents to UT outright, VZW further "played games" with Zcom, baldly claiming that prior

communications were not clear enough (Amend Comp. Ex. 7 at 000040- 000041).

Nevertheless, in the best of faith, Zcom again wrote to VZW to confirm and clarify its

authority to sell the sub agent locations to UT (Amend Comp. Ex. 7 at 000042 - 000043).

     <u>Only 10 Out Of 71 Store Deal Approved by VZW</u>:   VZW continued its malicious

conduct toward Zcom such that on January 17, 2012 VZW, 2 weeks before Zcom's

authority to market and sell VZW branded products and services was to evaporate, VZW

advised Zcom and UT that <u>out of 71 locations</u> that were part of the deal between Zcom and

UT, they were <u>only approving the transfer of 10</u> Zcom corporate affiliates on Long Island -

and rejecting 17 Zcom corporate affiliates and ignoring the remaining 54 sub agent

locations whom Zcom obtained authority to transfer to UT.  In the worst of faith,

notwithstanding that Zcom had full authority to act on behalf of its sub agents that were part

of the prospective deal, VZW disingenuously claimed that they were not even considered

because Zcom had not provided any "statement or proof" of its ability to convey those

locations.  Of course, VZW wholly ignored the "plain as day" language in Zcom's January

16, 2012 e-mail, where Zcom indicated that VZW should consider that communication as

written confirmation of Zcom's authority.  That the sub agents had agreed to sell and be

23

acquired by UT as part of its corporate owned entity was also of no moment to VZW. Thus, to be absolutely clear, Zcom had authority to convey all 54 sub agent locations identified in attachments which were provided to VZW - and which VZW had acknowledged receipt (Amend Comp. Ex. 7 at 000044 - 000045).

(Amend. Comp. ¶¶ 447-453).

VZW's refusal to approve sales of Zcom stores prior to the January 31, 2012 deadline set by VZW itself was arbitrary, unfair and in bad faith. The proof of same is in the facts: after Zcom's doors were shuttered on January 31, 2012, VZW rushed to sell off many of the same locations, including to buyers who Zcom had negotiated with and VZW refused to approve. In addition, VZW granted direct Master Agent or Agent authority to Zcom's former "sub agents," thereby successfully defalcating Zcom's business enterprise, in bad faith, and to Zcom's huge loss. Thus, these refusals were not a business decision to exercise a contractual right. To the contrary, they were a malicious and unlawful abuse of contractual discretion aimed at defalcating Zcom's business for free (Amend. Comp. ¶¶ 454-457).

Further evidencing VZW's bad faith, while Zcom was feverishly working to comply with VZW's "take it or leave it" directive to attempt to sell its business, VZW, despite (a) contractual pre-suit conditions precedent demanding notification of a controversy and good faith negotiations in an effort to resolve any dispute prior to commencing "any court case" - drafted into the contract by VZW itself (Amend Comp. Ex. 4 at §§ 14 - 14.2); and, (b) knowing full well that Zcom had placed VZW on actual notice that it would sue them

absent a good faith resolution (Amend Comp. Exs. 7-8), on November 4, 2011 rushed to this Court and commenced an improper anticipatory action sounding in Declaratory Judgment seeking this Honorable Court's "blessing" of their misconduct.  See *Cellco Partnership d/b/a Verizon Wireless v. In Touch Concepts d/b/a Zcom Wireless*, 11 Civ. 6493 (PGS) (TJB).

The pre-suit conditions that VZW itself wrote into the contract of adhesion with Zcom mandated that if either party to the agreement sought to commence any "court case" arising out of the agreement, they were mandated to first provide written notice to the other party and a fifteen day window for negotiation.  VZW provided <u>no</u> pre-suit notice, <u>nor</u> did it negotiate.  These are contractual terms that VZW is bound by.  They did not comply with them and falsely re-assured the Court that VZW's general allegations pursuant to Fed. R. Civ. P. 9(c) were made in good faith, because they refuse to simply admit the truth, and concede their failure, Zcom, forced to combat same in the face of VZW's sharp litigation, is being continuously damaged by way of delayed merit-based dispute resolution, disbursements, fees and expenses.  This is a breach of the contract by VZW (Amend. Comp. ¶¶ 762-780).  The irony, of course, is that what VZW did to Zcom, VZW boldly dares to do so in Court - with its General Counsel present and silent.

## ARGUMENT IN OPPOSITION

### POINT I

### UNDER SETTLED LEGAL PRINCIPLES, ZCOM'S FIRST AMENDED COMPLAINT STATES CAUSES OF ACTION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009).    Furthermore,  when considering a motion to dismiss, the Court must "accept as true the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor." *W. Penn Allegheny Health Sys., Inc. v. UPMC,* 627 F.3d 85, 91 (3d Cir. 2010), *cert. denied,* — U.S. —, 132 S. Ct. 98 (2011), *citing, Revell v. Port Auth. of New York, New Jersey,* 598 F.3d 128, 134 (3d Cir.2010).

Given that Zcom's fact rich first amended complaint "adequately put the defendants on notice of the essential elements of the plaintiffs' cause[s] of action" *(Nami v. Fauver,* 82 F3d 63, 65 (3d Cir 1996)), it is sufficient.   Accordingly, the Court must construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 334 (3d Cir. 2009) (emphasis added).  The Court's "'plausibility' determination will be 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Fowler v UPMC Shadyside*, 578 F3d 203, 211 (3d Cir 2009), *quoting, Iqbal*, 129 S.Ct. at 1949. Moreover, even if Zcom's complaint "is not as rich with detail as [the defendants] might

26

prefer, it need only set forth sufficient facts to support plausible claims." *Fowler*, 578

F.3d at 211-212, *citing, Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 at fn. 8 (2006).

     Zcom's complaint, replete with specific instances of wrongdoing - individually and

collectively - by the defendants, most certainly meets even the heightened post *Twombly*

and *Iqbal* pleading standards.   Accordingly, it is respectfully submitted that the defendants'

motions to dismiss must all be denied.

     Notwithstanding Zcom's well pled complaint, the defendants come to this

Honorable Court and claim that Zcom's pleading, which itself contains transcribed

statements from a recorded conversation of defendant Jorge Velez, then an account

manager for defendant Verizon Wireless, telling a Zcom "sub agent" that participation in

VZW's "shady" scheme was "do or die" is not particularized enough.   Furthermore, the

same scheme is described throughout the complaint in detail sufficient enough to permit

the defendants, and the Court, to be aware of the specific allegations.   In substance, in an

effort to enhance its new account activation figures by way of "prepaid" accounts - which

the customer really wasn't paying for:

       a.     VZW required Zcom and its "sub agents" to market and sell

"prepaid" wireless services to customers under the guise of the service being available for

"emergency" use;

       b.     the "prepaid" services were to be activated with funds out of Zcom

and/or its "sub agents" own pockets;

      c.      VZW assured Zcom and its "sub agents" that the out of pocket expenditures would be reimbursed by way of a $40.00 commission payment and a $20.00 incentive payment, colloquially referred to as a "spiff;"

      d.      Zcom and its "sub agents" detrimentally relied on VZW's assurances and paid out extensive funds with the expectation that they would recoup their monies, at a profit;

      e.      VZW never intended to actually pay much of the commissions, and instead, without informing Zcom and its "sub agents," VZW unilaterally terminated "prepaid" accounts which had not been used within 150 days of activation, notwithstanding that such accounts were marketed for "emergency use;"

      f.      once VZW self-destructed these accounts, they then "charged back" all of the commission money that they paid out - and VZW made a profit in the non-used "air time" sold: either $19.60 or, later, after April 2010, $6.40 (Amend. Comp. ¶¶ 9, 294-301, 307, 311, 365, 552, 594-610, 620-643).

