UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
IN TOUCH CONCEPTS, INC.,

> USDS SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 6 4 2013

                            Plaintiff,                          13 Civ. 1419 (PKC)

              -against-
                                                                MEMORANDUM
                                                                AND ORDER
CELLCO PARTNERSHIP d/b/a VERIZON
WIRELESS, TOM VERGHESE, RYAN BROOMES,
 JORGE VELEZ, ANTHONY FIOCCO, BRUNO
PAVLICEK, AJAY BHUMITRA, SHELLY
BHUMITRA, POONAM SAWNHEY, and JOHN/JANE
DOE CELLCO PARTNERSHIP d/b/a VERIZON
WIRELESS PERSONNEL ##1-10, so named as their
identities have yet to be established,

                            Defendants.
------------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

          In a 175-page, 862-paragraph complaint, plaintiff In Touch Concepts, Inc.

("Zcom") brings this action against defendants.  The complaint is neither "short" nor "plain" as

required by Rule 8(a)(2), Fed. R. Civ. P.  Counsel for plaintiff is cautioned to be mindful of the

mandates of Rule 8(a) in any pleading filed in a federal forum.  But for the procedural history of

this case, the Court would exercise its authority to dismiss this prolix pleading.  See Simmons v.

Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995); Doe v. Washington Post Co., 12 Civ. 5054, 2012 WL

3641294, at *2 (S.D.N.Y. Aug. 24, 2012); In re Merrill Lynch & Co., Inc. Research Reports Sec.

Litig., 218 F.R.D. 76, 78 (S.D.N.Y. 2003).

          The defendants are Cellco Partnership ("Verizon Wireless" or "Verizon"), Jorge

Velez, Tom Varghese,[1] Ryan Broomes, Anthony Fiocco, Bruno Pavlicek, Shelly Bhumitra,

---

[1] Mr. Varghese's name is misspelled in the case caption.

Poonam Sawnhey, Ajay Bhumitra, and John/Jane Doe Cellco Partnership Personnel ##1-10. Zcom, a former Verizon agent, and its subagents sold Verizon services and merchandise pursuant to an Agency Agreement. The complaint alleges a scheme purportedly created by Verizon and certain of its employees in order to increase account activations, which is an important marker of success in the wireless industry. Verizon, it is alleged, encouraged Zcom and its subagents to activate prepaid cellular devices in exchange for commissions it never intended to pay. According to Zcom, Verizon also coerced Zcom's subagents to increase the prepaid activations through fraudulent business practices. Zcom asserts that it took measures to report and eradicate such fraud. In an effort to cover up its own wrongdoing and punish Zcom, Verizon allegedly blamed Zcom for its own fraudulent scheme, terminated the Agency Agreement, and thwarted Zcom's attempts to sell its business operations. The Amended Complaint contains eleven causes of action based on such conduct, including claims for breach of contract asserted solely against Verizon as well as claims alleging various tortious conduct. Defendants now move to dismiss the Amended Complaint for failure to state a claim, pursuant to Rule 12(b)(6), Fed. R. Civ. P.

As a threshold matter, the Court first addresses its subject matter jurisdiction over the action and the claims asserted herein. This action, which asserted claims on behalf of a class, was removed from New York State Supreme Court pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), 1453. After removal, Zcom amended the complaint and removed all class allegations. As discussed herein, the Court concludes that, under the time-of-filing rule, it has subject matter jurisdiction over the action, but declines to exercise supplemental jurisdiction over claims against certain defendants. The Court then proceeds to discuss (1) Zcom's breach of contract claims against Verizon and (2) Zcom's tort and quasi-contract claims

2

against all remaining defendants.  Finally, the Court addresses Varghese's motion to strike allegations in the Amended Complaint.

BACKGROUND

For purposes of the motions to dismiss under Rule 12(b)(6), the Court accepts all nonconclusory allegations in the Amended Complaint as true, and draws all reasonable inferences in favor of plaintiff, as non-movant.

1.  The Parties

Zcom, a New York corporation, was a Verizon "Master Agent" authorized to sell Verizon's wireless services and merchandise.  (Am. Compl. ¶¶ 33-35.)  Until 2010, Zcom was jointly owned by its current president and CEO Vikas Dhall (a/k/a Victor Singh) and Alexandra Bershtein.  In 2010, Dhall purchased Bershtein's interest in the company.  (Id. ¶¶ 9, 225.)

Verizon is a general partnership with business presence throughout the United States and principal offices located in New Jersey.  (Id. ¶ 36.)  At all times relevant to this action, Verizon employed several of the individually named defendants.  Ryan Broomes and Jorge Velez served as account managers.  (Id. ¶¶ 69, 77.)  Anthony Fiocco and Bruno Pavlicek were "ostensibly" internal investigators.  (Id. ¶¶ 85, 94.)  Verizon and these individually-named defendants are jointly represented and together submit a motion to dismiss the Amended Complaint.  (Docket No. 42.)

Tom Varghese served as Verizon's Director of Indirect Distribution for the New York Metro Market until he was terminated from this position on July 11, 2011.  (Am. Compl. ¶¶ 6, 56.)  Varghese's responsibilities included approving new store locations in the New York metro area.  Varghese submits a separate motion to dismiss as well as a motion to strike portions of the Amended Complaint, pursuant to Rule 12(f), Fed. R. Civ. P.  (Docket No. 46.)  Varghese

joins in the arguments advanced by his co-defendants.  (E.g., Varghese Mem. at 10, 12, 14-15.)

This opinion frequently refers to Verizon, Broomes, Velez, Fiocco, Pavlicek, and Varghese collectively as "the Verizon defendants."

Zcom also brings suit against several individuals not employed by Verizon (collectively the "non-Verizon defendants").  Ajay Bhumitra ("Ajay") owns a portfolio of Sprint Nextel and AT&T-branded agency locations, which are competitors of Zcom and Verizon.  (Am. Compl. ¶ 104.)  Ajay submits his own motion to dismiss the Amended Complaint.  (Docket No. 48.)

Shelly Bhumitra ("Shelly"), Ajay's brother, is a principal of Zcom's former subagent Reachout Wireless, Inc. ("Reachout").  (Am. Compl. ¶ 110.)  Poonam Sawnhey is a principal of Zcom's former subagent American Candy, Inc.  (Id. ¶ 120.)  Shelly Bhumitra and Poonam Sawnhey are jointly represented and together submit a motion to dismiss the Amended Complaint.  (Docket No. 47.)  According to Zcom, Shelly Bhumitra and Poonam Sawnhey intended to destroy Zcom from within, in order to allow Ajay to take over Zcom's business or otherwise benefit.  (Am. Compl. ¶¶ 8, 123.)

2.  The 2008 Agency Agreement

For many years Zcom was a successful seller of Verizon products and services.  (Id. ¶¶ 34, 228.)  Its business comprised approximately twenty-five percent of Verizon's New York metro-area market share.  (Id. ¶ 34.)  Zcom acted as a "Master Agent" of Verizon and not as a franchisee.  (Id. ¶ 236.)  Verizon also authorized Zcom to engage subagents to sell Verizon services, subject to Verizon's approval of the subagents and store locations.  (Id. ¶¶ 35, 228-29; see also id. Ex. 4 ¶¶ 2.4.2, 2.7.)  Zcom eventually went from operating three to approximately 150 store locations, including about 30 "corporate owned" stores and 120 authorized subagents.

(Id. ¶¶ 228, 230.)

Zcom and Verizon renewed their Agency Agreement in 2008 for a five-year term. (Id. ¶ 237.)  The terms of the Agreement covered a range of matters including Verizon's approval of new stores and subagents, Zcom's ability to transfer or assign the Agreement, as well as grounds for the Agreement's termination.  (Id. Ex. 4 ¶¶ 2.4.2, 2.7, 10.8, 8.)  The Agreement also contains an express waiver of the implied covenant of good faith and fair dealing.  (Id. Ex. 4 ¶ 10.2 ("It is understood and agreed that this Agreement is not subject to any implied duties of good faith or fair dealing.").)

3. The Prepaid Activation Scheme

New phone number activations are an important measure of success in the cellular carrier industry.  (Id. ¶ 9(a).)  Generally, Verizon paid Zcom a commission for each postpaid subscription Zcom activated, so long as the phone number remained active for a minimum period of time.  (Id. ¶ 239.)  If a customer did not keep his account active long enough, Verizon automatically charged back the associated commission from Zcom by deducting "such monies from future payments due."  (Id. ¶ 244.)   In the event a commission was charged back, Zcom charged back an equal amount from the responsible subagent.  (Id. ¶ 245.)

Plaintiff alleges that beginning in 2009, the Verizon defendants devised a scheme to increase new phone activations by using *prepaid* cellular devices.  (Id. ¶¶ 20-24, 251-56.) Verizon instructed Zcom to sell "Customer Provided Equipment" ("CPE") – discarded cellular telephones provided to customers after an "upgrade" – as "emergency" use phones.  (Id. ¶¶ 261-265.)  Under the plan, Zcom would "credit" the customer's activation fee, activate the phone as a

"pre-pay" account, and provide the customer with $45.00 worth of prepaid minutes.[2]  (Id. ¶ 265.) While Zcom or a subagent was to bear the cost of the prepaid minutes, Verizon informed Zcom and its subagents that they would receive a $40.00 commission for each prepaid activation as well as an incentive (or "spiff") of $20.00.  (Id. ¶¶ 268-70.)  Thus, it appeared that Zcom and the subagents would recognize a profit for each prepaid activation after the commission and "spiff" were paid out.

In order for an agent to retain the commission payment, the prepaid phone had to remain active for at least 180 days.  (Id. ¶ 273.)  Otherwise, Verizon would "charge back" the commission from Zcom.  (Id. ¶¶ 244, 273.)  Verizon told Zcom that following the above instructions "was all that was required in order to ensure that the prepaid phone remained active for at least 180 days, thus avoiding 'chargebacks' of commissions."  (Id. ¶ 273.)

But such representations are now alleged to have been false, and the Verizon defendants knew as much.  (Id. ¶¶ 274, 276.)  Verizon never intended for agents to keep the $40.00 commission payments.  Verizon did not inform Zcom that in actuality a "test call" had to be made from the device in order to prevent deactivation within 150 days, "30 days shy of the minimum activation period for commissions."[3]  (Id. ¶¶ 277-79.)  Accordingly, Verizon was able to (1) report new phone activations and (2) recognize a profit by selling the prepaid minutes

---

[2] Verizon informed Zcom that it was to "start the prepaid accounts by crediting them with $15.00 and that after the first thirty days the accounts were to be replenished with $30.00."  (Am. Compl. ¶ 271.)  The customer was not informed, it is alleged, that these minutes were provided at the most expensive rates, commonly twenty-five cents per minute, and that the minutes expired in 30 days.  (Id. ¶¶ 266-67.)

[3] On December 8, 2009, a Zcom subagent contacted Zcom via e-mail expressing concern that the prepaid phones would become inactive during the chargeback period.  (Am. Compl. Ex. 15.)

while avoiding commission payments.[4]   (Id. ¶ 280.)  Beginning in April 2010, Verizon began to

"charg[e] back" commissions paid to Master Agents based on the December 2009 prepaid

activations.  (Id. ¶ 310.)  According to Zcom, approximately 40% of commissions paid for

prepaid activations were charged back.  (Id. ¶ 600.)

Verizon's "heavy 'push' of prepaid began in or about November 2009 . . . ."  (Id.

¶ 264.)  Verizon instructed Zcom to heavily promote the prepaid services (id. ¶ 304), though

notably, Zcom received no credit toward its minimum performance requirements based on

prepaid activations.[5]  (Id. ¶ 467.)  The Amended Complaint asserts that Zcom "as an entity did

not willfully or voluntarily participate in the [Verizon] [d]efendants' scheme, as Zcom did not

understand or comprehend [Verizon's] pre-paid fraudulent scheme until much later, after-the-

fact."  (Id. ¶ 312.)

---

[4] Allegedly, the original plan worked in practice as follows: a Master Agent would pay Verizon $13.20 (a discounted rate for $15.00 of prepaid minutes) within a day of the initial activation of the prepaid phone, and another $26.40 (a discounted rate for $30.00 of prepaid minutes) within 45 days of activation – totaling $39.60.  (Am. Compl. ¶¶ 282-84.)  Thereafter, Verizon paid the Master Agent a $40.00 commission and $20.00 "spiff" incentive. (Id. ¶ 285.)  The end customer often did not use the phone (which was marketed for "emergency use") within 180 days unless he requested a "test call" to ensure the phone was operational.  (Id. ¶¶ 289-92.)  A prepaid phone that did not have "test calls" made was deactivated within 180 days of activation.  Therefore, the agent became subject to a "chargeback" of the full $40.00 commission.  (Id. ¶¶ 286-87.)  Ultimately, Verizon received $79.60 – $39.60 from prepaid minutes and $40.00 in "charge backs."  After accounting for the $60.00 initially paid out as a commission and "spiff," Verizon realized a profit of $19.60 per prepaid activation.  (Id. ¶¶ 295-97.)

Beginning in January 2010, before any "charge backs" hit Zcom and its subagents, Verizon decreased the amount of minutes a Verizon agent needed to load onto the phone.  (Id. ¶¶ 298-99.)  Under the revised instructions, Verizon realized a profit of $6.40.  (Id. ¶¶ 300-01.)  The Amended Complaint indicates that once Zcom and its subagents became aware that there had to be some phone activity during the first 150 days, Verizon changed the plan so that loading the phone with $30.00 of prepaid minutes would keep the phone active for 180 days – long enough for an agent to keep the commission and "spiff" less the cost of minutes.  (Id. ¶ 9(b)(ii).)  It is unclear when Zcom became aware of this requirement, or whether the allegations describe a singular revised plan or two revised plans.  Even under the revised plan a prepaid phone could be deactivated before the end of the charge back period for other reasons, including a fictitious customer account name.  (Id.)

[5] Only post-pay subscription accounts counted toward minimum activation requirements and residual payments. (Am. Compl. ¶¶ 304 n.8, 468.)