Thus, on VZW's materially false representations, as conveyed by the company and its representatives, including defendants Verghese, Velez and Broomes, Zcom and its family of "sub agents" were compelled to outlay large sums of money in detrimental reliance on assurances of compensation which VZW never intended to wholly pay. Amend. Comp. ¶¶ 5, 9, 19-29, 52-53, 60-62, 70-72, 78-80, 86, 95, 118, 121, 132, 139, 146, 156, 165, 167, 170, 174-176, 182-189, 188-190, 198-199, 204-205, 210-211, 216-

217, 219, 251-340, 348, 361, 363-368, 372, 376, 387, 459-462, 496-522, 529-551, 573-610, 616-643, 654-656, 833-835; Exs. 15-20).

When it became apparent that VZW's prepaid activation "program" was actually an elaborate scheme to artificially inflate its activation figures and obtain additional profit for VZW, VZW looked to Zcom, its largest New York metropolitan area Master Agent to take responsibility. Zcom, however, refused to admit to wrongdoing for which it wasn't a part, and in turn VZW abused contractual discretion, in the worst of faith, terminating Zcom's authority under the nearly 20 year relationship amongst the parties - and VZW defalcated Zcom's distribution network for free and arbitrarily and in bad faith, *inter alia*, granted Zcom's "sub agents" direct agency or sold those locations to other VZW selected entities.

Furthermore, while Verghese urges that he cannot be held responsible for acts occurring after his termination from VZW, it is respectfully submitted that, as a whole, the complaint amply establishes that all acts for which Zcom seeks to hold Verghese liable, in concert with, *inter alia*, VZW, occurred <u>because</u> of Verghese's conduct while still employed with VZW and because of his abuse of his authority within VZW to damage and injure Zcom. Verghese cannot escape liability when he was involved in setting the harmful "wheels in motion."

**POINT II**

**VZW FAILED TO ACT IN GOOD FAITH OR FAIRLY**

The contract between VZW and Zcom, and the contracts between Zcom and its sub

agents are all governed by New York law.  New York law mandates that all contracts include

the implied covenant of good faith and fair dealing.  Critically, New York State's highest

court has spoken on this issue, holding that

> [i]n New York, all contracts imply a covenant of good faith and
> fair dealing in the course of performance.  This covenant
> embraces a pledge that neither party shall do anything which
> will have the effect of destroying or injuring the right of the
> other party to receive the fruits of the contract.

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153, 773 N.E.2d 496,

500 (2002) (*internal citations and quotation marks omitted*).  *See also Forman v.*

*Guardian Life Ins. Co. of Am.*, 76 A.D.3d 886, 888, 908 N.Y.S.2d 27, 30 (1st Dept. 2010).

To be clear, notwithstanding VZW's protestations to the contrary, under New York

law "[a] breach of the duty of good faith and fair dealing is considered a breach of contract."

*Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011), citing, *Nat'l Mkt. Share, Inc. v.*

*Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).  Importantly,

> [a]lthough a contract may give a party broad discretion, the
> implied covenant requires the party 'not to act arbitrarily or
> irrationally in exercising contractual discretion.'

*Gaia House Mezz, LLC v. State St. Bank & Trust Co.*, — F.Supp.2d —, 2012 WL

1530385 (S.D.N.Y. April 30, 2012), *quoting, Dalton v. Educ. Testing Serv.*, 87 N.Y.2d

384, 389, 663 N.E.2d 289 (1995).  Thus, under New York law, even when a contract

permits a party

> in its sole and absolute discretion, to terminate its obligations
> under the [contract], the [party] is required to carry out its
> contractual obligations incident to the exercise of its
> discretion in good faith.

*Outback/Empire I, Ltd. P'ship v. Kamitis, Inc.*, 35 A.D.3d 563, 825 N.Y.S.2d 747, 748 (2d

Dept. 2006).  This, VZW did not do.  Rather, VZW acted arbitrarily, capriciously and with

actual malice - fabricating evidence because the real facts did not suit them.

Furthermore, the "implied covenant obligated [VZW] to exercise such discretion in

good faith, not arbitrarily or irrationally."  *Maddaloni Jewelers, Inc. v. Rolex Watch*

*U.S.A., Inc.*, 41 A.D.3d 269, 270, 838 N.Y.S.2d 536, 538 (1st Dept. 2007).   Moreover,

> even where one has an apparently unlimited right under a
> contract, that right may not be exercised solely for personal
> gain in such a way as to deprive the other party of the fruits of
> the contract.  This limitation on an apparently unfettered
> contract right may be grounded either on the construction of
> the parties' fiduciary obligations or on the purely contractual
> rule that even an explicitly discretionary contract right may not
> be exercised in bad faith so as to frustrate the other party's
> right to the benefit under the agreement.

*Richbell Info. Services, Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302, 765 N.Y.S.2d

575, 586-587 (1st Dept. 2003) (*internal citations and quotations omitted*).   Here, Zcom

has consistently alleged that VZW's motives in terminating their contractual relationship

were rooted in their bad faith desire to punish Zcom for VZW's own malice, while enabling

VZW to "steal" Zcom's assets and good will, without compensation.  This is wholly

consistent with the wrongful conduct considered by the *Richbell Info. Services, Inc*. Court

in its holding that the implied covenant of good faith and fair dealing applies when, as here,

> the allegations here clearly go beyond claiming only that
> [VZW] should be precluded from exercising a contractual right;
> they support a claim that [VZW] exercised a right malevolently,
> for its own gain as part of a purposeful scheme designed to
> deprive plaintiffs of the benefits of the [contract with Zcom].
> These allegations do not create new duties that negate [VZW]'s
> explicit rights under a contract, but rather, seek imposition of
> an entirely proper duty to eschew this type of bad-faith targeted
> malevolence in the guise of business dealings.