Because Zcom did not participate in the scheme, Verizon, via Varghese, Broomes, Velez, and others, also initiated direct contact with Zcom's subagents and instructed them to promote CPE with prepaid services. (Id. ¶¶ 313-17.)  Verizon threatened to punish subagents who did not increase prepaid activations (id. ¶ 319) and sought to implement measures to financially harm underperforming stores.  (Id. ¶¶ 335-36; see, e.g., id. Exs. 16, 17.)  For instance, on or about December 4, 2009, Velez informed a Zcom subagent that people would lose jobs if activations were not made, and that higher-ups including Varghese were demanding more prepaid numbers.  (Id. ¶¶ 460-61; id. Ex. 14.)

While the agreements governing the relationships between Zcom and its subagents prohibited "[u]nethical and fraudulent activity" (id. ¶ 333), Verizon directed Zcom's subagents "to activate cellular instruments which had already been discarded by customers who had upgraded to newer equipment with prepaid services, even in fictitious names."  (Id. ¶ 306.) "The fictitious and fraudulent activations made by the [subagents] of Zcom, at the command of [Verizon], includ[ed] false celebrity account holders (sic) names."  (Id. ¶ 325.)  Two of the subagents that activated prepaid accounts under fictitious names were owned by Shelly Bhumitra and Poonam Sawnhey.  Zcom asserts that, in violation of New York State Penal Law § 175.05, Verizon caused Zcom's subagents to record the fraudulent activations, including the false celebrity account holder names, into their business records, which were then transmitted to Zcom's headquarters.  (Id. ¶¶ 324-25.)

Zcom suspected fraud (id. ¶ 327), and "detected what appeared to be fictitious prepaid account activations."  (Id. ¶ 337.)  Zcom did not know that Verizon employees were directly contacting its subagents.  (Id. ¶ 332.)  Thus, it reported the fraudulent activations to Verizon, and on November 29, 2009, informed Verizon that it was implementing a

8

"comprehensive anti-prepaid fraud program." (Id. ¶¶ 337-38.)  While Verizon commended

Zcom, it was simultaneously and covertly "coercing" Zcom's subagents to commit the very same

"prepaid activation fraud."  (Id. ¶ 339.)  Zcom alleges it was "unaware of the extent of

[Verizon's] misconduct."  (Id. ¶ 9(c).)

4.  The "Cover-Up"

Ultimately, the prepaid scheme was terminated (id. ¶ 372) and the Verizon

defendants undertook to cover up their own misconduct by looking for "scapegoats."  (Id. ¶¶ 25-

26, 28(c).)  For instance Verizon terminated several of its employees, including Varghese.  (Id.

¶¶ 64, 372.)

Verizon also began its own internal investigation regarding the fraudulent prepaid

activations.  (Id. ¶ 377.)  Soon after June 15, 2010, Fiocco and Pavlicek visited Zcom's

headquarters "ostensibly in furtherance of their 'investigation.'"  (Id. ¶ 380.)  Pavlicek and Fiocco

spoke with a former Zcom employee, Charu Sodhi, who was visiting at the time.  Sodhi

informed the internal investigators that Verizon was directing the "massive prepaid activations."

(Id. ¶ 386.)  Pavlicek was also shown documents indicating that Verizon had aggressively

promoted the sale of prepaid services, while Zcom attempted to prohibit unethical activations.

(Id. ¶ 387.)

Zcom and its employees substantially complied with the investigators' requests.

(Id. ¶¶ 381-82.)  The investigation, according to Zcom, was a farce with a predetermined result.

(Id. ¶ 377.)  Pavlicek and Fiocco were actually fabricating evidence in order to cast blame onto

Zcom, "as a means of 'whitewashing' the [Verizon] Defendants' own wrongdoing . . . ."  (Id. ¶

374.)

In a letter dated July 26, 2011, Verizon terminated the Agency Agreement with

Zcom, effective as of January 31, 2012. (Id. ¶¶ 368, 404; id. Ex. 5.) The letter states:

> [T]his letter constitutes [Verizon's] without cause notice of termination of its agency relationship with Zcom . . . effective as of 11:59 PM EST on January 31, 2012.
>
> Although this is a termination of the Agreement and of the parties' agency relationship for "no cause," I would like to point out that Verizon Wireless has grounds for a "with cause" termination.

(Id. Ex. 5.) The letter cites to Paragraph 8.8 of the Agency Agreement (id.), which specifically provides that Verizon "has the right to terminate this Agreement at any time, with or without cause, upon six (6) months prior written notice to Agent." (Id. Ex. 4 ¶ 8.8.)

The letter goes on to explain that Zcom, *inter alia*, engaged in the fraudulent prepaid activation scheme by (1) making at least 125 false prepaid activations and (2) providing daily prepaid activation quotas to its subagents, advising them to use phony customer names if they could not meet the quotas legitimately. (Id. Ex. 5.) The letter avers that Zcom took part in other improper and/or unethical conduct including: paying for a Verizon employee to travel to Europe;[6] issuing a mortgage to another Verizon employee; making improper gifts to Verizon employees; fraudulently obtaining commissions; and submitting false invoices. (Id.) According to Zcom, many of these false charges were fabricated via Pavlicek's collaboration with Shelly Bhumitra.[7] (Id. ¶ 378.)

---

[6] The Amended Complaint identifies this individual as Varghese, and claims that the trip was actually organized by Shelly Bhumitra. (Am. Compl. ¶ 378.)

[7] The non-Verizon defendants also played a significant role in Zcom's termination. Specifically, the Bhumitras and Poonam Sawnhey fabricated false allegations against Zcom in collaboration with Verizon employees. (Am. Compl. ¶¶ 106, 119, 123.) For instance, Shelly "corrupted an (sic) Zcom employee . . . to steal information which was proprietary to Zcom which was then sent to Shelly and maintained by Shelly on his own computer system." (Id. ¶ 112.) Before a scheduled meeting with Pavlicek, Zcom's CEO purportedly received a package from an "Anonymous Benefactor" containing records and materials "that Shelly caused to be stolen from Zcom" and "evidence that Pavlicek was communicating and collaborating with Shelly Bhumitra, despite Shelly's fictitious

The Agreement facially permits Verizon to terminate "without cause" (id. Ex. 4 ¶ 8.8), and Verizon's letter stated the termination was for "no cause." (Id. Ex. 5.)  Plaintiff alleges that Verizon provided "internally generated, fabricated, or false claims of bad acts" as "cause." (Id. ¶ 409.)  Verizon only claimed the termination was "without cause" in order to prevent Zcom from later contesting it in court. (Id. ¶ 410.)

## 5. The "Freeze-In" Scheme

After receiving the termination letter, Zcom attempted to convince Verizon to reconsider its decision.  It offered evidence that the allegations put forth in the July 26, 2011 termination notice were false. (See, e.g., id. Exs. 12, 21.)  This was to no avail.

Zcom then sought to mitigate its damages by selling its corporate-owned and subagent locations to another Verizon Master Agent. (Id. ¶¶ 438-39.)  Paragraph 10.8 of the Agency Agreement provides that the "Agent shall not, whether involuntarily or voluntarily, by merger or otherwise by operation of law, permit a Change of Control or transfer Control of Agent, or assign, delegate or transfer, in whole or in part, this Agreement, to any Entity without the prior written consent of [Verizon]." (Id. Ex. 4 ¶ 10.8.)

Zcom only sought to sell to business entities already authorized to sell Verizon products and services.[8]  Zcom presented Verizon with three prospective buyers. Verizon,

---

celebrity pre-paid activations." (Id. ¶¶ 370-71, Ex. 10.)  The package is annexed to the Amended Complaint as Exhibit 10.

[8] The Court notes that at oral argument before Judge Sheridan, Verizon represented that: "Verizon's contractual right to approve sales of Zcom locations to other Verizon agents, had no effect on Zcom's rights to sell its business to anyone other than Verizon agents.  It could have sold its business to AT&T, Sprint, T-Mobile, anybody else without any involvement by Verizon.  The only limitations in the contract dealt with Verizon's network itself and sales to Verizon agents." (Oral Argument Tr. at 12 (Feb. 19, 2013) ("Tr.").)  Indeed, an e-mail from Pina Salonna, Verizon's Director of Indirect Operations, to Zcom's CEO, explained, "To the extent that [Zcom] seeks to assign to an authorized [Verizon] Agent any of [Zcom's] rights and obligations under the October 7, 2008 Agent Agreement, the authorized [Verizon] Agent will need to formally request Verizon Wireless's written consent to the assignment as required by paragraph 10.8 . . . ." (Am. Compl. Ex. 5 at 000010.)

11

however, rejected Zcom's efforts to make a sale.  (Id. ¶¶ 446-453.)  The Amended Complaint

refers to such conduct as the defendants' "freeze-in" scheme.  Voluminous e-mail traffic

regarding the proposed transactions is annexed to the Amended Complaint as Exhibit 7; the

Court puts forth Zcom's interpretation of these communications, as described in the allegations

of the Amended Complaint.

The first prospective buyer ("Buyer #1") informed Zcom on or about October 8,

2011, that Verizon was showing Zcom's store locations to other agents for "what appeared to be

a take over (sic) of the entirety of Zcom without paying any consideration to Zcom."  (Id. ¶

448(b).)  Buyer #1 e-mailed Verizon on October 10, 2011, seeking preliminary approval to take

over as a Master Agent for Zcom.  (Id. ¶ 448(c).)  Verizon responded that it would need to

"independently evaluate" each store and refused to permit any buyer to purchase the subagent

locations.  (Id. ¶ 448(d).)  On October 14, 2011, Zcom e-mailed Verizon that it had been

informed Verizon was "seeking to steal all of Zcom's locations by distributing its stores to

'National Agents' of [Verizon]."  (Id. ¶ 448(e).)  Zcom subsequently e-mailed Verizon with a list

of stores that would be part of the deal with Buyer #1, and Verizon responded that "all of Zcom's

pre-approved locations would still have to be, in essence, re-approved, prior to any sale . . . ."

(Id. ¶ 448(g).)

The second prospective buyer ("Buyer #2") with whom Zcom engaged in

negotiations also had a pre-approved business relationship with Verizon.  (Id. ¶ 450(a).)  After

Buyer #2 contacted Verizon regarding a list of potential stores for purchase, Verizon advised

Buyer #2 that Verizon had to approve any deal the parties might make, only after the terms of the

deal were complete.  (Id. ¶ 450(c)-(f).)  On December 13, 2011, Buyer #2 told Zcom that "Zcom

stores were going to be coming to" it.  (Id. ¶ 450(g).)[9]

   The third prospective buyer, United Telecom, e-mailed Verizon when a deal

between Zcom and United Telecom was near final on December 15, 2011.  (Id. ¶ 452(a).)

Verizon responded that United Telecom and Zcom "had not provided requested information,"

even though Verizon knew the parties had provided such information.  (Id. ¶ 452(b).)  United

Telecom also made clear it was willing to either use preexisting approved Zcom subagents or

buy subagent locations and operate them through its corporate entity.  (Id.)  According to Zcom,

this proposal complied with the guidelines Verizon had communicated.  (Id.)  However, in an e-

mail dated January 11, 2012, Verizon urged that Zcom was not clear regarding its "authority to

consummate the deal" on behalf of its subagents. (Id. ¶ 452(d).)  Even after Zcom informed

Verizon on January 16, 2012 that it had obtained confirmation and leases from all the subagents

involved in the deal, Verizon only approved the transfer of 10 out of 71 proposed locations.  (Id.

¶ 452(e), (f).)  Verizon indicated that the subagent locations were not even considered because

Zcom had not provided proof of its authority to convey such locations.  (Id.)  United Telecom

again sought to make clear that it had obtained the written consent of the subagents involved in

the deal (id. ¶ 452(g)), but to no avail.  (Id. ¶ 452 (h)-(j).)

   On January 31, 2012, the Agency Agreement terminated, as did Verizon's

obligation to pay Zcom monthly "residuals" on postpaid accounts.  (Id. ¶ 408.)  Further,

Verizon, at its discretion, could now keep or "gift" Zcom's locations to the agents of its choosing

without compensating Zcom.  (Id.)

   Verizon "granted former Zcom [subagents] direct probationary licenses to market

---

[9] Zcom's brief in opposition clarifies the significance of the words "coming to."  According to Zcom, Verizon had informed Buyer #2 that it would receive these store locations, regardless of a deal, after the termination of Zcom's Agency Agreement.  (Pl. Mem. at 22.)

and sell [Verizon] branded products and services." (Id. ¶ 457.) These involved the same

locations Verizon did not allow Zcom to sell "in an effort to allow them to continue in business

by being taken over by an existing [Verizon] Master Agent." (Id.) Verizon directly awarded

agreements to prospective purchasers and their agents after thwarting deals between Zcom and

the same entities. (Id. ¶ 454.) The Verizon defendants "sought to tortiously enrich themselves"

by "taking Zcom's business, agents and locations" without compensation. (Id. ¶ 456.)

6. The "Freeze-Out" Scheme

The Amended Complaint describes a separate but related scheme in which

defendants stunted Zcom's store growth beginning in 2009. Until 2009, Zcom had been growing

at a rate of approximately 30 stores per year, and had recorded 150 store locations. (Id. ¶ 355.)

Zcom was on track to attain "National Agent" status in 2009, which would have entitled Zcom to

higher commissions, residuals, market development funds, advertising monies, etc., as well as

nationwide jurisdiction for store openings. (Id. ¶ 344.)

Beginning in 2009, Varghese and others stopped approving new Zcom stores in

an attempt to "freeze out" Zcom's growth.[10] Freezing Zcom's growth benefitted Verizon in that

Verizon saved money because it did not need to pay Zcom the higher residuals and commissions

it paid to "National Agents." (Id. ¶ 362.)