*Richbell Info. Services, Inc*., 309 A.D.2d at 302, 765 N.Y.S.2d at 587.  Moreover, and

importantly, "[w]hether the bad motive imputed to [VZW] was its actual motive is an issue

of intent generally left to the trier of fact."  *Id.* at 303, *citing, Matter of Kaszirer*, 298

A.D.2d 109, 110, 747 N.Y.S.2d 502 (1st Dept. 2002), *Merzon v. Lefkowitz*, 289 A.D.2d

142, 735 N.Y.S.2d 106 (2001).  *See also Dialcom, LLC v. AT & T Corp.*, 20 Misc. 3d

1111(A), 867 N.Y.S.2d 16 (Sup. Ct. Kings Cty. 2008).

> ● *PUBLIC POLICY AND FAIRNESS DICTATES THAT*
>    *THE IMPLIED COVENANT OF GOOD FAITH AND*
>    *FAIR DEALING CANNOT BE WAIVED*

Notwithstanding VZW's efforts to evade liability and judicial scrutiny by seeking to

unilaterally waive the implied covenant of good faith and fair dealing (Amend. Comp. Ex. 4

at § 10.2), such a waiver cannot be enforced as it is contrary to public policy.  While Zcom

is not aware of any New York Courts that have squarely addressed this issue, it is

respectfully submitted that this is because the question is itself so basic.  Notably, however,

the New York adaptation of the Uniform Commercial Code prohibits attempts to evade, or

wholly avoid, the implicit duty of good faith and fair dealing - and instead mandates reasonable conduct between parties to an agreement. N.Y. U.C.C. § 1-102(3) (McKinney). In analyzing this section of the UCC, the New York Appellate Division, Second Department found that it was designed to prevent parties to a contract from evading liability for all of their actions under a contract. *Orix Credit Alliance, Inc. v. E. End Dev. Corp.*, 260 A.D.2d 454, 455, 688 N.Y.S.2d 191, 192 (2d Dept. 1999).

The waiveability of the implied covenant was addressed head on by a Connecticut Court which specifically found that "[t]he implied covenant of good faith and fair dealing <u>cannot</u> be waived." *Rhode Island Hosp. Trust v. Martin Trust*, 6 Conn. L. Rptr. 75 (Conn. Super. Ct. 1992) (<u>emphasis added</u>). Relying on this principle, another Connecticut Court found that "[a] contract provision seeking to limit a party's liability must be narrowly construed and will not exculpate intentional or bad faith conduct." *Town of New Hartford v. Connecticut Res. Recovery Auth.*, 42 Conn. L. Rptr. 101 (Conn. Super. Ct. 2006). *See also T.D. Bank, N.A. v. Nutmeg Investments, LLC*, 50 Conn. L. Rptr. 714 (Conn. Super. Ct. 2010). Scholarly interpretation has likewise concluded that

> the implied duty of good faith stands as a <u>non-waivable pillar of contract law</u> that ensures that reasonable expectations will be enforced. It is designed to prevent trickery, deceit, or fraud. Ultimately, the implied covenant of good faith prevents one party from depriving the other of the fruits of the contract. It is a constraint that underlies every contractual relationship and is a fundamental tool that prevents parties from violating the spirit of the bargain.

Sandra K. Miller, *What Fiduciary Duties Should Apply to the LLC Manager after More*

33

*than a Decade of Experimentation?*, 32 J. Corp. L. 565, 595-596 (2007) (<u>emphasis</u> <u>added</u>), *citing, Mkt. St. Assocs. v. Frey*, 941 F.2d 588, 597 (7th Cir. 1991).  Accordingly, notwithstanding VZW's attempt to evade their duty to act in good faith and fairly towards Zcom, public policy clearly prohibits such a waiver.  Therefore, Declaratory Judgment striking VZW's malicious and bad faith attempt to evade the duties imposed by the implied covenant is ripe for this complaint, and itself ought be granted at the outset.

## POINT III

### THE DEFENDANTS' TORTIOUSLY INTERFERED WITH ZCOM'S CONTRACTS WITH ITS "SUB AGENTS"

The jointly represented VZW defendants and Verghese urge that the cause of action for interference is insufficient because, in their skewed view, the complaint does not identify the parties who were in contract with VZW, who were induced to breach.  That is simply not so.  Rather, the amended complaint specifically alleges that VZW knew that Zcom had contractual relationships with all of its sub agents (which, in fact, VZW had previously vetted and approved).  Thus, the identities of the parties to the contracts are clear, as is VZW's knowledge of the existence of the contracts.

Furthermore, the complaint also alleges that VZW, by way of directives to its employees, including defendants Verghese, Velez and Broomes, directly communicated with Zcom's sub agents, caused these VZW employees to pressure Zcom sub agents into participating in VZW's prepaid scheme.  Furthermore, the complaint further directly alleges that VZW directed Zcom's sub agents to create fraudulent prepaid accounts on

discarded CPE, in fictitious customer names, in breach of the contractual ethics policies Zcom had with its sub agents.

The complaint is also flush with e-mails from VZW personnel pertaining to the pressure to "push" prepaid activations, most of which were copied to numerous other employees within the VZW empire (Amend Comp. Exs. 16-20). Moreover, the amended complaint further alleges that VZW employed duress and coercion upon Zcom's sub agents to participate in the scheme, while sending employees, including defendant Velez (who was recorded) and Broomes (who acknowledged such visits by e-mail, Amend. Comp. Ex. 19), to personally meet with the sub agents to pressure compliance with VZW's fraudulent "pre-paid" program. The sub agents were, in turn, intimidated by VZW and its employees - who had absolute control over the rights to market and sell VZW branded products and services, and thus the livelihoods of the entirety of the Zcom "family" into participating with VZW's fraud, thus "caus[ing] and direct[ing] the sub agents to breach their own agreements with Zcom" (Amend Comp. ¶ 542) for the benefit of VZW, and its employees, who were able to inflate new account activations and reap performance bonuses (Amend Comp. ¶¶ 543-544).

In turn, Zcom was damaged by tremendous losses in commissions and ultimately the bad faith termination of the whole of its business, while VZW whitewashed their own corrupt acts via employees defendants Pavlicek and Fiocco, who covered up evidence against VZW, while fabricating evidence against Zcom, and VZW defalcated Zcom's network of stores for free and granting direct agency or Master Agent status to Zcom's former "sub agents" - Zcom therefore lost its good will, its distribution network,

35

substantial profit, and about $750,000.00 per month in residuals (Amend Comp. ¶¶ 8, 55, 241, 408, 437, 448)!

The allegations in the complaint meet all of the pleading requirements to establish tortious interference with contractual relations under New York law: (a) Zcom had valid contractual relationships with third parties, to wit: its sub agents; (b) VZW, Verghese, Velez and Broomes knew of the sub agent contracts (and in fact VZW had to vet and approve each sub agent - and thus was on actual notice as to who all of them were); (c) VZW and its then employee defendants intentionally caused the sub agents to breach their contracts with Zcom through improper means - including intimidation, duress and coercion, all without justification; and, (d) Zcom suffered and continuous to suffer actual damages as a result. *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 1375 (1996). *See also Lansco Corp. v. Strike Holdings LLC*, 90 A.D.3d 427, 933 N.Y.S.2d 666 (1st Dept. 2011).