The "freeze-out" scheme also "incidentally benefitted" the three non-Verizon

defendants. (Id. ¶¶ 346-47, 359.) The non-Verizon defendants purportedly acted in concert in

order to destroy Zcom's agency relationship with Verizon. Zcom takes the position that

destroying its relationship with Verizon would permit Ajay Bhumitra, a Zcom competitor, to

---

[10] The Agency Agreement provided that new stores and subagents required Verizon's written approval. (Id. Ex. 4 ¶¶ 2.4.2, 2.7.)

take over "Zcom's empire of [Verizon] branded prized locations at little or no cost." (Id. ¶ 351.)

Varghese was a good friend of Shelly and Ajay Bhumitra. (Id. ¶¶ 58-59.) According to Zcom, Shelly Bhumitra, Ajay Bhumitra, and Poonam Sawnhey bribed Varghese to stop approving new Zcom stores. (Id. ¶¶ 117, 122, 354, 360.)  Shelly and Poonam also participated in Verizon's prepaid activation scheme – even activating prepaid accounts using fictitious account names – in order to "ingratiate" themselves with the Verizon defendants, including Varghese. (Id. ¶ 348.)  These prepaid activations further incentivized Varghese to freeze Zcom's expansion because such activations enabled Varghese to report growth among the agents he supervised. (Id. ¶¶ 118, 121-22, 352.)

After Varghese's termination in July 2011 – the same month Zcom received the termination letter – Verizon continued "[t]he freezing of Zcom's growth" until its termination became effective on January 31, 2012. (Id. ¶ 672.) "[T]he policies and practices that were employed by the [Verizon] Defendants to freeze Zcom's growth were approved of by, *inter alia*, by (sic) [Verizon]." (Id. ¶ 675.)

7. Subsequent Litigation

On September 20, 2011, after Verizon ended its agency relationship with Zcom, Shelly Bhumitra and Poonam Sawnhey, through their corporate subagents, commenced a class action lawsuit against Zcom in New York State Supreme Court (the "State Court Action"). (Id. ¶ 368 (Reachout Wireless, Inc., et al. v. In Touch, et al., Supreme Court New York County, Index No. 652587/2011 (Ramos, J.).)  Reachout and American Candy allege that (1) Zcom – not Verizon – fostered the fraudulent prepaid scam and (2) Zcom wrongfully withheld commissions. (Id.)  Zcom named Ajay Bhumitra, Shelly Bhumitra, and Poonam Sawnhey as defendants in the State Court Action.  Zcom asserted counterclaims against the non-Verizon defendants and their

15

corporate entities.

On November 4, 2011, Verizon filed an action in the United States District Court, District of New Jersey (the "Parallel Action") seeking a declaratory judgment that it validly terminated the Agency Agreement.  Cellco Partnership v. In Touch Concepts Inc., No. 11 Civ. 6493 (PGS) (TJB) (D.N.J. filed Nov. 4, 2011), upon subsequent transfer, 13 Civ. 1418 (PKC) (S.D.N.Y.).  Zcom asserts that Verizon did not comply with the Agreement's pre-suit notice and negotiation provisions prior to filing (Am. Compl. ¶¶ 773-76; see id. Ex. 4 ¶ 14) and was dishonest with the New Jersey District Court regarding its compliance with the same.  (See id. ¶ 780.)

The third suit, the instant action, was filed in New York State Supreme Court on December 28, 2011.  The original complaint asserted class claims against the Verizon defendants for (1) tortious interference; (2) fraud and deceit; and (3) misrepresentation.  The non-Verizon defendants were not named as defendants in any of the class claims.  Zcom asserted, in its individual capacity, tort claims against the Verizon defendants as well as the non-Verizon defendants.

On January 3, 2012, Verizon and several other then-named defendants removed the instant case to this District, pursuant CAFA, alleging minimal diversity of citizenship. (Docket No. 1 ¶ 11.)  The Notice of Removal asserted that the Court had supplemental jurisdiction over the individual claims.  (Id. ¶ 19.)  On January 24, 2012, after denying plaintiff's request for a preliminary injunction and in accordance with the first-filed rule, this Court transferred the action to the United States District Court for the District of New Jersey.  (Docket No. 12.)

On May 5, 2012, during the suit's pendency in the District Court of New Jersey,

Zcom amended the complaint.  The Amended Complaint removed the class allegations as well as

certain defendants.[11]  While the Amended Complaint contains no class allegations, Zcom

continues to assert, in its individual capacity, the claims for (1) tortious interference; (2) fraud

and deceit; and (3) misrepresentation against the Verizon defendants, as well as the various other

tort claims.  The Amended Complaint also adds breach of contract claims asserted against

Verizon.

Defendants filed four separate motions to dismiss (Docket Nos. 42, 46, 47, 48),

pursuant to (1) Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim; (2) Rule 12(b)(2), Fed.

R. Civ. P., for lack of personal jurisdiction; and (3) Rule 12(b)(3), Fed. R. Civ. P. and 28 U.S.C.

§§ 1391, 1406, for improper venue.  Judge Sheridan, of the District of New Jersey, heard oral

argument of the various motions on February 19, 2013.  Thereafter, he transferred the instant

case as well as the Parallel Action to this District on March 1, 2013. (Docket No. 65.)

Accordingly, the Court need not address arguments advanced by Ajay Bhumitra, Shelly

Bhumitra, and Poonam Sawnhey that (1) venue was improper in the District of New Jersey and

(2) the District of New Jersey lacked personal jurisdiction over such defendants.  The Court now

considers defendants' motions to dismiss, pursuant to Rule 12(b)(6), for failure to state a claim

upon which relief can be granted.

MOTION TO DISMISS STANDARD UNDER RULE 12(b)(6)

To survive a motion to dismiss for failure to state a claim upon which relief can

be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell

---

[11] On March 26, 2012, several defendants served Zcom with a proposed sanctions motion pursuant to Rule 11(c)(2), Fed. R. Civ. P.  (Verizon Mem. at 5.)  Zcom asserts the filing of an amended complaint "was NOT the result of [Verizon's] threats" to move for sanctions.  (Pl. Mem. at 2.)

Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In assessing a complaint, courts draw all reasonable inferences in favor of the non-movant.  See In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).  Legal conclusions, however, are not entitled to any presumption of truth, and a court assessing the sufficiency of a complaint disregards them.  Iqbal, 556 U.S. at 678.  Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.

"[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).  "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."  DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).  "However, 'even if a document is "integral" to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.'"  Id. (quoting Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006)).

ANALYSIS

The Court first addresses the threshold issue of subject matter jurisdiction.  Then the Court discusses defendants' motions to dismiss the causes of action alleged in the Amended Complaint.  Finally, the Court considers Varghese's motion to strike certain allegations in the Amended Complaint.

I. Subject Matter Jurisdiction

Removal of this action from state to federal court was premised upon the

18

congressional grant of subject matter jurisdiction on the basis of minimal diversity where certain

state law class action claims are asserted.  28 U.S.C. §§ 1332(d), 1453.  But, while the action was

pending in federal court, plaintiff was permitted to amend its complaint to remove the class

action allegations.  Had removal been premised upon the amended complaint, it would have been

improper.  The question here is whether the post-removal amendment destroys subject matter

jurisdiction under CAFA.[12]

1.  Original Jurisdiction

In general, federal courts adhere to the precept that subject matter jurisdiction is

determined based on the circumstances at the time of *filing*.  Grupo Dataflux v. Atlas Global

Group, L.P., 541 U.S. 567, 570-71 (2004) ("This time-of-filing rule is hornbook law (quite

literally)." (footnote omitted)); LeBlanc v. Cleveland, 248 F.3d 95, 100 (2d Cir. 2001) (per

curiam).  Subsequent events do not necessarily divest a district court of its diversity jurisdiction.

St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 293-95 (1938) (noting that after

removal subsequent change of party's citizenship or reduction of amount in controversy does not

oust federal court of jurisdiction).

The Seventh Circuit has concluded that a "post-removal amendment . . . does not

destroy CAFA jurisdiction."  In re Burlington Northern Santa Fe Ry. Co., 606 F.3d 379, 381 (7th

Cir. 2010) (per curiam).  The Seventh Circuit's reasoning drew upon the above-stated

jurisdictional principle: CAFA is an extension of the court's diversity jurisdiction, which is

usually not destroyed by subsequent changes.  Id.  Moreover, while "it is sometimes possible for

a plaintiff who sues in federal court to amend away jurisdiction, removal cases present concerns

---

[12] On March 20, 2013, this Court ordered the parties to address in simultaneous letter briefs (1) whether the Court has subject matter jurisdiction over the remaining claims and (2) assuming it does, whether the Court must exercise supplemental jurisdiction over such claims.  (Docket No. 72.)

19

about forum manipulation that counsel against allowing a plaintiff's post-removal amendments to affect jurisdiction." Id. (citing Rockwell Int'l Corp. v. United States, 549 U.S. 457, 473-74 & n.6 (2007)). The manipulation concern arises because a dissatisfied plaintiff could seek to avoid anticipated adverse rulings from a federal court by removing class claims.

Burlington analogized the plaintiff's decision to not pursue class allegations to a district court's non-certification of a class, a development that several circuit courts have now concluded does not destroy CAFA jurisdiction. Cunningham Charter Corp. v. Learjet, Inc., 592 F.3d 805, 807 (7th Cir. 2010) ("Our conclusion vindicates the general principle that jurisdiction once properly invoked is not lost by developments after a suit is filed, such as a change in the state of which a party is a citizen that destroys diversity.") (Posner, J.); see also Metz v. Unizan Bank, 649 F.3d 492, 500-01 (6th Cir. 2011) (following Cunningham); United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. Shell Oil Co., 602 F.3d 1087, 1091-92 (9th Cir. 2010) (following Cunningham); Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1268 n.12 (11th Cir. 2009) (noting failure to show numerosity does not destroy subject matter jurisdiction under CAFA because "jurisdictional facts are assessed at the time of removal" and post-removal events "do not deprive federal courts of subject matter jurisdiction"). The court in Burlington noted, "[t]he same considerations of expense and delay apply" in both scenarios. 606 F.3d at 381.

The Court had subject matter jurisdiction premised upon CAFA at the time of removal, a point no party disputes. The Court adopts the Seventh Circuit's conclusion that the Court retains subject matter jurisdiction even when the claims upon which jurisdiction was originally premised are dropped by means of an amendment to the pleading. The Court retains original jurisdiction over the claims previously asserted as class claims.

2. Supplemental Jurisdiction

      The Court next considers whether it should or must exercise supplemental jurisdiction over the remaining state law causes of action.  The Notice of Removal asserted that "[t]hose claims in the Complaint over which this Court does not have original jurisdiction" pursuant to CAFA formed part of the same case or controversy, and thus, the Court had supplemental jurisdiction over such claims.  (Docket No. 1 ¶ 19.)  Except as otherwise provided, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  That 28 U.S.C. § 1367(b) puts forth *exceptions* to the general rule articulated in § 1367(a) for cases where original jurisdiction is premised on 28 U.S.C. § 1332, indicates that supplemental jurisdiction potentially exists in a case involving diversity jurisdiction.[13]

---

[13] Other district courts have expressed disagreement over whether supplemental jurisdiction under 28 U.S.C. § 1367 applies in the CAFA context.  The follow Courts have found that post-dismissal of the CAFA claims, principles of supplemental jurisdiction control.  Oskar v. IDS Property Cas. Ins. Co., No. 09 Civ. 4516, 2011 WL 1103905, at *7 (E.D.N.Y. March 23, 2011) ("As the basis for federal jurisdiction in this matter rests on the Class Action Fairness Act ('CAFA'), 28 U.S.C. [§] 1332(d)(2), and since all class claims have been dismissed pursuant to this Order, any surviving individual claims rest on this Court's supplemental jurisdiction pursuant to 28 U.S.C. [§] 1367(a)."); Delebreau v. Bayview Loan Servicing, LLC, 770 F. Supp. 2d 813, 821-22 (S.D. W.Va. 2011) (noting that after summary judgment was granted as to plaintiff's CAFA claims, supplemental jurisdiction provided the only possible basis for jurisdiction over plaintiff's individual claims and dismissing such claims), aff'd, 680 F.3d 412 (4th Cir. 2012); Taragan v. Nissan North America, Inc., No. C 09-03660, 2011 WL 941132, at *4 (N.D. Cal. March 16, 2011) (declining to exercise supplemental jurisdiction over state-law claims where CAFA-based claims no longer pending and distinguishing cases involving non-certification or de-certification of a class), aff'd in part, rev'd in part, 475 Fed. App'x 221 (9th Cir. 2012).  Other courts have found supplemental jurisdiction principles to be inapplicable.  Louisiana v. AAA Ins., No. 07 Civ. 5528, 2011 WL 5118859, at *11 (E.D. La. Oct. 28, 2011) (noting diversity jurisdiction is not discretionary and concluding supplemental jurisdiction statute is inapplicable); Colomar v. Mercy Hosp., Inc., No. 05 Civ. 22409, 2007 WL 2083562, at *3 (S.D. Fla. July 20, 2007) (noting "it is not readily apparent how a court can retain original jurisdiction of a case under CAFA, yet remand under a supplemental jurisdiction theory").

The Court may decline to exercise supplemental jurisdiction over a claim for several reasons including that "the district court has dismissed all claims over which it has original jurisdiction" and "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(3), (4). The CAFA claims, while no longer asserting class allegations, technically remain pending as individual claims. Thus, the Court has not "*dismissed* all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3) (emphasis added), and instead considers whether there exist "exceptional circumstances" under § 1367(c)(4).[14]

The Second Circuit has observed that in order to be considered exceptional, a circumstance must be "'quite unusual'" and that "federal courts 'must ensure that the reasons identified as "compelling" are not deployed in circumstances that threaten'" the principle that declining jurisdiction outside of § 1367(c)(1)-(3) is "the exception rather than the rule." Itar–Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 448 (2d Cir. 1998) (quoting Executive Software N. Am., Inc. v. United States Dist. Court, 24 F.3d 1545, 1558 (9th Cir. 1994)). "Once a court identifies one of the factual predicates which corresponds to one of the subsection 1367(c) categories, the exercise of discretion is informed by whether remanding the [supplemental] state claims comports with the underlying objective of most sensibly accommodating the values of economy, convenience, fairness, and comity." Id. at 446 (internal quotation marks and citation omitted).