Moreover, as is clear from the complaint, the contracts between Zcom and its sub agents would not have been breached "but for" the defendants' tortious conduct. *Washington Avenue Assoc. Inc. v. Eculid Equip. Inc.* 229 A.D.2d 486, 487, 645 N.Y.S.2d 511 (2d Dept. 1996).   Zcom's claims are not merely speculative (*Burrowes v. Combs* 25 A.D.3d 370, 373, 808 N.Y.S.2d 50 (1st Dept. 2006)), or "vague or conclusory" (*Washington Ave Assoc.*, 229 A.D.2d at 497), but are instead heavily fact driven. Therefore, VZW and its then employee defendants, Verghese, Velez and Broomes, are

liable to Zcom. *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 8 N.Y.3d 422, 867

N.E.2d 381 (2007).

## POINT IV

## ZCOM HAS ADEQUATELY PLED FRAUD AND MISREPRESENTATION

Under New York law, "[t]o make out a prima facie case of fraud, plaintiff must

allege 'a representation of material fact, falisty, scienter, reliance and injury.'" *US Express*

*Leasing, Inc. v. Elite Tech. (NY), Inc.*, 87 A.D.3d 494, 497, 928 N.Y.S.2d 696 (1st Dept.

2011), *quoting, Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 57, 720 N.E.2d 892

(1999). Zcom's amended complaint alleges that VZW and, *inter alia*, its then employee

defendants, including Verghese, Velez and Broomes, falsely represented that the VZW

Defendants would pay Zcom, and via Zcom its sub agents (as all financial dealings went

through Zcom) for prepaid activations made in furtherance of the promotion (which was,

then unbeknownst to Zcom, in fact a scheme) via commissions and incentives. These

material representations were false when made as VZW did not really intend to pay much of

the promised commissions - and in fact surreptitiously caused the prepaid accounts to fail

and trigger a "chargeback," thus evaporating commissions that were paid.

Notwithstanding that Zcom and its sub agents detrimentally, but reasonably relied,

on VZW's guidelines and assurances, Zcom and its "family" of sub agents were

significantly damaged by: (a) out of pocket payments for prepaid activations at VZW's

insistence that were not recouped by commissions; (b) commissions which were "charged

back" and/or never paid; and, (c) VZW's use of its own fraudulent "pre-paid" program as a

bad faith means to defalcate Zcom's business.

> Where, as here, Zcom has alleged VZW, Verghese, Velez and Broome's

>> statements of intent to perform, which were false according to
>> the complaint 'coupled with other allegations in the complaint
>> which support the inference that there was never an intention to
>> perform on [the defendants'] part' make out a cause of action
>> for fraud.

*El Entm't U.S. LP v. Real Talk Entm't, Inc.*, 85 A.D.3d 561, 562, 925 N.Y.S.2d 472, 473

(1ˢᵗ Dept. 2011), *quoting*, *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d

112, 122, 653 N.E.2d 1179 (1995).  Accordingly, all of the elements of fraud were pled

with particularity, militating against dismissal.  *ARB Upstate Communications LLC v. R.J.*

*Reuter, L.L.C.*, 93 A.D.3d 929, 932-933, 940 N.Y.S.2d 679, 684-685 (3d Dept. 2012);

*Scott v. Fields*, 92 A.D.3d 666, 668-669, 938 N.Y.S.2d 575, 577 (2d Dept. 2012);

*Kosowsky v. Willard Mountain, Inc.*, 90 A.D.3d 1127, 1128-1130, 934 N.Y.S.2d 545,

548-549 (3d Dept. 2011).  *See also 904 Tower Apartment LLC v. Mark Hotel LLC*, —

F.Supp.2d. —,  2012 WL 1075854, * 11 (S.D.N.Y. Mar. 29, 2012); *Mazzola v. Roomster*

*Corp.*, — F.Supp.2d. —, 2012 WL 1019124, *5 (S.D.N.Y. Mar. 26, 2012).

Furthermore, to the extent that the defendants urge that there is any deficiency in the

fact intensive pleadings, New York's highest Court has found that "[i]t is almost impossible

to state in detail the circumstances constituting a fraud where those circumstances are

peculiarly within the knowledge of the party against whom the defense is being asserted."

*Jered Contracting Corp. v. New York City Transit Auth.*, 22 N.Y.2d 187, 194, 239 N.E.2d

197, 201 (1968).  Thus, the minutia details of VZW's fraudulent scheme are within their

own records - to which Zcom surely does not yet have access - and discovery is stayed.

Moreover, in addition to a extremely detailed pleadings, Zcom has proffered documentary

evidence, including statements on behalf of VZW in the form of e-mails regarding the

prepaid scheme, and recorded statements of VZW's own employee Velez, which surely

apprise VZW and its then employee defendants, Verghese, Velez, and Broomes of the

details of the fraud, as alleged.  *See also Pludeman v. N. Leasing Sys., Inc.*, 10 N.Y.3d 486,

890 N.E.2d 184 (2008).  Indeed, VZW fired Verghese for misconduct - and these

defendants know exactly what those facts are (Amend. Comp. ¶¶ 9, 64, 372).

     While the defendants urge that there is some deficiency in the "group pleading" as

regards the "VZW defendants," that too is wrong.  Rather,

> [w]ithout going into lengthy detail as to each ground by each
> set of defendants, suffice it to say that the allegations
> adequately support a fraud claim. The fact that plaintiffs have
> been unable to identify specific acts and representations by
> each specific defendant is of no moment. 'The very nature of
> the scheme, as alleged, gives rise to the reasonable inference
> that all defendants were involved in the fraud.' To strictly
> construe Rule 9(b)'s pleading requirements especially where,
> as here, 'concrete facts are peculiarly within the knowledge of
> the party charged with the fraud,' would 'work a potentially
> unnecessary injustice.'

*Simington v. Lease Fin. Group, LLC,*  2012 WL 651130, *10 (S.D.N.Y. Feb. 28, 2012),

*quoting, Pludeman*, 10 N.Y.3d 491-493 (*parenthetical omitted*).

## POINT V

## THE DEFENDANTS TORTIOUSLY INTERFERED WITH ZCOM'S PROSPECTIVE BUSINESS RELATIONSHIPS

With extensive detail the amended complaint sets forth the defendants' schemes to interfere with Zcom's prospective business relationships, by "freezing" Zcom's growth when Zcom had already demonstrated it could and would prosper for itself and for VZW. It is further alleged that VZW had no good faith or valid business related basis to deny approvals of Zcom's expansion. Rather, defendant Verghese, a VZW manager, whose initial approval was required for any expansion by Zcom to be considered by VZW, was corrupted by bribes offered by and received from Ajay, Shelly and Poonam, and in turn, in consideration for those bribes, approvals were not granted by Verghese and/or VZW was told to issue denials.