As to the Verizon defendants, the Court concludes there are not exceptional circumstances and, in any event, concerns of judicial economy, convenience, fairness, and

---

[14] The parties' submissions consider the issue as if § 1367(c)(3) applies. The Court's conclusions regarding whether it ought to exercise supplemental jurisdiction would remain the same even if the Court had dismissed all claims over which it has original jurisdiction and proceeded to analyze the remaining claims under § 1367(c)(3).

comity would favor exercising jurisdiction over all claims asserted against these defendants. All of the tort claims asserted against Verizon and its individual employees rely on substantially similar factual allegations. Moreover, the Parallel Action, which seeks a declaratory judgment regarding Zcom's termination, involves issues also raised in Zcom's breach of contract claims. As the Parallel Action was initially filed in the District of New Jersey, it cannot be remanded to state court. In order to maximize efficiency and avoid a race to judgment, it is most reasonable for both actions to proceed in this District.

But the claims asserted against the non-Verizon defendants are differently situated. It is appropriate to remand them to the state court from which they were removed, even under the higher standard contemplated by § 1367(c)(4) because there are exceptional circumstances and compelling reasons to decline exercising jurisdiction. The Court notes the unusual circumstances under which the non-Verizon defendants arrived in federal court. Zcom did not file this action in federal court, and the non-Verizon defendants did not remove the case to federal court. Rather, other defendants removed the action pursuant to CAFA, which does not require all defendants to consent to removal. However, Zcom has never asserted class allegations – the basis for the Court's original jurisdiction – against any of the non-Verizon defendants. While CAFA may contemplate that the non-Verizon defendants must live with a co-defendant's decision to remove, here, the class claims are no longer pending.

Moreover, after the instant litigation was filed in state court, Zcom named Ajay Bhumitra, Shelly Bhumitra, and Poonam Sawnhey, the non-Verizon defendants, as defendants in the State Court Action filed by the two corporate entities affiliated with Shelly Bhumitra and Poonam Sawnhey. Zcom filed counterclaims, which contain substantially similar allegations as alleged in the instant action. (Bhumitra & Sawnhey Ltr. Br. at 1-2; see also Bhumitra Ltr. Br. at

23

1 (noting counterclaims against Ajay in the State Court Action were based "upon the same purported facts . . . and, in many respects, duplicative" of the claims asserted against Ajay in this action).)  See Phillip Morris Inc. v. Heinrich, 95 Civ. 0328, 1998 WL 122714, at *2 (S.D.N.Y. March 19, 1998) (noting one compelling reason to decline exercising jurisdiction was existence of pending state court action addressing same claims); but see SST Global Tech., LLC v. Chapman, 270 F. Supp. 2d 444, 459-63 (S.D.N.Y. 2003) (finding no exceptional circumstances where claims in state proceeding were not identical to claims in federal proceeding).[15]

Thus, Zcom has initiated two related proceedings against the non-Verizon defendants, who now defend themselves in two separate judicial systems.  Discovery has been stayed in the instant action, while the parties have already begun to exchange responsive materials in the State Court Action. (Bhumitra Ltr. Br. at 2.)  Remanding the claims against the non-Verizon defendants would "avoid the inherent duplication of discovery, depositions, as well as potentially inconsistent rulings." (Bhumitra & Sawnhey Ltr. Br. at 3.)

Furthermore, the two claims asserted against the non-Verizon defendants in this action for (1) injurious falsehood and (2) tortious interference with prospective business relations are at best peripheral to the allegations at the core of the Amended Complaint involving Zcom's dispute with Verizon and its employees.  Remanding the claims against the non-Verizon defendants would foster efficient case management in the action remaining in this Court, while minimizing the resources expended by the parties.

Given these unusual circumstances, the Court concludes remanding such claims

---

[15] The letter briefs of Ajay Bhumitra, Shelly Bhumitra, and Poonam Sawnhey indicate that Judge Ramos of the New York State Supreme Court has already dismissed several of Zcom's counterclaims against defendants.  Defendants' motions to dismiss Zcom's amended counterclaims are currently pending.  The non-Verizon defendants seek remand to state court.

would best promote fairness to the parties and maximize judicial efficiency, while posing

minimal threat to the general precept that declining jurisdiction is the exception rather than the

rule.  Accordingly, the Court declines to exercise supplemental jurisdiction over the claims

asserted against Ajay Bhumitra, Shelly Bhumitra, and Poonam Sawnhey.

   The Court proceeds to address the claims asserted against the remaining

defendants – the Verizon defendants.

## II. Zcom's Breach of Contract Claims against Verizon

   The Amended Complaint asserts several claims alleging that Verizon breached

the 2008 Agency Agreement.[16]  Count VIII asserts that Verizon breached the Agreement by

failing to comply with pre-suit notice and negotiation provisions before filing the Parallel Action

in the District of New Jersey.  Count IX asserts that Verizon breached the Agreement by

claiming in bad faith that it was terminating Zcom "without cause" when in truth it internally

purported to have "cause," but it was a bad faith determination of "cause."  Count X asserts that

Verizon otherwise breached the Agreement by way of breaching the implied covenant of good

faith and fair dealing.  Relatedly, Count XI seeks a declaratory judgment that Paragraph 10.2 of

the Agreement, which expressly waives all implied duties of good faith and fair dealing, is

unenforceable.  As several of the breach of contract claims depend on whether Paragraph 10.2 is

valid and enforceable, the Court addresses the claim for declaratory relief before proceeding to

Zcom's claims for damages.

## 1. Express Waiver of Implied Covenant of Good Faith and Fair Dealing (Count XI)

   For all contracts, New York law imposes an implied covenant of good faith and

---

[16] The Agency Agreement's "Governing Law" provision states that "the interpretation and enforcement of this Agreement and all matters arising out of or relating to it shall be governed by the law of New York."  (Am. Compl. Ex. 4 ¶ 10.1.)

fair dealing such that a party may be in breach of the duty even when it has abided by the express terms of the contract. Fishoff v. Coty Inc., 634 F.3d 647, 653 (2d Cir. 2011); 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153 (2002).  The implied "covenant [of good faith and fair dealing] embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." 511 W. 232nd, 98 N.Y.2d at 153 (internal quotation marks and citation omitted); Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc., 97 A.D.3d 781, 784 (2d Dep't 2012) (holding complaint adequately alleged breach of implied covenant where defendant purportedly circumvented exclusivity provision in contract by converting milk "distribution" portion of business into "delivery" business); Frankini v. Landmark Constr. of Yonkers, Inc., 91 A.D.3d 593, 595 (2d Dep't 2012) (holding complaint adequately alleged breach of implied covenant where payment was due upon "completion and *sale*" of property and defendant *leased* property after completion).  "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995).

Paragraph 10.2 of the Agency Agreement, titled "No Implied Duties," states that "[i]t is understood and agreed that this Agreement is not subject to any implied duties of good faith or fair dealing." (Am. Compl. Ex. 4 ¶ 10.2.) Zcom seeks declaratory judgment severing Paragraph 10.2 from the Agency Agreement because, it argues, it is unenforceable under New York law.  The parties agree there is no New York state case law directly on point.  According to Zcom, no such authorities exist because the question is "so basic." (Pl. Mem. at 32.)  Verizon asserts it is not aware of authorities refusing to give effect to such a waiver (Verizon Mem. at 10-11), and cites Schuster v. Dragone Classic Motor Cars, Inc., 98 F. Supp. 2d 441, 447 (S.D.N.Y.

26

2000), for the proposition that broad contractual waivers of rights are generally enforceable.

The modern conception of an implied covenant of good faith and fair dealing is found in the New York Court of Appeals decision in The Kirke La Shelle Company v. The Paul Armstrong Company, 263 N.Y. 79 (1933). Briefly, the parties entered into an agreement to share royalties on a 50-50 basis from revivals of a play "Alias Jimmy Valentine" and granted each party pre-approval rights. Id. at 82. At the time of the 1921 agreement, talking pictures did not exist and were not addressed in the agreement. Concluding that a talking movie version of the play could destroy the value of a stage production, the Court implied a negative covenant not to destroy the value of the contract:

> [I]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.

Id. at 87. A partial answer to the question of whether this covenant can be waived or contracted away is found in common sense principles and dicta in The Kirke La Shelle. The Court distinguished an earlier federal case in words that express support for the proposition that the language of a contract may, depending upon its specificity, foreclose a covenant that might otherwise be implied:

> There the court refused to imply a negative covenant . . . because the defendant was an innocent purchaser for value without notice and the contract expressly reserved to the grantor not only the motion picture rights but also all other rights.

Id. at 89 (citing Macloon v. Vitagraph, Inc., 30 F.2d 634, 635 (2d Cir. 1929)). The proposition which the The Kirke La Shelle court appeared to approve is wholly unremarkable. It is akin to a court declining to imply a term obligating a party to perform within a reasonable time where the

contract expressly provides a specific time for performance. Where the implied covenant of good faith and fair dealing is sought to be used as a contractual gap filler, i.e. to restrain or require action for which there is no express provision in the contract, this Court concludes that other express language of the contract may foreclose such use.

But New York cases have expanded the use of the implied covenant of good faith in a manner other than as a gap-filler. For example, it is used to cabin some contractual rights, holding that a contractual right affording discretion may not be exercised in bad faith – arbitrarily, irrationally, or malevolently. E.g., Dalton, 87 N.Y.2d at 389; see also Richbell Info. Servs., Inc. v. Jupiter Partners, L.P., 309 A.D.2d 288, 302 (1st Dep't 2003). But even here the express provision of the agreement may negate a limitation on the exercise of a contractual right by defining when, with greater precision, discretion may or may not be exercised. So, for example and as will be discussed herein, a contractual right to terminate "without cause" means precisely that and the exercising party need not justify its exercise of that right in a judicial forum.

But these principles do not answer one of the questions presented in this case: may the parties to a contract by a single term wholesale disclaim the implied covenant of good faith and fair dealing and thereby foreclose its use for any purpose by a court construing a contract? The first issue is to discern the parties' intent in including this provision. Then, assuming it manifests an intent to strip a court of the ability to use the implied covenant as an interpretive tool, the next issue is whether such a result would offend the public policy of New York. While it may be convenient to view the implied covenant as embodying virtue and, literally, goodness, it has not been met so warmly in some of the literature and one author has

28

suggested that it may not be needed in view of other modern interpretive tools.[17]   Fortunately, the

Court need not reach the question at this juncture because, even if it is assumed that the covenant

should be implied despite the contractual carve-out, the result on this motion is not altered.

2.   Breach of Contract due to Verizon's Termination of Zcom (Count IX)

As mentioned, the July 26, 2011 termination letter purports to terminate Zcom

"without cause," citing Paragraph 8.8 of the Agreement, but then goes on to list numerous

reasons that Verizon considered adequate for a "cause" termination under separate provisions of

the Agreement, such as Paragraph 8.4.1.   Zcom asserts that Verizon breached the Agency

Agreement by couching its "for cause" termination as "without cause" in bad faith.   According to

Zcom, Verizon's "motives in terminating their contractual relationship were rooted in their bad

faith desire to punish Zcom for [Verizon's] own malice, while enabling [Verizon] to 'steal'

Zcom's assets and good will, without compensation."  (Pl. Mem. at 31.)   Count IX does not

plausibly allege a breach of the Agreement.

   i.            Zcom's Termination did not Breach the Express Terms of the Agency Agreement

Under New York law, when examining a contractual provision, "[t]he cardinal

principle for the construction and interpretation of . . . contracts . . . is that the intentions of the

parties should control."  SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC, 467 F.3d

107, 125 (2d Cir. 2006) (quoting Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 135

(2d Cir. 1986)).  "[T]he best evidence of intent is the contract itself; if an agreement is 'complete,

clear and unambiguous on its face[, it] must be enforced according to the plain meaning of its

terms.'"  Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168,

---

[17] H. Dubroff, *The Implied Covenant of Good Faith in Contract Interpretation and Gap-Filling: Reviling a Revered Relic,* 80 St. John's L. Rev. 559 (2006).

177 (2d Cir. 2004) (second alteration in original) (quoting <u>Greenfield v. Philles Records, Inc.</u>, 98

N.Y.2d 562, 569 (2002)).  "[A]mbiguity exists where a contract term could suggest more than

one meaning when viewed objectively by a reasonably intelligent person who has examined the

context of the entire integrated agreement and who is cognizant of the customs, practices, usages

and terminology as generally understood in the particular trade or business."  <u>Id.</u> at 178

(alteration in original) (quoting <u>World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.</u>, 345

F.3d 154, 184 (2d Cir. 2003) (internal quotation marks omitted)).  "Whether or not a writing is

ambiguous is a question of law to be resolved by the courts."  <u>Id.</u> (quoting <u>W.W.W. Assocs., Inc.</u>

<u>v. Giancontieri</u>, 77 N.Y.2d 157, 162 (1990)).

   Paragraph 8.8 of the Agency Agreement provides that Verizon "has the right to

terminate this Agreement at any time, with or without cause, upon six (6) months prior written

notice to Agent."  (Am. Compl. Ex. 4 ¶ 8.8.)  The Court concludes that Paragraph 8.8 is

unambiguous.  The plain language permits Verizon to terminate the Agency Agreement at any

time, with *or* without cause, so long as Zcom received notice at least six months in advance.

Thus, Verizon did not need a "cause" or any specific reason to terminate the Agreement.  <u>Cf.</u>

<u>Int'l Klafter Co., Inc. v. Continental Cas. Co., Inc.</u>, 869 F.2d 96, 99 (2d Cir. 1989) ("[T]he words

'any cause' do not admit of any interpretation other than the meaning of the words themselves:

termination is permitted for any reason at all.").