The defendants raise what, it is respectfully submitted, is a hyper-technical dispute with the amended complaint under the circumstances. They uniformly argue that the cause of action for interference with prospective contractual relations is deficient because the prospective sub agents were not identified in the amended complaint. In a vacuum this argument would hold water; however, here, particularly as to VZW and its then employees, including defendants Verghese, Velez and Broomes, they have actual notice of who the prospective business was with - because Zcom submitted applications to VZW, via Verghese, which - as is complained - were arbitrarily and capriciously denied. Thus, the information sought is within the actual purview of the demanding defendants.

40

Furthermore, as to Shelly, Ajay and Poonam, they too are intimately familiar with the process - given the fact that Shelly and Poonam actually applied through Zcom to become sub agents, at the request of Ajay, and successfully went through the entirety of the approval process (while failing to disclose their actual business allegiance to Ajay).   As alleged, Verghese, a VZW manager with oversight of the interrelationship between Zcom and VZW, was an agent of both VZW - by virtue of his employment status, and of Shelly, Poonam and Ajay - by virtue of their wrongful bribery scheme.   Accordingly, as [t]he general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it" (*Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784, 488 N.E.2d 828, 829 (1985)), all parties to this action have actual, or at least constructive knowledge of whom Zcom was in prospective business relations with.  This is particularly so when, under New York law, "a  principal that accepts the benefits of its agent's misdeeds is estopped to deny knowledge of the facts of which the agent was aware." *Marine Midland Bank v. John E. Russo Produce Co., Inc.*, 50 N.Y.2d 31, 44, 405 N.E.2d 205, 212 (1980).  *See also People v. Greenberg*, 95 A.D.3d 474, 946 N.Y.S.2d 1, 9 (1st Dept. 2012); *Prisco v. State of New York*, 1996 WL 596546, * 17 (S.D.N.Y. Oct. 16, 1996).

The amended complaint alleges the defendants' scheme to freeze Zcom's growth with significant detail.  There are specific allegations of how the defendants, individually and collectively, acted, with malice, to thwart the expansion of Zcom, such that the

defendants all benefitted. While it is conceded that the allegations do not specify, by name, the prospective sub agents who were dealing with Zcom, and proffered to VZW, by way of Verghese, the defendants all know who they are, or such knowledge is imputed to them. Furthermore, the amended complaint temporally limits the scope of the freeze to the period from 2009 until the termination became effective on January 31, 2012. Thus, the complaint does inferentially identify these prospective sub agents as those businesses who Zcom proffered to VZW for sub agency during that limited time period, who VZW denied approval to. Additionally, VZW also thwarted Zcom's prospective relationships with Prospective Buyer ## 1 and 2, as well as significantly thwarting the relationship with United Telecom. These entities are clearly and unambiguously identified in the amended complaint. Accordingly, the identities are "self-evident" for pleading purposes, strongly militating against dismissal. *Averbach, supra*.

The amended complaint thus adequately alleges specific prospective business relationships of Zcom which the defendants frustrated for their own benefit, to the great detriment of Zcom. It is therefore respectfully submitted that all of the elements of tortious interference with prospective business relations, under New York law, have been adequately and sufficiently pled. *See e.g. Sparig v. Danenberg*, 2012 WL 2564231 (E.D.N.Y. June 29, 2012); *Ullmannglass v. Oneida, Ltd.*, 86 A.D.3d 827, 927 N.Y.S.2d 702 (3d Dept. 2011); *Kevin Spence & Sons, Inc. v. Boar's Head Provisions Co., Inc.*, 5 A.D.3d 352, 774 N.Y.S.2d 56 (2nd Dept. 2004).

## POINT VI

## VZW BREACHED ITS CONTRACT WITH ZCOM

Here, there appears to be no dispute that there was a contract between Zcom and VZW (Amend. Comp. Ex. 4).  Furthermore, Zcom performed under the contract, for which VZW received substantial benefit, to the tune of 25% of its New York metropolitan agent based market.  VZW breached the contract in multiple ways, all of which caused damage to Zcom.

- *VZW BREACHED THE CONTRACT BY FAILING TO PROVIDE NOTICE OF ITS INTENT TO SUE AND TO PROVIDE ZCOM WITH AN OPPORTUNITY TO NEGOTIATE*

By the terms of the contract, before VZW could commence "any court case" against Zcom arising under the contract VZW was required to provide notice to Zcom and an opportunity to negotiate any dispute (Amend. Comp. Ex. 4 at §§ 14 - 14.2).  The complaint alleges that VZW failed to meet these contractually mandated conditions.  Critically, the complaint also alleges that Zcom was significantly damaged as a result of VZW's breach in that: (i) this case was transferred out of Zcom's home and chosen forum; (ii) Zcom continues to expend significant funds in efforts to protect itself from the breach, and remedy the damage from same; and, (iii) Zcom's damages are growing because VZW has resorted to misrepresentations of fact with false general allegations pursuant to Fed. R. Civ. P. 9(c) to cover up their abject failure to comply with the contract - thus making Zcom's

defense more complex and expensive (which is exactly VZW's malicious goal - bleed Zcom, after killing it).

- *ZCOM'S COUCHING OF ITS "FOR CAUSE" TERMINATION OF ZCOM AS "WITHOUT CAUSE" WAS IN BAD FAITH - AS IT WAS DEVISED TO EVADE JUDICIAL REVIEW OF THEIR MISCONDUCT*

The amended complaint alleges that VZW was contractually required to exercise "reasonable discretion" in assessing alleged conduct of Zcom (Amend. Comp. Ex. 4 at § 8.4.1), yet it willfully and maliciously failed to do so.    Rather, in the worst of faith, VZW sought to pass blame to Zcom for its own misconduct and that of its employees.  Then, after taking steps to cover up their misdeeds, by way of defendants' Pavlicek and Fiocco's sham "investigation," VZW fabricated evidence of wrongdoing by Zcom.

By virtue of the language of the termination letter, it is apparent that VZW was terminating Zcom "for cause" - notwithstanding that they couched it as "without cause" so as to evade judicial scrutiny.  This, the amended complaint alleges, was unreasonable and in bad faith, and thus is breach of VZW's contract with Zcom (Amend. Comp. Ex. 4 at §§ 8.4.1, 8.7).  Zcom was damaged by these breaches in that it lost the entirety of the benefit of its bargain with VZW.

Under settled New York law, the elements of a cause of action are "the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages." *JP Morgan Chase v. J.H. Elec. of New York, Inc.*, 69 A.D.3d 802, 803, 893 N.Y.S.2d 237, 239 (1st Dept. 2010). *See also McGhee v. Odell*, 96

44

A.D.3d 449, 946 N.Y.S.2d 134, 135 (1st Dept. 2012); *King Pharmaceuticals, Inc. v.*

*Corepharma, LLC*, 2010 WL 1850200, * 1 (D.N.J. May 7, 2010).  Each of these elements

has been pled, and established.