   Other provisions in the Agency Agreement do not render Paragraph 8.8

ambiguous.  True, separate provisions under Paragraph 8, titled "BREACH, TERMINATION,"

require Verizon to allow the breaching party time to take curative action.  Paragraph 8 states:

> This Agreement may be terminated immediately upon written
> notice to the breaching party if the breach is not cured within the
> applicable cure period provided, however, that such termination

notice may not be sent until after the applicable cure period has
expired.

(Am. Compl. Ex. 4 ¶ 8.) Paragraph 8.7 states that "[f]or any breach . . . for which a particular

cure period is not specified, the breaching party shall have a thirty (30) day cure period." (Id. ¶

8.7.) Paragraph 8.8, however, makes no mention of "reasonable discretion" or a "cure period."

It would be illogical for a "without cause" termination provision to provide a "cure period," as

there would be no underlying breach to cure. Had Verizon terminated the Agreement due to

"unethical, misleading, or unfair business practices" pursuant to Paragraph 8.4.1, it would have

been required to exercise reasonable discretion. How Verizon could exercise "*reasonable*

*discretion*" in the context of a "without cause" termination – which obviates the need for any

reason – is not evident. Accordingly, it is immaterial that Verizon failed to employ "reasonable

discretion" or provide a period for Zcom to take curative action, pursuant to separate contractual

provisions (e.g., Am. Compl. ¶¶ 800-02) because it was not required to do so. Verizon bargained

for the right not to be required to state a reason for termination and is entitled to the benefit of

that bargain.

There is no dispute that Verizon provided the contractually required six months

notice to Zcom for a "without cause" termination. The July 26, 2011 letter purported to

constitute a "without cause" notice of termination, pursuant to Paragraph 8.8, to take effect on

January 31, 2012. (Id. Ex. 5.) Thus, Verizon complied with the unambiguous terms of the

Agency Agreement. True, the July 26, 2011 letter also states:

> Although this is a termination of the Agreement and of the parties'
> agency relationship for "no cause," I would like to point out that
> Verizon Wireless has grounds for a "with cause" termination.

(Id.) That Verizon might have had a belief, well-founded or not, that it would have had good

cause to terminate under other provisions of the Agreement did not undermine its ability to terminate the Agreement "without cause" upon six months notice.

      ii.      <u>Zcom's Termination did not Breach the Implied Covenant of Good Faith and Fair Dealing</u>

The Amended Complaint alleges that the termination was carried out in bad faith because Verizon was punishing Zcom for not participating in the prepaid activation scheme and passing blame onto Zcom for the very misconduct it had orchestrated by fabricating evidence against Zcom. (Am. Compl. ¶¶ 7, 792-796, 809.) Thus, Zcom was deprived of the benefit of its bargain. (<u>Id.</u> ¶ 811.)

Assuming *arguendo*, as Zcom urges, that the implied covenant or good faith and fair dealing cannot be waived, it does not improve Zcom's position on termination. The implied obligation "is in aid and furtherance of other terms of the agreement of the parties." <u>Sheth v. New York Life Ins. Co.</u>, 273 A.D.2d 72, 73 (1st Dep't 2000) (quoting <u>Murphy v. Am. Home Prods. Corp.</u>, 58 N.Y.2d 293, 304 (1983)) (considering an at-will employment agreement). Therefore, "[n]o obligation can be implied . . . which would be inconsistent with other terms of the contractual relationship." <u>Id.</u> (alteration in original) (quoting <u>Murphy</u>, 58 N.Y.2d at 304); <u>see also Richbell Info. Servs.</u>, 309 A.D.2d at 302 ("[T]here is clearly some tension between, on the one hand, the imposition of a good faith limitation on the exercise of a contract right and, on the other, the avoidance of using the implied covenant of good faith to create new duties that negate explicit rights under a contract."). The implied covenant "encompass[es] any promises which a reasonable person in the position of the promisee would be justified in understanding were included." <u>511 W. 232nd</u>, 98 N.Y.2d at 153 (internal quotation marks and citation omitted).

New York State appellate courts have recognized that "[a] party has an absolute,

32

unqualified right to terminate a contract on notice pursuant to an unconditional termination clause without court inquiry into whether the termination was activated by an ulterior motive." Triton Partners LLC v. Prudential Sec., Inc., 301 A.D.2d 411, 411 (1st Dep't 2003) (quoting Big Apple Car, Inc. v. City of New York, 204 A.D.2d 109, 111 (1st Dep't 1994)) ("The breach of the covenant of good faith and fair dealing claim was properly dismissed since it was merely a substitute for a nonviable breach of contract claim."); A.J. Temple Marble & Tile, Inc. v. Long Is. R.R., 256 A.D.2d 526, 527 (2d Dep't 1998). Here, the Agency Agreement unambiguously permits Verizon to unconditionally terminate the agency relationship *without* cause, provided written notice is given to the agent at least six months in advance.[18]

Still, Zcom argues that where a contract affords a party discretion, the implied covenant mandates that the party exercise such discretion in good faith, rather than in an arbitrary or irrational manner. See Dalton, 87 N.Y.2d at 389; Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 41 A.D.3d 269, 270 (1st Dep't 2007) ("[T]he implied covenant obligated [the party] to exercise such discretion in good faith, not arbitrarily or irrationally."); Outback/ Empire I, Ltd. P'Ship v. Kamitis, Inc., 35 A.D.3d 563, 563 (2d Dep't 2006) ("Therefore, although certain provisions allowed the plaintiff, in its sole and absolute discretion, to terminate its obligations under the lease, the plaintiff was required to carry out its contractual obligations incident to the exercise of its discretion in good faith."). Further, Zcom asserts such contractual discretion may not be exercised malevolently. See Richbell Info. Servs., 309 A.D.2d at 302 (concluding allegations went beyond claiming defendant "should be precluded from exercising a

---

[18] The Court rejects Zcom's attempt to read a "good faith" condition into Paragraph 8.8 based on "good faith" requirements referenced in other provisions of the Agency Agreement. (Tr. at 18-20.) While other contractual provisions may expressly require the exercise of "good faith," Paragraph 8.8 does not. That Paragraph 8.8 does not mention such a requirement further evidences that Verizon had authority to terminate the Agreement unhampered by additional conditions or obligations.

contractual right" and supported a claim that defendant "exercised a right malevolently, for its own gain as part of a purposeful scheme").

However, an obligation cannot be implied which is inconsistent with or negates the express terms of the contract. A reasonable party in Zcom's position would not believe any implied limitations were incorporated into the "without cause" termination provision. Cf. Int'l Klafter, 869 F.2d at 99 ("The word 'cause' does not have any intrinsic component of good faith or even rationality; the words 'for any cause' are not the opposite of 'without cause.' Rather, 'any cause' means at will termination, even at the whim of the terminating party. The party terminating is not required to give any reason."). A contracting party who has bargained for a "without cause" termination provision and incurs a significant notice period in exchange in order to avoid subsequent litigation regarding whether the reason for termination was adequate is entitled to the benefit of that bargain.[19]

As the New York Court of Appeals recently noted, courts "do not ordinarily read implied limitations into unambiguously worded contractual provisions designed to protect contracting parties." Moran v. Erk, 11 N.Y.3d 452, 456 (2008). The language in Paragraph 8.8 makes plain that the fruits of the contract were contingent on Verizon's absolute discretion to terminate. Had Zcom wished for more restrictive grounds for termination, "it could have bargained with [Verizon] to include specific limitations on [Verizon's] ability to" terminate. World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp., No. 03 Civ. 8843, 2010 WL

---

[19] At oral argument before Judge Sheridan, Zcom advanced that the implied covenant limited Verizon's discretion to terminate the Agreement because Zcom did not have a *reciprocal* right to terminate "without cause." (Tr. at 17-18.) Zcom relies primarily on Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co., 650 F. Supp. 2d 314 (S.D.N.Y. 2009) (Rakoff, J.), which states that New York law does not recognize a claim for breach of the implied covenant in an "at-will" contract, a contract in which *both* parties have the right to terminate. Id. at 324. That only one party had the right to terminate without cause in this particular Agreement does not alter the Court's reasoning.

3155176, at *14 (S.D.N.Y. July 30, 2010) (Preska, J.), aff'd in part, vac'd in part, 694 F.3d 155

(2d Cir. 2012).

        For these reasons, Zcom has failed to plausibly allege that Verizon's termination

of the agency relationship breached the 2008 Agency Agreement.  Accordingly, Count IX of the

Amended Complaint is dismissed.

### 3. Breach of Contract by way of Breaching the Implied Covenant of Good Faith (Count X)

        Count X alleges that Verizon breached the Agency Agreement by way of

breaching the implied covenant of good faith and fair dealing.  Count X lists out allegations

regarding substantially all of the conduct discussed in the Amended Complaint (e.g., Verizon's

urging Zcom to participate in the prepaid activation scheme, coercing subagents to participate in

the same, charging back commissions, fabricating evidence, declining to permit Zcom's sale of

its business etc.).  (Am. Compl. ¶¶ 816-845.)  Indeed, Zcom charges that "[a]ll of the misconduct

of [Verizon] individually and in concert with the other [Verizon] [d]efendants was in bad faith

and unfair to Zcom."  (Id. ¶ 830.)

        The Court construes Count X to generally allege that Verizon exercised its

contractual rights in bad faith.[20]  Insofar as allegations in Count X relate to Zcom's termination,

the Court has already addressed and dismissed such allegations in its discussion of Count IX.

The Court could imagine other potential breach of contract claims based on alleged arbitrary or

irrational exercises of contractual discretion.  For instance, Paragraphs 2.4.2 and 2.7 condition

additional store locations and subagents on Verizon's written approval.  Likewise, Paragraph

---

[20] Verizon's motion treats Count X as alleging that Verizon breached the implied covenant of good faith and fair
dealing by *terminating* Zcom.  Zcom's brief in opposition does little to clarify the scope of Count X, but does
address Verizon's failure to act in good faith in a section separate from its argument that the termination in particular
breached the Agreement.  (Pl. Mem. at 30-32, 44-46.)

10.8 conditions assignment of the Agreement on Verizon's written approval.  (See Verizon Reply at 10-11 (noting much of the conduct for which Zcom alleges tort liability was contractually authorized and Zcom cannot recover in tort for damages that flow through contract).)

The viability of such a claim is questionable.  Cf. State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 170 (2d Cir. 2004) ("Where a contract allows a bank to withhold consent for particular conduct and sets no express restrictions on the bank's right to do so, the bank is not prohibited from unreasonably or arbitrarily withholding such consent.").  In Moran, the New York Court of Appeals concluded that the implied covenant of good faith did not limit an attorney's discretion to void a real estate contract pursuant to an attorney approval contingency provision, noting that courts "do not ordinarily read implied limitations into unambiguously worded contractual provisions designed to protect contracting parties." 11 N.Y.3d at 456.  While the Moran decision was also based on considerations specific to the contingency provision at issue, courts in this District "have interpreted Moran broadly." Serdarevic v. Centex Homes, LLC, 760 F. Supp. 2d 322, 334-35 (S.D.N.Y. 2010) (doubting viability of claim for breach of implied covenant of good faith and fair dealing where limitations on discretion were not created by contract language); see also World Wide Polymers, 2010 WL 3155176 at *13-14 (noting courts have extended Moran's logic to other types of discretionary clauses); Paxi, LLC v. Shiseido Ams. Corp., 636 F. Supp. 2d 275, 286 (S.D.N.Y. 2009) ("[T]he obligation of good faith and fair dealing does not negate a[n] expressly bargained-for clause that allows a party to exercise its discretion, unless that clause imposes a limit on the discretion to be exercised or explicitly states that the duty of good faith and fair dealing applies.").  The broad

36

application of <u>Moran</u> suggests that a court may not limit contractual discretion where limitations

are not supported by the express contractual language. <u>Serdarevic</u>, 760 F. Supp. 2d at 335.

In any case, the Court need not decide this issue, because Count X does not put

forth a breach of contract claim based on a breach of the implied covenant with any clarity or

specificity. Count X contains 30 paragraphs of meandering allegations without sufficient

explanation as to how they relate to the annexed Agreement between the parties. Then, in a

conclusory fashion, without reference to the terms of the Agreement, Zcom asserts it was

"deprived of the benefits" of the Agreement. (<u>Id.</u> ¶ 843.) A plausible claim that Verizon acted in

bad faith in order to deprive Zcom of the benefit of its bargain should logically include some

reference to the parties' bargain. Bad faith conduct is not considered in a vacuum, but rather, in

the context of the parties' intentions and expectations, as memorialized in the contract. Count X

is properly dismissed due to its lack of specificity. <u>See</u> Rule 8(a)(2), Fed. R. Civ. P. (requiring a

"short" and "plain" statement showing pleader is entitled to relief).

4. <u>Breach of Contract Claim arising out of Agreement's Pre-Suit Notice Provision (Count VIII)</u>

Paragraph 14 of the Agency Agreement, entitled "DISPUTE RESOLUTION

AND ESCALATION," provides that "Neither party may commence any court case against the

other party without first providing written notice and an opportunity to negotiate with the other

party." (Am. Compl. Ex. 4 ¶ 14.) The provision goes on to outline specific notice requirements

and negotiation procedures. (<u>Id.</u>)

Zcom now asserts that Verizon breached the Agency Agreement by initiating the

Parallel Action for declaratory judgment without first providing Zcom written pre-suit notice and

an opportunity to negotiate.[21] (Id. ¶¶ 762-782.) This failure to provide pre-suit notice purportedly damaged Zcom because it has spent money defending the Parallel Action and the instant action was transferred to the District of New Jersey. (Id. ¶¶ 777-78.)

      Verizon's argument for dismissal of Count VIII relies on New York state case law establishing that the "mere non-occurrence of a contractual condition precedent does not, by itself, give rise to a claim for breach of contract." (Verizon Mem. at 20-21 (citing Wood v. Laughlin, 103 A.D.2d 881 (3d Dep't 1984); Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc., 94 A.D.2d 947 (4th Dep't 1983), aff'd, 61 N.Y.2d 106 (1984)).) According to Verizon, Paragraph 14 "did no more than condition Verizon Wireless's contract right to bring a lawsuit against [Zcom] arising under the Agreement on the occurrence of certain pre-suit actions."[22] (Id. at 21.) Zcom's brief in opposition does not seriously address this argument, but rather regurgitates the complaint's allegations and re-catalogues Zcom's damages.