- *VZW'S FAILURE TO ACT IN GOOD FAITH*
  *AND FAIRLY WAS A BREACH OF CONTRACT*

The Honorable Court is respectfully referred to the detailed discussion of the

implied covenant of good faith and fair dealing, and VZW's wholesale violation of same,

supra.   Additionally, however, under New York law

> [e]ven if a party is not in breach of its express contractual
> obligations, it may be in breach of the implied duty of good
> faith and fair dealing ... when it exercises a contractual right as
> part of a scheme to realize gains that the contract implicitly
> denies or to deprive the other party of the fruit (or benefit) of
> its bargain.

*Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.*, — A.D.3d —, — N.Y.S.2d —, 2012 WL

3024000, *2 (2d Dept. July 25, 2012) (*internal citation and quotation omitted*).

Furthermore,

> [t]he implied covenant of good faith and fair dealing 'is
> breached when a party to a contract acts in a manner that,
> although not expressly forbidden by any contractual provision,
> would deprive the other party of the right to receive the
> benefits under their agreement'

*Frankini v. Landmark Const. of Yonkers, Inc.*, 91 A.D.3d 593, 595, 937 N.Y.S.2d 80, 83

(2d Dept. 2012), *quoting, P.T. & L. Contracting Corp. v. Trataros Const., Inc.*, 29 A.D.3d

763, 764, 816 N.Y.S.2d 508 (2d Dept. 2006).  Accordingly, the amended complaint more

that sufficiently pleads a breach of the implied covenant.

Here, prior to July 26, 2011, Zcom was a thriving business doing directly, and indirectly, almost $150 Million Dollars per year in sales through Zcom's distribution network of "corporate owned" and "sub agent" locations, and reasonably expected to stay in business for the foreseeable future (Amend. Comp. ¶¶ 9, 483).  Now, after the July 26, 2011 termination notice and VZW's continuing breaches of contract, including the instant contract, Zcom has nothing as VZW has defalcated Zcom's business assets in bad faith.

## POINT VII

## THE "ECONOMIC LOSS DOCTRINE" IS INAPPLICABLE TO THIS CASE

The VZW defendants urge that Zcom's causes of action for tortious interference with contract and with prospective business relations are barred by the "economic loss doctrine."  Under New York law this doctrine only stands to bar contribution "where the damages sought ... are exclusively for breach of contract."  *Galvin Bros., Inc. v. Town of Babylon*, 91 A.D.3d 715, 936 N.Y.S.2d 563 (2d Dept. 2012).  Here, however, the damages sought do not solely arise under the contract between Zcom and VZW, but also deal with interference by the defendants, including VZW and its employees, with Zcom's contracts with its sub agents, and with prospective sub agents and prospective buyers of Zcom after VZW terminated Zcom's contract in bad faith.  Accordingly, the claims are far broader than VZW misleadingly urges and the "economic loss doctrine" does not serve as a bar to any of Zcom's claims.  *Sound Refrigeration & Air Conditioning, Inc. v. All City Testing & Balancing Corp.*, 84 A.D.3d 1349, 1350, 924 N.Y.S.2d 172, 173 (2d Dept. 2011).

## POINT VIII

## ALL OF THE DEFENDANTS SPREAD VICIOUS LIES ABOUT ZCOM, RENDERING THEM LIABLE FOR INJURIOUS FALSEHOOD

In New York, a claim for injurious falsehood is one for commercial disparagement. *Lampert v. Edelman*, 24 A.D.2d 562, 261 N.Y.S.2d 450 (1st Dept.1965). Notably, "[t]he tort of trade libel or injurious falsehood requires the knowing publication of false and derogatory facts about the plaintiff's business of a kind calculated to prevent others from dealing with the plaintiff, to its demonstrable detriment." *Banco Popular N. Am. v. Lieberman*, 75 A.D.3d 460, 462, 905 N.Y.S.2d 82, 85 (1st Dept. 2010). Here, the complaint, with detail, alleges that all of the defendants made statements, to others, disparaging Zcom, and falsely indicating that Zcom was involved in misconduct. (*See e.g.* Amend Comp. ¶¶ 715-743).

The amended complaint, and reasonable inferences that may be derived therefrom, allege that the defendants individually and collectively fabricated "evidence" about Zcom in an effort to "dirty up" Zcom in the wireless activation industry, thus giving VZW "cover" for its bad faith termination of Zcom, along with a scapegoat for its own fraudulent "prepaid" scheme. At the same time, Shelly, Poonam and Ajay fed false information to VZW, and others in the wireless activation industry, to further defame Zcom, in an effort to expedite its demise. The amended complaint affirmatively alleges that "the VZW Defendants have undertaken a strategy of prejudicing the reputation and credibility of Zcom among Zcom's sub agents and within the telecommunications community" (Amend. Comp.

47

¶ 726).  Furthermore, the VZW defendants have publicized the knowingly false claims

Zcom created the "prepaid" scam, including directing the use of fictitious customer names,

and forced the scheme upon its "sub agents" using coercion and duress (Amend. Comp. ¶¶

727-732).  Additionally, VZW further maliciously broadcast that Zcom was involved in

criminality, including fabricated tales of Zcom performing false mass activations and

submitting false invoices for reimbursement (Amend. Comp. ¶¶ 733-734).  The amended

complaint further alleges that VZW publicly repeated its self-created false grounds for

terminating Zcom, knowing that the allegations were false (Amend. Comp. ¶¶ 735-738,

740) and causing substantial financial harm to Zcom while harshly tarnishing its reputation

(Amend. Comp. ¶¶ 741-742).  Critically, VZW baselessly blocked Zcom from selling its

business to prospective buyers ## 1 and 2, while severely hampering the sale to United

Telecom, and it is without question a fact that VZW's falsehoods about Zcom were

reiterated by them to these prospective buyers - while explaining to these prospective

buyers of Zcom why Zcom was selling and going out of business (*see e.g.* Amend. Comp.

¶¶ 687-710).

     Shelly, Poonam and Ajay took VZW's bold public repetition of the knowingly

mendacious claims about Zcom - which they too knew to be false - as license to further

disseminate falsehoods.   With purely malicious intent, solely with a view towards

defaming Zcom, and without any valid claim against Zcom, Shelly and Poonam, by way of

their corporate entities, and on behalf of themselves and Ajay, commenced a civil action in

New York State Supreme Court - solely as a means to repeat their spewed venomous

diatribe (Amend. Comp. ¶¶ 368-371, 430).  Additionally, rather than serve their baseless

complaint, grounded solely in malice, on Zcom, Shelly and Poonam instead ran right to the

*New York Post* to further disseminate their lies.  Josh Kosman, *Verizon pre-paid tangle,*

*New York Post*, September 28, 2011, http://www.nypost.com/p/news/ business/

verizon_pre_paid_tangle_0colc0vovmONO2g0mkY7mK.  Under New York law, there is

no privilege afforded to statements made during the course of judicial proceedings which

was maliciously instituted.  *Williams v. Williams*, 23 N.Y.2d 592, 599, 246 N.E.2d 333,

337 (1969), *citing, Rosenblatt v. Baer*, 383 U.S. 75, 86, 86 S.Ct. 669, 676 (1966) -

accordingly, the defendants cannot find safe haven in their own misconduct.