      Parties frequently include pre-suit notice and negotiation provisions in contracts. One would expect that if a party's noncompliance with such a provision could result in the award of money damages to its adversary, damages awards for costs and attorneys' fees (or at least counterclaims for such awards) would be relatively commonplace. Yet Zcom cites no authorities in the section of its brief addressing this claim, much less any case law holding a party liable for damages due to noncompliance with a pre-suit notice provision. This is consistent with New York's general policy that parties to a litigation bear their own attorneys' fees absent a statutory

---

[21] On May 29, 2012, Judge Sheridan denied Zcom's motion to dismiss the Parallel Action on this ground.

[22] Verizon also asserts that Paragraph 13 of the Agency Agreement expressly prohibits Zcom from recovering "consequential, incidental, indirect, punitive special or trebled or enhanced damages . . . claimed for breach of contract . . . ." (Am. Compl. Ex. 4 ¶ 13.) However, Verizon does not offer an explanation why damages resulting from noncompliance with the pre-suit notice conditions fall into any of these categories.

or contractual fee shifting provision. 214 Wall St. Assocs., LLC v. Med. Arts-Huntington Realty, 99 A.D.3d 988, 990 (2d Dep't 2012) (noting under the American Rule, which is followed in New York, attorneys' fees are an incident of litigation not recoverable absent a contractual provision or statutory authority). Zcom does not allege and the Court cannot imagine damages outside the expense of litigation itself.

But assuming a defendant can be held liable for money damages due to its noncompliance with a contractual pre-suit notice condition, Zcom has not plausibly alleged Verizon's liability in this case. Zcom must allege that the *breach* – the failure to give notice and an opportunity to negotiate – caused the alleged damages. Here, Zcom fails to plausibly allege that Verizon would not have brought the Parallel Action had it complied with Paragraph 14. Further, while Zcom alleges it was damaged by the Court's transfer to the New Jersey District Court (Am. Compl. ¶ 777), it does not plausibly allege that Verizon's compliance with Paragraph 14 would have altered this development.[23]

Therefore, the Court concludes that the appropriate relief for Verizon's failure to comply with the pre-suit notice and negotiation conditions, if true, is dismissal of the Parallel Action not money damages. The motion to dismiss Count VIII of the Amended Complaint is granted.

---

[23] At best, Zcom could argue that Verizon's compliance with such provisions would have necessitated a later filing date in the Parallel Action, and therefore, I would not have transferred this case to New Jersey in accordance with the first-filed rule. Accepting the allegations in the Amended Complaint as true, Zcom provided notice to Verizon of its own intent to sue earlier in 2011. (Am. Compl. ¶¶ 10-18.) Paragraph 14 provides that the parties must negotiate within fifteen days of the written pre-suit notice. Accordingly, Zcom must argue that it would have filed the instant action in New York State Supreme Court upon receiving Verizon's pre-suit notice and before Verizon had the opportunity to file the Parallel Action. The Amended Complaint does not allege that Zcom would have taken such measures.

III. Zcom's Tort and Quasi-Contract Claims against the Verizon Defendants

1. Tortious Interference with Existing Contracts (Count I)

Zcom alleges that the Verizon defendants tortiously interfered with existing contracts between Zcom and its subagents and customers. "Tortious interference with an existing contract is a commonly pled tort." White Plains Coat & Apron Co., Inc. v. Cintas Corp., 460 F.3d 281, 285 (2d Cir. 2006) ("White Plains I"). Under New York law,[24] in order to establish tortious interference with an existing contract a plaintiff must show the following: "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach, and (4) damages." Id. (quoting Foster v. Churchill, 87 N.Y.2d 744, 749-50 (1996)).

However, "procuring the breach of a contract in the exercise of equal or superior right is acting with just cause or excuse and is justification for what would otherwise be an actionable wrong." Foster, 87 N.Y.2d at 750 (internal quotation marks and citation omitted). Accordingly, "[i]n response to such a claim [for tortious interference], a defendant may raise the economic interest defense—that it acted to protect its own legal or financial stake in the breaching party's business." White Plains Coat & Apron Co., Inc. v. Cintas Corp., 8 N.Y.3d 422, 426 (2007) ("White Plains II"). "The imposition of liability in spite of a defense of economic interest requires a showing of either malice on the one hand, or fraudulent or illegal means." Foster, 87 N.Y.2d at 750.

---

[24] Verizon asserts that New York state law applies to all tort claims. (Verizon Mem. at 6 n.5.) Zcom's brief in opposition relies primarily on New York law, and does not advance that the law of another state applies. Varghese's brief treats the laws of New York and New Jersey as if there is no conflict. No party advocates that the Court should apply the law of New Jersey or any other state to plaintiff's tort claims. Thus, the Court applies New York law to all tort claims. See Fed. Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 566 (2d Cir. 2011) ("[W]here the parties agree that New York law controls, this is sufficient to establish choice of law."); Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (implied consent sufficient to establish choice of law).

The Court interprets Count I to allege liability based upon defendants encouraging and coercing Zcom's subagents to fraudulently activate prepaid accounts under fictitious account names, because such conduct caused the subagents to breach their contracts with Zcom. The Verizon defendants argue that liability for tortious interference with existing contracts is improper here because defendants merely exercised contractual termination rights, and "an act is not 'wrongful' for purposes of tortious interference liability if it is 'done in the exercise of an equal or superior right.'" (Verizon Mem. at 12-13.) The Court understands this argument to be based on a somewhat different interpretation of Count I, which reads the claim to assert liability "because Verizon Wireless terminated [Zcom] pursuant to the [alleged prepaid activation scheme], and as a result of [Zcom's] termination, all of [Zcom's] sub-agent agreements terminated as well." (Id. at 11.) The Court agrees that Count I is "vague" and "convoluted" (id.),[25] but interprets Count I to assert liability because defendants were in direct contact with Zcom's subagents "coercing them to commit the very prepaid activation fraud that Zcom was trying to thwart[.]" (Am. Compl. ¶ 339.) The Court does not understand Verizon to argue that defendants were exercising an "equal or superior right" when coercing subagents to make fraudulent activations under fictitious names.

Defendants also assert that plaintiff has failed to allege nonconclusory facts regarding (1) particular subagents who violated agreements with Zcom, (2) the specific agreements breached, and (3) how the alleged wrongful conduct actually breached such agreements. (Verizon Mem. at 13.) Tortious interference with existing contracts is an intentional tort. The complaint details that Zcom had approximately 120 subagent locations.

---

[25] Cf. Dean Aff. Ex. A at 64 (Transcript of Hearing in the State Court Action before the Honorable Charles E. Ramos on Aug. 9, 2012) ("If you can't allege counterclaims more succinctly I mean, I am almost inclined to dismiss the counterclaims based upon this, the size of this pleading. It's almost impossible to read . . . .").

The allegations refer generally to Zcom's subagents and do not specify which subagents the defendants intentionally induced to breach their contracts with Zcom. Thus, plaintiff has not adequately alleged its claim. See, e.g., Plasticware, LLC v. Flint Hills Res., LP, 852 F. Supp. 2d 398, 404 (S.D.N.Y. 2012) ("Plaintiff has not plausibly alleged adequate details about a specific contract between itself and a third party, but merely has alleged that it has 'agreements' with its customers. This is insufficient."); Bose v. Interclick, Inc., 10 Civ. 9183, 2011 WL 4343517, at *10 (S.D.N.Y. Aug. 17, 2011) ("[W]ithout facts regarding the terms of the contracts or the specific parties to the contracts, it cannot be determined if a contract indeed existed or if Defendants' activities procured a breach of those contracts.").

Zcom annexes exhibits containing e-mail traffic and other documents indicating that defendants and non-party Verizon employees contacted its subagents and instructed, or even pressured them to push the prepaid activations. It is less than clear which subagents received such communications and were consequently induced to breach their agreements. It is plaintiff's job to parse such communications in order to properly identify its claims to the Court, not *vice versa*. The complaint does detail a specific conversation between Velez and a particular subagent. During Velez's conversation with that subagent Velez stated: "Tom is asking for numbers." (Am. Compl. ¶ 462.) While this particular subagent is arguably well-identified, the annexed affidavit from the subagent's principal clearly states that he was *unwilling* to use the methods advanced by the Verizon employees. (Id. Ex. 14.) Accordingly, Zcom has not adequately alleged that this subagent breached his agreement with Zcom.[26]

---

[26] The complaint does, however, allege that the subagents owned by Shelly Bhumitra and Poonam Sawnhey activated prepaid accounts under fictitious names. Zcom alleges that these defendants were acting with Varghese's "approval." (Id. ¶ 536.) While somewhere in the 862-paragraph complaint there may be an allegation that defendants intentionally procured such breaches, plaintiff's prolix pleading does not make defendants' intentional

Further, Zcom does not plausibly allege that Pavlicek and Fiocco engaged in any interference.  Indeed, a reasonable reading of the complaint as a whole indicates that that Pavlicek and Fiocco acted only as internal investigators, and did not contact and encourage subagents to make fraudulent activations.  (See id. ¶ 314 (noting individuals including Varghese, Broomes, and Velez improperly and tortiously contacted subagents).)

The Court concludes that Zcom has not adequately pled the elements of a claim for tortious interference with existing contracts, and therefore need not address potential additional pleading infirmities that would also be grounds for dismissal.

2.  <u>Tortious Interference with Prospective Business Relations or Prospective Business Advantage (Counts IV and V)</u>

The Amended Complaint asserts two claims for tortious interference with *prospective* business relations. Count IV alleges that all defendants tortiously interfered with Zcom's prospective business relationships with its subagents and prospective subagents by hampering Zcom's store growth.  Count V alleges that the Verizon defendants tortiously interfered with Zcom's prospective business relationships by not approving Zcom's sale of its business to any of three interested purchasers before January 31, 2012.

A cause of action for tortious interference with prospective contractual relations requires that the plaintiff prove four elements: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." <u>Kirch v. Liberty Media Corp.</u>, 449 F.3d 388, 400 (2d Cir. 2006) (quoting <u>Carvel Corp. v. Noonan</u>, 350 F.3d 6, 17 (2d Cir. 2003)

---

conduct clear to the Court.  Rather, it appears that Bhumitra and Sawnhey engaged in the prepaid activation fraud in order to please the Verizon defendants, who in turn froze Zcom's growth.

("Carvel I")); see also Thorne v. Alexander & Louisa Calder Found., 70 A.D.3d 88, 108 (1st

Dep't 2009) (citing Carvel Corp. v. Noonan, 3 N.Y.3d 182, 189-190 (2004) ("Carvel II")).

"[C]onduct constituting tortious interference with business relations is, by definition, conduct

directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a

relationship." Carvel II, 3 N.Y.3d at 192.

The third element – the "wrongful means" element – requires that defendants

acted with a certain degree of culpability. "While New York law recognizes the tort of

interference with both *prospective* and *existing* contracts, 'greater protection is accorded an

interest in an existing contract (as to which respect for individual contract rights outweighs the

public benefit to be derived from unfettered competition) than to the less substantive, more

speculative interest in a prospective relationship (as to which liability will be imposed only on

proof of more culpable conduct on the part of the interferer).'" White Plains II, 8 N.Y.3d at 425-

26 (quoting Guard-Life Corp. v. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 191 (1980)).

"Wrongful means include physical violence, fraud or misrepresentation, civil suits and criminal

prosecutions, and some degrees of economic pressure; they do not, however, include persuasion

alone although it is knowingly directed at interference with the contract." Carvel II, 3 N.Y.3d at

191 (internal quotation marks and citation omitted).

The New York Court of Appeals explained in the Carvel II case that unless the

conduct at issue is "criminal or independently tortious," to establish the tort, the plaintiff must

prove that "defendant[s] [have] engage[d] in conduct for the sole purpose of inflicting intentional

harm." Id. at 190. "A motive of 'normal economic self-interest' is inconsistent with a sole

purpose of inflicting intentional harm." Hassan v. Deutsche Bank A.G., 515 F. Supp. 2d 426,

430 (S.D.N.Y. 2007) (Castel, J.) (quoting id.), aff'd, 336 Fed. App'x 21 (2d Cir. 2009);

44

Lawrence v. Union of Orthodox Jewish Congregations of Am., 32 A.D.3d 304 (1st Dep't 2006).

The New York Court of Appeals declined to address "whether any other exception to the general

rule exists – whether there can ever be other instances of conduct which, though not a crime or

tort in itself, was so 'culpable,' . . . that it could be the basis for a claim of tortious interference

with economic relations." Carvel II, 3 N.Y.3d at 190-91. Other courts have construed Carvel II

to leave open the possibility that "extreme and unfair" economic pressure may also constitute

"wrongful" means. E.g., Friedman v. Coldwater Creek, Inc., 551 F. Supp. 2d 164, 169-70

(S.D.N.Y. 2008) (Preska, J.), aff'd, 321 Fed. App'x 58 (2d Cir. 2009); see also MiniFrame Ltd.

v. Microsoft Corp., No. 11 Civ. 7419, 2013 WL 1385704, at *9 (S.D.N.Y. March 28, 2013)

(Sullivan, J.). The Court concludes the allegations do not fall into this potential exception.

i.      Refusal to Approve New Store Locations and Subagents (Count IV)

Zcom asserts that all defendants tortiously interfered with Zcom's prospective

business relationships by thwarting Zcom's expansion. Specifically, Zcom alleges that

beginning in 2009, Varghese, on behalf of Verizon, stopped approving new store locations and

subagents thereby cabining Zcom's growth. (Am. Compl. ¶ 653.) This was motivated, *inter*

*alia*, by bribes Varghese received from the non-Verizon defendants. (Id. ¶¶ 663-66.) After

Varghese's termination in July of 2011, Verizon continued to prevent Zcom's store growth.