That these statements may not have been in writing - as seems to be urged by the

VZW defendants, who only concern themselves with the termination letter - is not

controlling.  Rather, that the defendants repeated these falsehoods to others, knowing that it

would impair Zcom's business reputation is sufficient to establish this cause of action.

Furthermore, as the defendants' statements about Zcom, individually and collectively

"'tend[ed] to injure [Zcom[ in [its] trade, business or profession' [they are] defamatory per

se."  *D'Annunzio v. Ayken, Inc.*, 2012 WL 2906248 (E.D.N.Y. July 17, 2012), *quoting,*

*Stern v. Cosby*, 645 F.Supp.2d 258, 273 (S.D.N.Y. 2009), *citing, Liberman v. Gelstein*, 80

N.Y.2d 429, 435, 605 N.E.2d 344 (1992).  Under these circumstances, New York law

presumes "special damages" and Zcom need not allege or prove them.  *Glazier v. Harris*,

95 A.D.3d 538, 944 N.Y.S.2d 75, 76 (1st Dept. 2012), *citing, Liberman, supra.*

49

## POINT IX

## VZW HAS BEEN UNJUSTLY ENRICHED VIA
## ITS MALICIOUS ACTS TOWARDS ZCOM

Outside the scope of the contract between VZW and Zcom, VZW has benefitted by obtaining extensive value via its essential "theft" of Zcom's entire business.  Here, "because acts of [VZW and] others have placed [VZW in] the possession of money ... under such circumstances that in equity and good conscience [VZW] ought not to retain it." they are liable to Zcom for unjust enrichment.  *State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94, 102 (E.D.N.Y. 2010).  The "'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'" *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000), *quoting, City of Syracuse v. R.A.C. Holding, Inc.*, 258 A.D.2d 905, 685 N.Y.S.2d 381 (4th Dept 1999).  Here, VZW has clearly received vast benefits to the detriment of Zcom - outside the scope of the contract.  This includes every Zcom location that VZW granted an agency to after January 31, 2012, to anyone, including Zcom's "sub agents."  Such dealings unjustly enriched VZW at Zcom's expense and accordingly, the VZW defendants are liable for unjust enrichment.

## POINT X

## IN **THIS** ACTION, THE COURT HAS JURISDICTION
## OVER ALL OF THE PARTIES

The instant matter is venued in the DNJ pursuant to a transfer order of Hon. P. Kevin Castel, United States District Judge for SDNY.  Notably, on or about December 28, 2011 Zcom commenced same, as a class action, in New York State Supreme Court, New York

County, pursuant to Article 9 of the New York Civil Practice Law and Rules - the New York analogue to Fed. R. Civ. P. 23.  Therefore, within the context of federal procedural law, at commencement the action was a class action.  28 U.S.C. § 1711(2); 28 U.S.C. § 1332(d)(1)(B).  *See also Coll. Of Dental Surgeons Of Puerto Rico v. Connecticut Gen. Life Ins. Co.*, 585 F.3d 33, 39-40 (1st Cir. 2009) ("[t]o satisfy CAFA's definition of a class action, a case need only be 'filed under' either Federal Rule of Civil Procedure 23 or some state-law analogue of that rule").

Within days of commencement, VZW and related persons and entities removed the action to the SDNY pursuant to the Class Action Fairness Act ["CAFA"].  Matters removed to federal Court under CAFA require only "minimal diversity" such that at least one plaintiff and one defendant are citizens of different states.  28 U.S.C.§ 1453.  According to representations made by VZW's counsel, VZW is a citizen of New Jersey and Delaware.  Accordingly, accepting such representations as true, removal to federal court was permissible.  *Blockbuster, Inc. v. Galeno*, 472 F.3d 53(2d Cir.2006); *Ventimiglia v. Tishman Speyer Archstone-Smith Westbury, L.P.,* 588 F. Supp. 2d 329 (E.D.N.Y. 2008).

Thereafter, on informal application of VZW and related persons and entities, and over the objection of Zcom, but <u>only</u> Zcom,  Judge Castel transferred the case to the DNJ in light of a pending "first-filed" declaratory judgment action that had been filed by VZW against Zcom on or about November 4, 2011.  Notably, at the time that Judge Castel made his transfer ruling from the bench, counsel for defendants Shelly Bhumitra, Poonam Sawnhey and Ajay Bhumitra were all on the record, before the Court.  They did not object

or otherwise comment.  Accordingly, by their silence on the issue, when they had a forum to speak and an opportunity to be heard on the very issue, they ought be estopped from complaining now.

VZW commenced its declaratory judgment action against VZW as an impermissible anticipatory filing to take unjust advantage of the "first filed" rule.  Furthermore, VZW improperly commenced the declaratory judgment action without compliance with pre-suit notice requirements, which are conditions precedent within the meaning of Fed. R. Civ. P. 9(c).  VZW later, when facing a motion to dismiss, amended as of right to "generally allege" a falsehood, claiming that pre-suit conditions were met.   Additionally, VZW cannot meet the $75,000.00 amount in controversy requirement for diversity jurisdiction in the declaratory judgment action, as it has sustained no damages - and has not alleged any harm to itself.  Notably, Zcom already moved to dismiss VZW's declaratory judgment action based upon their failure to meet pre-suit conditions precedent; however, District Judge Sheridan, in a learned opinion, determined that there must be "some discovery" on VZW's claims in its first amended complaint that they had complied with all pre-suit requirements. Accordingly, after "some discovery" Zcom will move for summary judgment, as envisioned by Judge Sheridan's procedurally instructive Order of May 31, 2012.

Thereafter, by consent of the parties, Zcom interposed its first amended complaint. In this amendment, Zcom, *inter alia,* withdrew the class action claims.  However, on issues of removal, the "district court must focus on the plaintiff's complaint at the time the petition for removal was filed."  *Granovsky v. Pfizer, Inc.*, 631 F. Supp. 2d 554, 559

(D.N.J. 2009).  *See also Pullman Co. v. Jenkins*, 305 U.S. 534 (1939); *Seawright v. Greenberg*, 233 F. App'x 145, 147 (3d Cir. 2007), *quoting, Westmoreland Hosp. Ass'n v. Blue Cross of W. Pennsylvania*, 605 F.2d 119, 123 (3d Cir. 1979).  As this Honorable Court has held "a subsequent amendment to the complaint after removal designed to eliminate the federal claim will not defeat federal jurisdiction."  *D'Agostino v. Appliances Buy Phone, Inc.*, 2011 WL 4345674 (D.N.J. September 15, 2011) (Sheridan, J.), *citing, Seawright*, 233 F. App'x. at 148.  Thus, the post-removal "elimination of [class action] federal causes of action does not defeat jurisdiction."  *Id.*

When the petition for removal was filed, Zcom's complaint was a class action apparently subject to diversity jurisdiction pursuant to CAFA.  *See e.g.* 28 U.S.C. § 1332(d).   Furthermore, the federal bench maintains supplemental jurisdiction over all related causes of action in the complaint because once the federal judiciary "has original jurisdiction over [at least] a single claim in the complaint, it has original jurisdiction over a 'civil action' within the meaning of § 1367(a)."  *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 559 (2005).  *See also Shah v. Hyatt Corp.*, 425 F. App'x 121, 124 (3d Cir. 2011).