The Verizon defendants assert they were merely exercising contractual rights

afforded by the Agency Agreement. (See id. Ex. 4 ¶ 2.4.2. ("Agent shall obtain the prior written

approval of [Verizon] before opening or acquiring any new locations where Agent intends to

market or sell [Verizon] Service and provide [Verizon] with written notice prior to closing any

Location."); id. ¶ 2.7 (prohibiting Agent from "delegat[ing] any of its rights and obligations

under this Agreement to any Entity, including an Affiliate of Agent without the prior written

45

consent of [Verizon]").)  The Court construes Verizon's argument to assert that because defendants were exercising discretion afforded by the Agency Agreement, they could not have employed the requisite "wrongful means" to establish a claim for tortious interference with prospective business relations.  The Court agrees.

Mere disapproval of new store locations and subagents is neither criminal nor independently tortious.  Rather, it was expressly sanctioned in the terms of the Agency Agreement.  Further, the Amended Complaint admits that the Verizon defendants' purpose was not *solely* to harm Zcom.  The "freeze out" of Zcom's new store growth "permitted [Verizon] not to pay Zcom at the 'Big 6' level of compensation, etc. . . . saving money for" Verizon.  (Am. Compl. ¶ 356.)  The allegations acknowledge that blocking new Zcom store locations was in Varghese's economic self-interest because he received payments from the non-Verizon defendants in exchange for refusing to approve new stores.   Moreover, the complaint admits that Varghese intended to benefit Verizon's bottom line.  (Id. ¶ 346.)  Therefore, while Zcom asserts that defendants acted with malice, it does not allege that inflicting intentional harm was defendants' *sole* purpose.

The Verizon defendants also move to dismiss Count IV because the "economic loss doctrine" bars recovery in tort where damages flow from contract.  (Verizon Mem. at 15.) The Verizon defendants do not cite New York case law in support of this proposition.  However, the Court agrees with the basic premise that where plaintiff's damages are based on a defendant's improper performance of a contract, a breach of contract action is the proper basis for plaintiff's recovery.  See Carvel II, 3 N.Y.3d at 193 (noting "[t]he intervention of tort law to regulate when a franchisor may or may not compete with its franchisees is neither necessary nor useful," where complex relationship is governed by contract).  While there are many allegations

of wrongful conduct in the complaint as a whole, the particular allegations of "interference" in Count IV do not encompass conduct broader than mere acts of contractual discretion. Essentially, the claim is duplicative of a potential breach of contract claim.

Finally, Count IV fails to state a claim because it does not allege any specific business relationships that Zcom would have obtained but for defendants' interference. (Verizon Reply at 10-11.) Zcom makes broad assertions that it "always had prospective subagents, and existing subagents looking to expand"; "[a]ll of the existing subagents seeking to expand had already been approved"; and the prospective subagents "were all prepared to market and sell [Verizon] branded products and services as part of the Zcom family." (Am. Compl. ¶¶ 667-69.) It does not identify any particular prospective subagent it would have obtained or any existing subagent that would have expanded but for defendants' conduct. Learning Annex Holdings, LLC v. Gittelman, 48 A.D.3d 211, 211 (1st Dep't 2008) (cause of action for tortious interference with prospective business relations is not viable since plaintiff has failed to identify any specific customers it would have obtained but for defendant's actions); Vigoda v. DCA Prods. Plus Inc., 293 A.D.2d 265, 267 (1st Dep't 2002) ("As plaintiffs cannot name the parties to any specific contract they would have obtained had they performed at the NACA showcase, they have failed to satisfy the 'but for' causation required by this tort.").

Acknowledging it has not identified specific prospective business relations (Pl. Mem. at 42),[27] Zcom argues that the Verizon defendants have notice of such business relations "because Zcom submitted applications to [Verizon], via [Varghese]" (id. at 40), and a principal

---

[27] Zcom also noted during oral argument before Judge Sheridan: "[T]his [claim] is the one where we're weakest at. Because in our submissions we have not submitted identification of specific store locations, even though they were then given to Verizon and are in Verizon's possession. We simply don't have possession or control over them, otherwise they would have been submitted." (Tr. at 24-25.)

is estopped from denying knowledge of facts regarding his agent's misdeeds.  (Id. at 41.)
Regardless of whether such knowledge is properly imputed to Verizon and its other employees,
Zcom cites no authority excusing it from pleading specific business relationships.  Assuming the
Amended Complaint provided adequate notice to the defendants, the Court remains tasked with
determining whether Zcom has plausibly alleged a claim.

For these reasons, the Court concludes that Zcom has failed to plausible allege a
claim for tortious interference with prospective business relations, and Count IV is dismissed as
to all remaining defendants.

ii.      Refusing to Approve Sale Post-Termination Letter (Count V)

According to Zcom, the Verizon defendants also tortiously interfered with its
prospective business relations by thwarting Zcom's attempts to sell its store locations before the
January 31, 2012 termination date.  Zcom attempted to sell to three prospective buyers.  Verizon
did not approve of the sales to the first two buyers and only approved the sale of 10 out of 71
store locations to a third buyer, United Telecom.  Later, Verizon awarded agreements to the same
prospective purchasers and their agents.  (Am. Compl. ¶¶ 438-457.)

Again, plaintiff fails to plausibly allege defendants' actions constituted "wrongful
means."  Paragraph 10.8 of the Agency Agreement, titled "Assignment and Amendment"
provides that the "Agent shall not, whether involuntarily or voluntarily, by merger or otherwise
by operation of law, permit a Change of Control or transfer Control of Agent, or assign, delegate
or transfer, in whole or in part, this Agreement, to any Entity without the prior written consent of
[Verizon]."  (Id. Ex. 4 ¶ 10.8.)

Withholding approval for the sales, pursuant to an express contractual provision,
does not amount to an independent crime or tort.  Cf. Gray v. Toyota Motor Sales, U.S.A., Inc.,

48

806 F. Supp. 2d 619, 624-25 (E.D.N.Y. 2011) (franchisor's withholding consent on transfer of

ownership of motor vehicle dealership did not rise to level of crime or tort).  Further, the

allegations plainly admit that defendants acted in their own economic self-interest and therefore

did not act *solely* to harm Zcom.  The Amended Complaint concedes that the Verizon defendants

sought to "enrich themselves, unjustly, by wrongly taking Zcom's business, agents and locations,

with no compensation . . . ."[28]  (Am. Compl. ¶ 709.)  Zcom asserts that Verizon "profited" by

"having all of Zcom's choice locations available to [Verizon], at its discretion to keep or 'gift' to

any agent of its sole choice – without paying Zcom." (Id. ¶ 408.)  Further, when the Agreement

terminated Verizon no longer had to pay the "approximately $750,000 per month in post-pay

'residuals.'"  (Id.)  The Court assumes such payments would have continued had the Agreement

been assigned to a prospective buyer.

   Zcom again concedes in its briefing that Verizon acted, at least in part, due to its

own economic self-interest.  According to Zcom, the refusals were not a business decision to

exercise a contractual right, "they were a malicious and unlawful abuse of contractual discretion

aimed at defalcating Zcom's business for free." (Pl. Mem. at 24.)  Moreover, this assertion

bolsters Verizon's argument that Count V, like Count IV, merely alleges improper performance

of the Agency Agreement, not an independently viable tort claim.  See Carvel II, 3 N.Y.3d at 193

(the extent to which competition is allowed between franchisor and franchisee should be

---

[28] Neither Zcom nor the Verizon defendants cite to or discuss Carvel II, in which the New York Court of Appeals
extensively discussed the tort of interference with prospective business relations.  The Court notes that dicta in
Carvel II distinguished a 1957 Court of Appeals case, A.S. Rampell, Inc. v. Hyster Co., 3 N.Y.2d 369 (1957), which
considered a defendant-manufacturer who enticed away its distributor's employees.  In Rampell, the distributor
claimed that the parties had a "relation of confidence" and the inducement's real purpose was the appropriation of
plaintiff's sales organization and good will.  Carvel II, 3 N.Y.3d at 194.  Unlike in Rampell, the instant case does not
involve conduct that induced others to leave Zcom.  Moreover, Verizon relaxed the Agreement's exclusivity
provision, and Zcom was free to operate under or sell its business to another wireless carrier.  What Verizon
acquired after the termination date was anticipated by the provisions of the Agency Agreement.

determined by the contract, not courts and juries devising a code of conduct after the fact).

The claim is dismissed as to Varghese for the additional reason that Varghese was terminated from his position at Verizon before Zcom received the termination letter and undertook any efforts to sell off its business. The Court rejects Zcom's argument that Varghese set the harmful "wheels in motion" and therefore may be held liable. (Pl. Mem. at 29.) There is no allegation suggesting that after Varghese was terminated, he still sought to harm Zcom by dissuading or obstructing potential business relationships. Carvel II, 3 N.Y.3d at 192 ("[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship.").

The Court concludes that Zcom has failed to plausibly allege a claim for tortious interference with prospective business relations, and Count V is dismissed as to all defendants.

3. Fraud and Misrepresentation Claims (Counts II and III)

Count II alleges the Verizon defendants are liable for "fraud and deceit" and Count III alleges the Verizon defendants are liable for "misrepresentation." Both are fraud-based claims and rely on essentially the same conduct. Accordingly, the parties and the Court address the claims together.

The Verizon defendants directed Zcom and its subagents to participate in the prepaid activation plan, promising certain commissions and incentives in exchange. Verizon, through its employees, provided instructions regarding such prepaid activations. (Am. Compl. ¶ 576.) Zcom was informed that it would receive a commission of $40.00 per prepaid activation and that replenishing the phone's prepaid minutes was "all that was required in order to ensure that the prepaid phone remained active for at least 180 days, thus avoiding 'chargebacks' of

commissions." (Id. ¶¶ 269-273, 619.)  These representations were false because defendants had

no intention of paying commissions to Zcom and its subagents for prepaid activations.  Verizon

did not inform Zcom that a "test call" was necessary to avoid premature deactivation and that it

intended to charge back commissions. (Id. ¶¶ 274-79, 627.)  When the prepaid phones

deactivated automatically, the Verizon defendants charged back commissions from its agents.

(Id. ¶ 593.)  Further, defendants encouraged Zcom's subagents to fraudulently make prepaid

activations under fictitious account names, which would also result in charge backs.

To state a claim for fraud under New York law, a plaintiff must prove "[1] a

misrepresentation or a material omission of fact which was false and known to be false by

defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable

reliance of the other party on the misrepresentation or material omission, and [4] injury."

Premium Mortg. Corp. v. Equifax, Inc., 583 F.3d 103, 108 (2d Cir. 2009) (per curiam)

(alterations in original) (quoting Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421

(1996)).

Additionally, "[i]n alleging fraud or mistake, a party must state with particularity

the circumstances constituting fraud or mistake."  Rule 9(b), Fed. R. Civ. P.  To plead a

fraudulent misstatement, "the plaintiff must (1) specify the statements that the plaintiff contends

were fraudulent, (2) identify the speaker, (3) state where and when the statements were made,

and (4) explain why the statements were fraudulent."  Anschutz Corp. v. Merrill Lynch & Co.,

Inc., 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks and citation omitted).  Although

"[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally,"

Rule 9(b), Fed. R. Civ. P., a plaintiff alleging fraud must plead facts giving rise to "a strong

inference of fraudulent intent."  Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995).

This may be accomplished "by (1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 634 (2d Cir. 1996).

According to the Verizon defendants, Zcom has not and cannot plead it reasonably relied on any of defendants' representations or omissions because Zcom admits it detected fraudulent activations as early as November 2009, urged Verizon to look into the matter, and responded by implementing its own anti-fraud program.[29]  (Verizon Mem. at 16-17.) But even if Zcom was well aware of the fictitious activations carried out by its individual subagents, this does not mean it was aware *Verizon* had orchestrated an institutionalized fraudulent scheme.  Perhaps due to the complaint's volume and lack of specificity, Verizon's argument on the reliance element appears to focus on separate fraudulent activity: the activations made with phony customer names.  The argument does not address what the Court views as the gravamen of the alleged fraud: Verizon never intended to pay out commissions for prepaid activations.  Verizon provided instructions regarding the prepaid activations, which omitted to mention that unless a "test call" was made a phone would deactivate before the end of the chargeback period.  Verizon and its employees encouraged subagents to activate accounts under fictitious names, which would also result in charge backs.

Considering the complaint in a light most favorable to plaintiff, the Court construes Zcom's allegation that it "did not willfully or voluntarily participate in the [Verizon]

---

[29] Verizon asserts that Zcom therefore instead attempts to plead the reliance of its subagents.  Zcom does not dispute Verizon's assertion that Zcom's fraud claims are not viable to the extent they are premised on Verizon's communications with subagents rather than with Zcom itself.  (Verizon Reply at 12 n.6 ("Verizon Wireless demonstrated in its moving brief that [Zcom] lacks standing to assert fraud claims on behalf of its non-party former sub-agents.  [Zcom] cites no contrary authority in its brief." (citation omitted).)

Defendants' scheme" (Am. Compl. ¶ 312) to mean that it did not act to perpetrate the fraud or coerce its subagents into making fraudulent activations, not necessarily that it knew of the entire scheme and chose not to activate any prepaid devices in response.  Indeed, the complaint indicates that Zcom took action in reliance on defendants' representations.  Zcom and its subagents "aggressively marketed and sold prepaid . . . products and services in accordance with instructions provided by the [Verizon] [d]efendants as a direct result of the promises and assurances that the [Verizon] [d]efendants made."  (Id. ¶ 630.)  Other allegations also lead to the reasonable inference that Zcom activated prepaid devices, and did not merely act as an intermediary for payments between Verizon and its subagents.  (E.g., id. ¶ 296 (Verizon "initially realized . . . $19.60 . . . per each prepaid activation done by Zcom and its subagents . . . ."); id. ¶ 300 (Verizon "realized . . . $6.40 per each prepaid activation done by Zcom and/or its subagents . . . .").)  The Court concludes such allegations and others adequately allege the reliance element.