It is clear that because of the effect of CAFA, this Court maintains jurisdiction over this case.  Moreover, after the matter was removed to federal court Shelly, Poonam and Ajay had 30 days to seek a remand back to state court "on the basis of any defect other than lack of subject matter jurisdiction."  28 U.S.C. § 1447(c).  They failed to do so and must not now be permitted to use this tactic as both a sword and a shield.   Rather, the failure to

53

timely interpose a remand motion based on removal "results in a waiver of the objection." *Farina v. Nokia Inc.*, 625 F.3d 97, 114 (3d Cir. 2010) *cert. denied*, — U.S. —, 132 S. Ct. 365 (2011).  *See also Medlin v. Boeing Vertol Co.*, 620 F.2d 957, 960 (3d Cir. 1980).

Zcom respectfully disagrees with District Judge Castel's decision to transfer this case to the District of New Jersey - and reserves the right to address the propriety of same after "some discovery" on the issue of VZW's commencing its declaratory judgment action, by "ambush," - to win "the race to the courthouse" when Zcom did not know there was a race.  *See E.E.O.C. v. Univ. of Pennsylvania*, 850 F.2d 969, 979 (3d Cir. 1988), *aff'd*, 493 U.S. 182 (1990); *Honeywell Int'l Inc. v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 2011 WL 6293032 (D.N.J. December 16, 2011). Nevertheless, at the time of the action being commenced, it was brought under state law as a class action, and the amount in controversy was alleged to exceed $5,000,000.00.  *See* 28 U.S.C § 1332(d)(2).

As the matter was initially commenced as a class action, requiring only minimal diversity, it technically could have been commenced in the DNJ.  Therefore, it is respectfully submitted that this Honorable Court has jurisdiction as against Shelly, Poonam and Ajay.  *See e.g.* 28 U.S.C. § 1404(a).

## POINT XI

## VERGHESE'S MOTION TO STRIKE MUST BE DENIED

Defendant Verghese urges that allegations in the complaint, which include an affidavit of Charu Sodhi attesting her having personally experienced Verghese's solicitation

of bribes in furtherance of his duties as a VZW manager (Amend. Comp. Ex. 6).  This

motion must be denied as well.  Importantly, such motions are "highly disfavored" and are

not to be granted "unless the moving party shows that 'the allegations have no possible

relation to the controversy and may cause prejudice to one of the parties, or if the

allegations confuse the issues.' " *Eisai Co., Ltd. v. Teva Pharmaceuticals USA, Inc.*, 629

F. Supp. 2d 416, 424-425 (D.N.J. 2009), *quoting, Garlanger v. Verbeke*, 223 F. Supp.2d

596, 609 (D.N.J. 2002), *quoting, Tonka Corp. v. Rose Art Indus., Inc.,* 836 F. Supp. 200,

217 (D.N.J. 1993).

Here, factual allegations, including sworn to allegations of fact, that Verghese was

involved in soliciting and receiving bribes associated with his VZW duties and had a close

relationship with Ajay Bhumitra involving underhanded fraudulent dealings are surely

pertinent to a consideration of Verghese accepting bribes from Ajay, Shelly and Poonam to

impact his duties on behalf of VZW, and his willingness to engage in such conduct with the

Bhumitras and Poonam, to the detriment of Zcom.  Accordingly, as "[u]nder the 'strict'

standard of Rule 12(f), 'only allegations that are so unrelated to plaintiffs' claims as to be

unworthy of any consideration should be stricken[,]'" (*Eisai Co., Ltd.,* 629 F. Supp. 2d at

425, *quoting, Johnson v. Anhorn*, 334 F.Supp.2d 802, 809 (E.D.Pa.2004)), Verghese's

motion must be denied. *See also Harrison Research Laboratories, Inc. v. HCRAmerica,*

*LLC*, 2010 WL 5343197 (D.N.J. Dec. 20, 2010).  Here, in fact, Charu Sodhi's affidavit is

illustrative of much more: VZW's "steering" Charu to Verghese and Verghese's corrupt

overt actions.  A most reasonable inference for Zcom's complaint is that VZW had a policy

and practice of bad faith corrupt interlocking behavior towards its Agents and proposed

agents.  After all, VZW "owns" the agent; life or death in the cellular activation business.

## CONCLUSION

It is respectfully submitted that on the law and the facts, all of the defendants

motions must be denied in their entirety.  However, in the event that this Honorable Court

determines that there is any merit to any claim of a pleading deficiency, it is respectfully

requested that Zcom be afforded leave to amend same such that the defendants individual

and collective internal misconduct, visited upon Zcom, be subjected to the salutory

disinfectant sunshine of the Court and the probing verdict of a just jury.

Dated: July 30, 2012
     New York, New York

            Respectfully submitted,
            THE LAW FIRM OF RAVI BATRA, P.C.
            *Attorneys for Defendant In Touch Concepts, Inc.*

            */s/ Michael W. Kennedy*
            Michael W. Kennedy, Esquire
            Ravi Batra, Esquire (*pro hac vice*)
            The Batra Building
            142 Lexington Avenue
            New York, New York 10016
            (212) 545-1993

*On the brief*:

Ravi Batra, Esquire (*pro hac vice*)
Todd B. Sherman, Esquire
     (*of the bars of the State of New York*
     *and Southern and Eastern Districts of New York*)

InTouchConcepts\073012BriefOppDNJDismiss

56

# CASE No. 12 Civ. 00542 (PGS) (TJB)

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

———

IN TOUCH CONCEPTS, INC., d/b/a ZCOM,

*Plaintiff,*

-against-

(1) CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, (2) TOM
VERGHESE, (3) RYAN BROOMES,
(4) JORGE VELEZ, (5) ANTHONY FIOCCO, (6) BRUNO PAVLICEK,
(7) AJAY BHUMITRA; (8) SHELLY BHUMITRA, (9) POONAM
SAWNHEY; and, (10) JOHN/JANE DOE CELLCO PARTNERSHIP
d/b/a VERIZON WIRELESS PERSONNEL ## 1-10, so named as their
identities have yet to be established,

*Defendants.*

# PLAINTIFF'S BRIEF IN OPPOSITION
# TO ALL DEFENDANTS' MOTIONS TO DISMISS

THE LAW FIRM OF RAVI BATRA, P.C.
The Batra Building
142 Lexington Avenue
New York, NY 10016
(212)545-1993
InTouchConcepts\073012BriefOppDNJDismiss