Varghese's separate motion to dismiss raises the argument that allegations in the Amended Complaint fail to meet the particularity requirements of Rule 9(b).  Indeed, Rule 9(b) is not satisfied because the complaint attributes the alleged fraudulent statements to the "Verizon defendants" generally.  See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993) (considering federal securities fraud claim).  The Amended Complaint explains that Varghese was involved in encouraging the prepaid activations, but does not allege he gave any specific instructions to Zcom about the prepaid program.  Thus, plaintiff's allegations regarding Varghese's liability fail to comply with Rule 9(b)'s pleading requirements.  The Court rejects Zcom's assertion that it has adequately pled fraud because the facts are peculiarly within the defendants' knowledge.  Zcom's fraud based claims are grounded in assertions purportedly made

to Zcom by the defendants, and any representations or omissions made by Varghese should be within ZCom's knowledge.

The Court notes that the moving brief submitted by the remaining Verizon defendants does not raise the particularity requirements of Rule 9(b) as a basis for dismissal. These Verizon defendants' reply brief literally mentions "Rule 9(b)," but only in support of its argument that the "Complaint fails to offers (sic) (and its brief fails to cite to) any specific facts to support a plausible allegation of" reliance. (Verizon Reply at 12.) Accordingly, the Verizon defendants, other than Varghese, have not raised the particularity requirements of Rule 9(b) as a defense to the Amended Complaint and the Court need not address whether the Zcom pleads fraud with particularity as to the remaining Verizon defendants.

But even under the less onerous pleading requirements of Rule 8(a), Fed. R. Civ. P., Zcom has failed to state a claim against Pavlicek and Fiocco. While Zcom refers vaguely and generally to the Verizon defendants through the complaint, Pavlicek and Fiocco's individual involvement appears limited to the internal investigation and falsification of evidence. Indeed, Zcom's opposition brief mentions Varghese, Velez, and Broomes multiple times in its discussion of the fraud based claims, while not mentioning Pavlicek and Fiocco.

Counts II and III are dismissed without prejudice as to Varghese, Pavlicek and Fiocco. The motions to dismiss Counts II and III are otherwise denied. Still, the Court remains uncertain whether Counts II and III state anything more than a garden variety breach of contract claim. See, e.g., McKernin v. Fanny Farmer Candy Shops, Inc., 176 A.D.2d 233, 234 (2d Dep't 1991) (considering claim for fraudulent inducement, noting it is "well settled" that where a fraud claim "is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties'

54

agreement, a cause of action sounding in fraud does not lie"). The Court may better assess the issue on a more complete record at the summary judgment stage.

4. Injurious Falsehood (Count VI)

Count VI of the Amended Complaint alleges that all defendants are liable for the tort of injurious falsehood. (Am. Compl. ¶¶ 714-46.) According to Zcom, the Verizon defendants "repeatedly and publicly" made statements that Zcom, *inter alia*, created the fraudulent prepaid account activation scheme, and made its subagents meet certain prepaid activation quotas (id. ¶¶ 728-33); submitted false invoices to Verizon (id. ¶ 734); and bribed and improperly provided gifts to Verizon employees. (Id. ¶¶ 735-37.) Count VI also charges the Verizon defendants with fabricating inculpatory evidence in order to cover up their part in the prepaid activation scheme (id. ¶¶ 716-22), while secreting evidence favorable to Zcom. (Id. ¶¶ 723-24.)

"The action for injurious falsehood lies when one publishes false and disparaging statements about another's property under circumstances which would lead a reasonable person to anticipate that damage might flow therefrom." Cunningham v. Hagedorn, 72 A.D.2d 702, 704 (1st Dep't 1979). Injurious falsehood "requires the knowing publication of false and derogatory facts about the plaintiff's business of a kind calculated to prevent others from dealing with the plaintiff, to its demonstrable detriment." Banco Popular N. Am. v. Lieberman, 75 A.D.3d 460, 462 (1st Dep't 2010). "The gravamen of an injurious falsehood action is a false and disparaging statement about another's property or directly damaging to one's pecuniary interests." Egiazaryan v. Zalmayev, No. 11 Civ. 2670, 2011 WL 6097136, at *10 (S.D.N.Y. Dec. 7, 2011) (Castel, J.).

As Courts in this District have explained, injurious falsehood is "confined to

55

denigrating the quality of the [plaintiff's] business'[s] goods or services," whereas defamation involves "impugn[ing] the basic integrity or creditworthiness of a business." Berwick v. New World Network Int'l, Ltd., No. 06 Civ. 2641, 2007 WL 949767, at *15 (S.D.N.Y. Mar. 28, 2007) (first and second alteration in original) (quoting Henneberry v. Sumitomo Corp. of Am., 415 F. Supp. 2d 423 (S.D.N.Y. 2006) (quoting Ruder & Finn v. Seaboard Sur. Co., 52 N.Y.2d 663 (1981))); see also Korova Milk Bar of White Plains, Inc. v. PRE Properties, LLC, No. 11 Civ. 3327, 2013 WL 417406, at *16 (S.D.N.Y. Feb. 4, 2013); Angio-Medical Corp. v. Eli Lilly & Co., 720 F. Supp. 269, 272-74 (S.D.N.Y. 1989).

　　　　While titled as a claim for "injurious falsehood," allegations in Count VI of the Amended Complaint mainly assert a claim for defamation. The statements at issue each tend to call into question Zcom's integrity, not the quality of Zcom's (and thus, Verizon's) products and services. Apparently persuaded by defendants' arguments on this point, Zcom curiously asserts in its opposition brief that defendants' statements are "defamatory *per se*," and thus, need not comply with the requirement of pleading special damages to state an injurious falsehood claim.[30] (Pl. Mem. at 49.)

　　　　Under New York law, the elements of a defamation claim are (1) a defamatory

---

[30] If construed as a claim for injurious falsehood, Count VI also fails to state a claim because it does not allege special damages with sufficient particularity. A claim for injurious falsehood, unlike a claim for defamation *per se* requires the pleading of special damages. Glazier v. Harris, 99 A.D.3d 403, 404 (1st Dep't 2012) (claim for slander *per se* need not plead special damages); DiSanto v. Forsyth, 258 A.D.2d 497, 498 (2d Dep't 1999) (claim for injurious falsehood must plead special damages). "In pleading special damages, actual losses must be identified and causally related to the alleged tortious act." L.W.C. Agency, Inc. v. St. Paul Fire & Marine Ins. Co., 125 A.D.2d 371, 373 (2d Dep't 1986). Count VI asserts that the Verizon defendants are liable for $150 million. (Am. Compl. ¶ 746.) While the Amended Complaint asserts that defendants' false statements injured Zcom's credibility and reputation in the business community, it does not allege how this resulted in actual losses amounting to $150 million. See Drug Research Corp. v. Curtis Publ'g Co., 7 N.Y.2d 435, 441 (1960) (considering claim for libel on the product: "[s]uch round figures, with no attempt at itemization, must be deemed to be a representation of general damages").

statement of fact, (2) regarding the plaintiff, (3) published to a third party, (4) that is false, (5)

made with the applicable level of fault, (6) causing injury, and (7) not protected by privilege. See

Dillon v. City of New York, 261 A.D.2d 34, 38 (1st Dep't 1999) (citing Restatement (Second) of

Torts § 558).  Accordingly, both torts require a plaintiff to allege that the defendant made a

statement and published it to a third party.  Swinton v. Safir, 93 N.Y.2d 758, 765 (1999)

(defamation not actionable without some dissemination of the alleged defamatory statements);

Banco Popular, 75 A.D.3d at 462 (injurious falsehood requires knowing publication of false

statements).   Regardless of whether the Court construes Count VI as a claim for defamation or

injurious falsehood, the Amended Complaint fails to state a claim because it does not plausibly

allege the publication of any statements to a third party.

   The Amended Complaint makes plain that the Verizon defendants made

statements about Zcom's business practices *to Zcom* in the July 26, 2011 termination letter sent

to Zcom's principal.  Less clear is how any particular Verizon defendant "published" defamatory

statements to a third party.  Numerous allegations in Count VI begin with the phrase "[Verizon]

falsely stated, repeatedly and publicly, that . . . ."  (E.g., Am. Compl. ¶¶ 727, 729, 730, 732, 733,

734, 736, 737.)  Yet the 175-page, 862-paragraph complaint does not put forth any

*nonconclusory* factual allegations regarding the publication of such defamatory statements to

third parties.  Indeed, it remains unclear *who* affiliated with Verizon made such statements, *to*

*whom* such statements were made, and *how* they were communicated.  The mere allegation that

the Verizon defendants undertook "a strategy of prejudicing the reputation and credibility of

Zcom among Zcom's [subagents] and within the telecommunications community" (id. ¶ 726), is

not sufficient to withstand a motion to dismiss.[31]  For the first time in its opposition brief, Zcom

asserts that "it is without question a fact" that the Verizon defendants reiterated the false

statements about why Zcom was going out of business to the three prospective buyers of Zcom.

(Pl. Mem. at 48 (citing Am. Compl. ¶¶ 687-710).)  Whether or not this is "without question a

fact," it is not a fact alleged in the Amended Complaint.

Varghese argues in his separate motion to dismiss that after he was terminated by

Verizon, he "could not have influenced any public statements made by" Verizon regarding the

reasons for Zcom's termination.  (Varghese Mem. at 14.)  The Court concludes Zcom has not

plausibly alleged Varghese made any particular false statements to third parties regarding

Zcom's termination, or that Varghese caused Verizon to make such false statements.

Thus, Amended Complaint does not plausibly allege a claim for injurious

falsehood (or defamation) and Count VI is dismissed as to all defendants.

5. Unjust Enrichment (Count VII)

Finally, the Amended Complaint asserts a claim for unjust enrichment against the

Verizon defendants because Verizon "orchestrated the downfall of Zcom" in order to "take

Zcom's good will, business relationships, subagents and customer base without any

compensation paid to Zcom." (Am. Compl. ¶ 754.)  Verizon profited from the operations put

into place by Zcom, because it continues to keep Zcom's customers but no longer pays residuals

---

[31] To the extent Pavlicek and Fiocco fabricated evidence about Zcom, the complaint indicates such efforts were undertaken with the approval of Verizon and does not allege with sufficient facts who other than those affiliated with Verizon would have viewed specific false evidence.  Zcom does make numerous references to a package delivered by an "Anonymous Benefactor" containing evidence that Verizon, Bruno Pavlicek and Shelly Bhumitra were collaborating and feeding false information about Zcom.  The contents of the package are annexed to the Amended Complaint as Exhibit 10, and include, *inter alia*, a random assortment of e-mails, photos, and diagrams. The allegations in Count VI do not identify any particular statement made by a Verizon employee in Exhibit 10.  If there is a defamation or injurious falsehood claim lurking somewhere in these e-mails, Zcom has not properly identified it to the Court.

to Zcom. (Id. ¶ 752-53.) Zcom urges that Verizon and the individual Verizon defendants have

benefitted "outside the scope of the contract" via "theft" of Zcom's business. (Pl. Mem. at 50.)

"To prevail on a claim for unjust enrichment in New York, a plaintiff must

establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and

good conscience' require restitution." Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000). A

claim for unjust enrichment, however, cannot lie where the subject matter of the claim is

governed by a valid and enforceable written contract between the parties. Beth Israel Med. Ctr.

v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 587 (2d Cir. 2006).

Here, provisions of the 2008 Agency Agreement between Zcom and Verizon

cover the dispute between all parties. As discussed in substantial detail, Paragraph 8 provides

the circumstances under which the parties may terminate the Agreement. (Am. Compl. Ex. 4.)

Paragraph 10.8 explains that Zcom must obtain Verizon's approval before assigning, delegating

or transferring the Agreement. (Id.)   With regard to Zcom's goodwill and customers, the

Agreement specifically provides: (1) "Upon Activation of a Subscriber, that Subscriber shall

become the customer of [Verizon] for [Verizon] Service" (id. ¶ 2.10); (2) the "Agent has no

exclusive rights to the Area"; and (3) the Agent acknowledges that Verizon has the "right to

market the [Verizon] Service in the Area and elsewhere . . . on any terms it chooses." (Id. ¶ 2.3.)

Even if Verizon and the individual Verizon defendants benefitted to the detriment

of Zcom, provisions contained in the 2008 Agency Agreement govern the conduct underlying

Zcom's unjust enrichment claim against the Verizon defendants. Therefore, Zcom's recovery is

limited to its contractual remedies. Count VII is dismissed.

IV. Varghese's Motion to Strike Allegations in the Amended Complaint

Varghese moves in the alternative to strike paragraphs 391 through 402 of the

Amended Complaint, pursuant to Rule 12(f), Fed. R. Civ. P.  The Court has now dismissed all claims asserted against Varghese.  To the extent Zcom wishes to replead, the Court cautions it against including immaterial allegations such as the assertion in Paragraph 402(c).

## CONCLUSION

As to Verizon, the motion to dismiss (Docket No. 42) is granted, except as to the claims for fraud (Counts II and III).  As to Broomes and Velez the motion to dismiss (Docket No. 42) is granted except as to the claims for fraud (Counts II and III).  As to Pavlicek and Fiocco, the motion to dismiss (Docket No. 42) is granted.  Varghese's motion to dismiss (Docket No. 46) is granted.  All claims asserted against Ajay Bhumitra, Shelly Bhumitra, and Poonam Sawnhey are severed from the Amended Complaint and remanded to the state court from which they were removed because the Court declines to exercise supplemental jurisdiction over such claims.  The Clerk is directed to terminate their motions to dismiss.  (Docket Nos. 47, 48.)  Within twenty (20) days of this Memorandum and Order, Zcom must move for leave to replead and annex the proposed amended pleading.  Again, the Court cautions Zcom to comply with the pleading requirements set out in Rule 8(a), Fed. R. Civ. P.  Any proposed amended pleading may not exceed 30 pages.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       June 4, 2013